# EXHIBIT E

Westlaw.

Slip Copy

Page 1

2005 WL 627796 (E.D.Pa.)

**(Cite as: 2005 WL 627796 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Nancy YOUNG
v.
RECONSTRUCTIVE ORTHOPAEDIC
ASSOCIATES, II, P.C., et al.
**No. Civ.A. 03-2034.**

March 16, 2005.

Mark W. Tanner, Feldman Shepherd Wohlelernter & Tanner, Philadelphia, PA, for Plaintiff.

Rachelle M. Wassel, Meyer Darragh Buckler Bebenek & Eck, PLLC, Pittsburgh, PA, for Defendant.

*MEMORANDUM OF DECISION*

RUETER, Magistrate J.

*1 Presently before the court is defendant Reconstructive Orthopaedic Associates, II, P.C.'s ("ROA") Motion for Summary Judgment on Counts Two through Seven of plaintiff's Second Amended Complaint (Document Nos. 46 and 47). After oral argument on January 11, 2005, and for the reasons set forth below, ROA's Motion for Summary Judgment is GRANTED, and judgment is entered in favor of ROA and against plaintiff.

I. *FACTS*

The following facts, except as specifically noted, are undisputed. On January 11, 1999, plaintiff was hired by Specialty Care Network ("SCN") as a medical assistant. At the time plaintiff was hired,

she met with SCN's payroll supervisor, Marian Grasso, who explained the compensation and benefits available to plaintiff. (Grasso Dep. at 24-25.) Ms. Grasso informed plaintiff that within ninety days, she would be eligible to be covered by both a long term and a short term disability plan with NML. *Id.* at 39. [FN1]

> FN1. These disability plans were "non-contributory," meaning that the employer paid the entire premium and there were no deductions from the employees' pay in consideration for the coverage. (Grasso Dep. at 12.)

Ms. Grasso left SCN in January 1999, and was replaced by Maryann Maloney. [FN2] (Grasso Dep. at 9, 23.) In spring 1999, ROA purchased certain assets of SCN, and ROA became plaintiff's employer. (West [FN3] Dep. at 6-17.) A new long term disability plan was implemented in June 1999 and is at issue in this case (the "LTD Policy"). Under the new LTD Policy, the employees paid the premiums through payroll deductions. (West Dep. at 19; Melsi [FN4] Dep. at 15.) ROA informed its employees of the change in disability plans. (Maloney Dep. at 21-22.) Employees were given thirty days to submit an enrollment card to ROA, which ROA then would forward to NML. (Melsi Dep. at 35, 58.) During this open enrollment period, employees who previously had been enrolled in SCN's disability plan and were part of the transition, would have been enrolled in the new plan without proof of insurability if they submitted an enrollment card. (Melsi Dep. at 31-41.)

> FN2. Between April 1999 and February 2003, Maryann Maloney was controller of ROA. (Maloney Dep. at 12-13.)

> FN3. At all times relevant hereto, Michael West was the Chief Executive Officer of ROA. (West Dep. at 9.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 627796 (E.D.Pa.)

(Cite as: 2005 WL 627796 (E.D.Pa.))

> FN4. Anthony Melsi was the NML agent who sold the disability policy to ROA. (Melsi Dep. at 8-10.)

ROA bore responsibility to explain the enrollment process to its employees, to collect the enrollment cards and to forward them to NML. *Id.* at 58. Ms. Maloney distributed enrollment cards "to managers with instructions to have all of their employees fill them out and return them." (Maloney Dep. at 21, 29.) Every employee was to return a card indicating his or her enrollment in the plan or his or her decision to waive enrollment. The original enrollment cards were kept in the possession of ROA and copies were sent to Mr. Melsi by facsimile. (Melsi Dep. at 41.) Ms. Maloney compared the enrollment cards in her possession to the list of employees who had been enrolled in SCN's disability plan. (Maloney Dep. at 30.) Since plaintiff had never been enrolled under SCN's disability plan, Ms. Maloney did not realize that she had not received an enrollment card from plaintiff, and did not contact plaintiff to ascertain whether she wanted disability coverage. *Id.* at 30-32. As discussed in greater detail below, plaintiff contends that she timely submitted an enrollment card to ROA. (Young Dep. at 99, 101, 131-33, 142.)

**\*2** Mr. Melsi testified that plaintiff's name was never added to the list of employees covered under the disability policy. (Melsi Dep. at 78-79.) According to Mr. Melsi, it was SCN's responsibility to notify NML when a new employee was hired. *Id.* at 19-22.

In April 2000, plaintiff, with her immediate supervisor Beth DeLone, met with Ms. Maloney in her office. (Maloney Dep. at 56-57.) Plaintiff explained that she had just learned that no disability insurance deductions were being taken from her pay and requested an explanation. *Id.* at 57. Ms. Maloney checked her files and found no enrollment card for plaintiff. *Id.*

At this point in the recitation of facts, plaintiff and ROA offer differing versions of what transpired. ROA contends that plaintiff admitted to Ms. Maloney that she had not submitted an enrollment card. *Id.* at 58, 60. Ms. Maloney testified that Ms. DeLone asked if there was anything Ms. Maloney could do to help plaintiff. *Id.* at 59. Ms. Maloney stated that she met with Mr. West, ROA's CEO, and it was decided jointly to have plaintiff complete and backdate an enrollment card which ROA then would present to NML as timely received. *Id.* at 66-67. Ms. Maloney could not recall who devised the plan to backdate the enrollment card. However, she testified that both she and Mr. West agreed with this course of action, [FN5] and that plaintiff also agreed to the backdating scheme. *Id.* at 66-67, 75-76, 79, 106. Ms. Maloney told her contact at NML that plaintiff had completed and timely submitted an enrollment card, and persisted in this falsehood when further questioned by NML. *Id.* at 86, 91-94. Mr. West admitted that he also lied to Mr. Melsi regarding this matter. (West Dep. at 48-50.)

> FN5. Ms. Maloney testified that she wanted to help plaintiff because she understood that plaintiff was "having problems at home." (Maloney Dep. at 68-69.) She also testified that during the transition from SCN to ROA, employees had some negative feelings towards SCN. *Id.* at 68. She believed that helping plaintiff would show that ROA cared about its employees. *Id.*

Plaintiff disputes ROA's version of the facts. Plaintiff contends that she did, in fact, submit a timely enrollment card for the LTD Policy in June 1999. (Young Dep. at 99, 101, 131-33, 142.) At her deposition, plaintiff testified that she informed Ms. DeLone that deductions for disability premiums were not being taken from her pay. *Id.* at 98-99. According to plaintiff, Ms. DeLone spoke with Ms. Maloney. Subsequent to this conversation, Ms. Delone told plaintiff that a mistake had been made and the disability deductions would begin. *Id.* at 99-100. Plaintiff represented that, a few days later, Ms. Maloney personally reiterated this information. *Id.* Plaintiff denies she told Ms. Maloney that she had not completed and submitted the enrollment card in a timely manner. *Id.* at 131-32.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 627796 (E.D.Pa.)

**(Cite as: 2005 WL 627796 (E.D.Pa.))**

Page 3

It is undisputed, however, that Mr. Melsi, on behalf of NML, did not receive an enrollment card for plaintiff during the enrollment period. (Melsi Dep. at 46-47, 61-62.) In April 2000, ROA began taking payroll deductions from plaintiff's pay for disability premiums. [FN6] (Young Dep. at 100.) In light of the statements from Ms. Maloney and Mr. West, NML continued to investigate ROA's contention that plaintiff had enrolled in the disability plan in a timely manner. NML also requested that plaintiff submit an application and statement concerning her medical history so that it could determine whether plaintiff met the underwriting guidelines for coverage. (Gorsek [FN7] Dep. at 21.) Plaintiff completed this application, and Ms. Maloney submitted it to NML on August 23, 2000.

> FN6. When it was determined that plaintiff had not enrolled in the disability plan, the amounts deducted from plaintiff's pay were refunded by ROA. (Young Dep. at 104.)

> FN7. Debra Gorsek was an associate disability benefits analyst for Standard Insurance Company. (Gorsek Dep. at 7.)

**\*3** In November 2000, plaintiff became unable to work due to Parkinson's Disease. Plaintiff completed a claim form requesting the payment of benefits under the LTD Policy on November 24, 2000. (Pl.'s Mem. Opp. Summ. J., Ex. O.) On December 5, 2000, NML notified plaintiff that it denied her application for coverage under the LTD Policy because she had a history of cancer. *Id.* Ex. Q.

On January 3, 2001, Ms. Maloney sent a letter to NML in which she again misrepresented that plaintiff had completed an enrollment card and that ROA had submitted it to NML all in a timely manner. *Id.* Ex. R. [FN8] Plaintiff received the final denial of her application from NML's quality assurance unit in a letter dated January 17, 2003. *Id.* Ex. U.

> FN8. The letter attached as Exhibit R to plaintiff's memorandum of law in opposition to the motion for summary

judgment is mistakenly dated January 3, *2000.*

## II. *PROCEDURAL HISTORY*

Plaintiff filed a Second Amended Complaint against ROA alleging breach of contract (Count Two), fraud and/or negligent misrepresentation (Count Three), negligence (Count Four), breach of the covenant of good faith and fair dealing (Count Five), violations of Pennsylvania's Wage Payment and Collection Law, pursuant to 43 Pa. Cons.Stat. Ann. § 2601, *et seq.* (Count Six), and breach of fiduciary duties pursuant to section 404 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1104 (Count Seven). [FN9]

> FN9. The Second Amended Complaint also contained a cause of action against NML alleging breach of fiduciary duty in violation of ERISA, citing section 502, 29 U.S.C. § 1132 (Count One). By Memorandum and Order dated January 19, 2005, this court granted NML's Motion for Summary Judgment on Count One of the Second Amended Complaint. As noted in the Memorandum, plaintiff admitted at the oral argument on the motion that she had no evidence that ROA timely submitted an enrollment card for plaintiff to NML and, therefore, she had no "cognizable claim again NML." (N.T., 1/11/05, at 15.)

In its Motion for Summary Judgment, defendant ROA argues that: (1) plaintiff's state law causes of action in Counts Two through Six are preempted under section 514 of ERISA; [FN10] and (2) summary judgment should be granted on plaintiff's claim under ERISA (Count Seven) because the relief she seeks is not available under any part of section 502 of ERISA, 29 U.S.C. § 1132.

> FN10. In the alternative, ROA also alleges that even if these claims were not preempted under ERISA, they fail as a matter of law. Because the court finds that plaintiff's state law claims are preempted by ERISA § 514, the court need not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 627796 (E.D.Pa.)

**(Cite as: 2005 WL 627796 (E.D.Pa.))**

 address ROA's alternative argument.

III. *SUMMARY JUDGMENT STANDARD*

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has ruled that Rule 56(c) requires "the threshold inquiry of determining whether there is a need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reaso