H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.
Joseph ALAIRE, et al., Plaintiffs,
v.
AMOCO CORPORATION, Defendant.
**No. 90 C 611.**

May 7, 1990.

*MEMORANDUM OPINION AND ORDER*

SHADUR, District Judge.

***1** Amoco Corporation ("Amoco") has moved to dismiss, on grounds of nonexhaustion of internal plan procedures, the claims of all plaintiffs in this action--16 of Amoco's ex-employees--for severance benefits under Amoco's Service Allowance Policy (the "Policy"). [FN1] For the reasons stated in this memorandum opinion and order, Amoco's nonexhaustion defense is rejected and its motion to dismiss on that ground is denied.

*Facts* [FN2]

All plaintiffs were employees of Amoco's wholly-owned subsidiary Amoco Oil Company, [FN3] who were notified of their impending termination November 12, 1984, put in their last day at work later that month and were actually terminated effective January 1, 1985. At that time Amoco had the Policy in effect--and the Policy described its own purpose as "to provide severance allowances for employees whose services are permanently terminated for causes which are no fault of the employee involved." [FN4]

Amoco Mem. 4-5 is reasonably candid about the absence of any advice to plaintiffs about the existence or nature of the asserted internal claims procedure that it now says was not exhausted:

In the present case, Plaintiffs admittedly were not told about the claims procedure while they were employed by Amoco because they were not covered by the Policy.

And when on June 23, 1988 plaintiffs' attorneys sent a demand letter to Amoco on behalf of all plaintiffs, and again when the same attorneys sent a January 26, 1989 follow-up letter, Amoco ignored them entirely--it did not even respond to either demand. On that score Amoco Mem. 5 continues:

In any event, Amoco readily admits that it did not respond to Mr. Wilson's June 23, 1988 letter (or a follow-up letter) and, accordingly, may not have complied with its own procedure.

*Exhaustion*

*Kross v. Western Electric Co.,* 701 F.Supp. 1238, 1244 (7th Cir.1983) teaches that given ERISA's statutory silence "as to whether exhaustion of administrative remedies is a prerequisite to bringing such a civil action [to redress ERISA violations]," it necessarily follows that "application of the exhaustion doctrine in ERISA cases by requiring a claimant to exhaust administrative remedies prior to bringing suit is a matter within the discretion of the trial court." During that same year, in *Lieske v. Morlock,* 570 F.Supp. 1426, 1429 (N.D.Ill.1983) (citations omitted) this Court's colleague Honorable Nicholas Bua followed his citation to *Kross* with this accurate statement of two considerations that bear upon the exercise of that discretion:

However, two exceptions to the exhaustion requirement exist. First, exhaustion will be excused when resort to such procedures would be futile, and second, the exhaustion requirement is excused when a claimant is wrongfully denied meaningful access to administrative procedures. [FN5]

And since that time, in the course of affirming a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decision by this Court dealing in part with an ERISA claim, *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 466 (7th Cir.1986) has reconfirmed both the broad scope of discretion given district courts in applying the administrative exhaustion doctrine (citing *Kross*) and the existence of the recognized futility exception to the exhaustion doctrine. [FN6]

***2** As *Lieske* suggests, the law does not compel administrative exhaustion when it would be a meaningless formality, a real exercise in futility. Here Amoco itself is the plan administrator, and Amoco has taken the flat position that plaintiffs are not even covered by the Policy and are therefore not entitled to the benefits they claim. It would involve nothing more than a charade if plaintiffs were forced to jump through an extra hoop only to obtain the same statement of rejection that they have already received via Amoco's Answer to their Complaint.

*Conclusion*

Exhaustion of administrative remedies as a prerequisite to invoking the judicial process may often represent a desirable requirement as a matter of policy--it is intended to assure that courts are not forced to deal with claims that may be fully disposed of without legal action, and also to provide courts with the benefit of the plan administrator's interpretations of a plan's administrative provisions in cases that do end up in litigation. [FN7] But under all the circumstances here, Amoco surely has not properly established a justification for requiring exhaustion as a prerequisite to this action. Its affirmative defense in that respect is rejected, and its Rule 12(b)(6) motion to dismiss this action on nonexhaustion grounds is denied.

FN1. Amoco also contends that the Policy did not cover plaintiffs' termination in any event. That issue is not nearly ripe for disposition and will not be touched upon in this opinion.

FN2. Because Amoco's motion is predicated on Fed.R.Civ.P. ("Rule") 12(b)(6), the current ruling is bounded by the matters set out in plaintiffs' Complaint. As the text will reflect, however, this Court has taken into account some of the documents referred to in the parties' memoranda to avoid the need to replow the same field when those documents (which are really undisputed) properly find their way into the record.

FN3. Amoco Mem. 3 has waived any potential defenses based on the identity of the corporation involved and the fact that this action is brought against Amoco rather than its subsidiary. This opinion will therefore use "Amoco" indiscriminately to refer to both the parent and the subsidiary corporation.

FN4. All plaintiffs were terminated as a result of a contraction of Amoco's operations, not because of any fault on their part.

FN5. [Footnote by this Court] Plaintiffs' counsel contends that this case fits both of those exceptions. That certainly appears likely, but given the unquestionable applicability of the futility exception it is unnecessary to decide on the second exception as well.

FN6. Amoco cites *Grossmuller v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Local 813,* 715 F.2d 853, 859 (3d Cir.1983) for the proposition that exhaustion of administrative remedies is the preferred course of action even where the administrator has been guilty of procedural violations. Whether or not that would strike a responsive chord in our own Court of Appeals, in this instance the further discussion in the text reflects that the exercise of sound discretion does *not* call for such a result here.

FN7. There is of course one other element of an ERISA claim that may be impacted by such an administrative interpretation. That has to do with the legal standard by which a denial of benefits is to be reviewed when the case then ends up before a court (see *Firestone Tire & Rubber Co. v. Bruch,* 109 S.Ct. 948, 953-56

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1989) and the extensive discussion of the standard-of-review issue by our Court of Appeals in *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* No. 89-1822, slip op. at 6-10 (7th Cir. Apr. 27, 1990)).

1990 WL 70486 (N.D.Ill.)

**Motions, Pleadings and Filings** **(Back to top)**

- 1:90CV00611 (Docket) (Feb. 05, 1990)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Anita F. ALBERTS, Plaintiff,
v.
INDEPENDENCE BLUE CROSS AND PENNSYLVANIA BLUE SHIELD, Defendants.
**No. CIV.A. 96-CV-3926.**

Nov. 22, 1996.

*MEMORANDUM-ORDER*

GREEN.

***1** Presently before this court is Defendants' Motion to Dismiss Plaintiff's Pennsylvania state law claims. For the reasons set forth below, the Defendants' motion will be GRANTED.

I. Factual Background

Plaintiff and her partner in the law firm purchased a health insurance policy from Defendants for their families and their one employee. In January 1996, Plaintiff had surgery performed at a New York hospital. The doctors who performed the surgery were not in Defendants' network of doctors. Plaintiff alleges that instead of paying the policy mandated 80% of the out-of-network, non-participating doctors' regular charges, Defendants paid approximately 20% of the outstanding medical bills based on an undisclosed payment schedule.

In an amended complaint, seeking injunctive and declaratory relief, Plaintiff alleges violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. §§ 201-1 to -9.2, violation of Pennsylvania's bad faith insurance practices statute, 42 Pa.C.S.A. § 8371, breach of contract, and common law civil conspiracy. Defendants have moved for dismissal by alleging that Plaintiff's state law claims are preempted under ERISA. 29 U.S.C. § 1144(a).

II. Discussion

All factual allegations contained in the complaint as well as all reasonable inferences that may be drawn from those allegations must be accepted as true and viewed in the light most favorable to the non-moving party when reviewing a Rule 12(b)(6) motion. *Hishon v. King & Spalding,* 467 U.S. 69 (1984); *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855 (3d Cir.1994); *Rocks v. City of Philadelphia,* 868 F.2d 644 (3d Cir.1989). The motion should be denied unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of her claims which would entitle her to relief. *Colney v. Gibson,* 355 U.S. 41 (1957).

Taking all of Plaintiff's allegations as true, she has failed to show that her state law claims are not preempted by 29 U.S.C. § 1144(a). The Supreme Court has recognized that ERISA's preemption clause is broad in it scope. *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133 (1990); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41 (1987). Section 1144(a) states that "the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." The phrase "relate to" is given "its broadest common-sense meaning, such that a state law 'relates to a benefit plan' in the normal sense of the phrase if it has a connection with or reference to such a plan." *Pilot Life Ins. Co.,* 481 U.S. at 47. A state law claim may be preempted where "the existence of the benefit plan is a critical factor in establishing liability." *Ingersoll-Rand Co.,* 498 U.S. at 139-40.

Each of Plaintiff's state law claims relate to defendant's health benefit plan. Plaintiff's claim under the U TPCPL relates to her health benefit plan. The UTPCPL makes it unlawful to engage in "unfair methods of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

competition and unfair or deceptive acts or practices of trade or commerce" through misrepresenting the services or failing to comply with the terms of the contract. 73 Pa. Stat. Ann. §§ 201-3, 201-2(4)(ii), (v), (vii), and (xiv). Plaintiff alleges that Defendants "intentionally and knowingly concealed their secret benefit schedule" and that they "used and continue to use confusing and misleading language in their contracts to falsely describe the benefits they would pay." Plaintiff's complaint, p. 7. Plaintiff also alleges that Defendants "intentionally and knowingly committed the above acts" to attract subscribers to its plan by "promising them the choice" of using non-plan providers and facilities at a reduced rate. Plaintiff's complaint, p. 7. Through her own allegations, Plaintiff discloses that "the existence of the [health] benefit plan is a critical factor in establishing liability" under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. *Ingersoll-Rand Co.,* 498 U.S. at 139-40. Although Plaintiff alleges that some of the misrepresentations occurred prior to the purchase of the health benefit plan, the misrepresentations relate to performance--reimbursement for the costs of the operation--under the health benefit plan.

***2** Likewise, Pennsylvania's "bad faith" statute, 42 Pa.C.S.A. § 8371, states that "in an action under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions...." Instead of showing how the statute does not relate to the health benefit plan, Plaintiff relies on the plan, as an "insurance policy," for the basis of her coverage under the statute. Accordingly, Plaintiff's claim is preempted by 29 U.S.C. § 1144(a) because it relates to her health benefit plan which is already covered under ERISA.

Plaintiff's breach of contract and common law civil conspiracy claims similarly relate to Defendants' performance, or of the lack thereof, under the health benefit plan. Accordingly, Plaintiff's state law causes of action against Defendants will be dismissed.

An appropriate Order follows.

*ORDER*

AND NOW, this day of November, 1996, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Plaintiff's state law causes of action (Count I--breach of contract; Count II--violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law; Count IV--bad faith insurance practices; and Count V--conspiracy) is GRANTED.

1996 WL 677512 (E.D.Pa.)

**Motions, Pleadings and Filings** (Back to top)

• 2:96cv03926 (Docket)
(May. 23, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Texas, Dallas Division.
Linda ERWIN, Individually and as Representative of the Estate of Charles H. Erwin, Plaintiff,
v.
U-HAUL INTERNATIONAL, INC., U-Haul Co., and U-Haul Company of Texas, Defendants.
**No. CIV.A.3:01-CV-2218-M.**

Feb. 22, 2002.

MEMORANDUM ORDER AND OPINION

LYNN.

***1** On September 28, 2001, Plaintiff filed suit in state court against U-Haul International, Inc., U-Haul Co., and U-Haul Company of Texas ("the U-Haul Defendants"), alleging common law fraud, conspiracy, common law and statutory bad faith, and third party beneficiary claims. On November 5, 2001, the U-Haul Defendants removed the action to federal court, and, four days later, filed a Motion to Dismiss Plaintiff's claims as ERISA-preempted. Having considered the U-Haul Defendants' Motion to Dismiss, as well as the Response and Reply thereto, the Court is of the opinion that the Motion should be GRANTED in part and DENIED in part. The Court finds that Plaintiff's common law fraud, [FN1] conspiracy, [FN2] common law and statutory bad faith, and third party beneficiary claims [FN3] are preempted by ERISA, as they relate to U-Haul's alleged involvement, as Plaintiff's employer, in a denial of benefits under an ERISA-qualified health plan. Because Plaintiff requests compensatory and punitive damages for these violations, the Court cannot recharacterize the claims as an ERISA claim. [FN4] Thus, the Court determines that it must dismiss these claims. However, the Court finds that the fraudulent inducement claim against Defendants is not preempted by ERISA and therefore should not be dismissed.

FN1. *See* Order of October 1, 2001, *Erwin v. Texas Health Choice, et al.,* Civil Action No. 3:01-CV-380-M (finding Plaintiff's common law fraud claim in related case to be preempted by ERISA).

FN2. Plaintiff may note that the Court did not dismiss the conspiracy claim in Plaintiff's case against Texas Health Choice (f/k/a HMO Texas), Kaiser Foundation Health Plan of Texas, Permanente Medical Association of Texas, The Medical Group of Texas (f/k/a TexMed Physicians), and Sierra Health Services ("the Insurer Defendants") in *Erwin v. Texas Health Choice, et al.,* Civil Action No. 3:01-CV-380-M. The Court refused to dismiss the conspiracy claim against the Insurer Defendants because Plaintiff alleged that part of Defendants' liability stemmed from their involvement in a conspiracy to provide inadequate health care to Mr. Erwin. Because that allegation related to Defendants' role as health care providers, rather than health care benefit payors, the Court did not dismiss the conspiracy claim in that case. However, because Plaintiff does not allege that the U-Haul Defendants provided any health care to Mr. Erwin, but rather alleges that, as a party to Mr. Erwin's ERISA health care plan, the U-Haul Defendants are responsible for the plan's denial of payment for Mr. Erwin's liver transplant, the conspiracy claim against the U-Haul Defendants is based solely on the U-Haul Defendants' connection to the ERISA plan and is therefore preempted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3. *See* Order of February 22, 2002, *Erwin v. Texas Health Choice, et al.,* Civil Action No. 3:01-CV-380-M (finding Plaintiff's common law and statutory bad faith claims and third party claims to be preempted by ERISA).

FN4. *See* Order of October 1, 2001, *Erwin v. Texas Health Choice, et al.,* Civil Action No. 3:01-CV-380-M (finding that Plaintiff's common law fraud claim could not be recharacterized as an ERISA claim because Plaintiff requested compensatory and punitive damages for the violation).

Plaintiff alleges that Defendants fraudulently induced Mr. Erwin to accept employment with U-Haul "by concealing and/or misrepresenting the contract terms of" the health care plan Mr. Erwin would participate in as a U-Haul employee. On the issue of whether ERISA preempts this claim, the Court finds instructive the Sixth Circuit's decision in Perry v. P*I*E Nationwide, Inc., 872 F.2d 157 (6th Cir.1989). In *Perry,* the plaintiffs alleged that their employer, P*I*E, had fraudulently induced them to join the employee stock investment plan P*I*E had created by misrepresenting the terms of the plan in an attempt to gain the plaintiffs' consent to join. *Id.* at 159. Affirming the district court, the Sixth Circuit held the fraudulent inducement claim was not ERISA-preempted. *Id.* at 161-62. The *Perry* court based its holding in part on the premise that " 'where the state law has only an indirect effect on the plan *and* where it is one of general application which pertains to an area of important state concern, the court should find there has been no preemption." ' *Id.* at 161 (quoting Provience v. Valley Clerks Trust Fund, 509 F.Supp. 388, 391 (E.D.Cal.1981)). The court then reasoned that "[i]t may well be argued that state common law actions based on fraud ... do concern important state interests and have general application to state causes of action rather than to federal claims." *Id.* Furthermore, the Sixth Circuit noted approvingly the district court's finding that " '[p]reemption by ERISA ... does not apply to alleged common law actions of fraud or misrepresentation 'to get the plaintiffs to join the plan," ' because such conduct occurs before the plaintiffs become participants in the plan. Id. at 159. The Court finds the *Perry* court's reasoning applicable to the case at hand.

***2** Although the Fifth Circuit has not handed down a decision that is as directly on point as *Perry,* in Perkins v. Time Insurance Co ., 898 F.2d 470, 473 (5th Cir.1990), which favorably cites the *Perry* court's holding, the Fifth Circuit found that a plaintiff's fraudulent inducement claim against an insurance agent for misrepresenting the terms of the ERISA plan to convince plaintiff to join the plan was not preempted. The *Perkins* court reasoned,

> [w]hile ERISA clearly preempts claims of bad faith as against insurance companies for improper processing of a claim for benefits under an employee benefit plan ... we are not persuaded that this logic should extend to immunize agents from personal liability for their solicitation of potential participants in an ERISA plan prior to its formation. Giving the ERISA 'relates to' preemption standard its common-sense meaning, we conclude that a claim that an insurance agent fraudulently induced an insured to surrender coverage under an existing policy, to participate in an ERISA plan which did not provide the promised coverage, 'relates to' that plan only indirectly.... *See* *Perry v. P*I*E Nationwide, Inc.*, 872 F.2d 157, *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990) (state claims alleging fraudulent inducement to participate in an ERISA plan are not preempted by ERISA).

*Id.* (certain citations omitted); *see also* *Hubbard v. Blue Cross & Blue Shield Assoc.*, 42 F.3d 942 (5th Cir.1995) (holding that a plaintiff's fraudulent inducement claim, based on allegations that the parent company of her insurer disseminated false advertising in regard to the plaintiff's insurer in an attempt to induce the plaintiff to join the insurance plan, was not ERISA-preempted).

The above-cited cases persuade the Court that Plaintiff's fraudulent inducement claim, which is based on alleged misrepresentations made by Mr. Erwin's future employer in an attempt to get Mr. Erwin to accept U-Haul's job offer, is not preempted by ERISA. Although the fraudulent inducement claim necessarily touches upon the existence of the ERISA plan, it is related to the plan only indirectly. Plaintiff's claim does

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not concern Mr. Erwin's right to benefits under the plan-an issue which would, of course, be preempted-but instead involves conduct of U-Haul that occurred prior to Plaintiff's status as a participant in the plan.

In conclusion, the Court GRANTS Defendants' Motion to Dismiss the common law fraud, conspiracy, common law and statutory bad faith, and third party beneficiary claims, but DENIES the Motion to Dismiss the fraudulent inducement claim. Because the Court is dismissing all ERISA-preempted claims, and Plaintiff has not pleaded a claim against the U-Haul Defendants under ERISA, the Court lacks jurisdiction over this case and therefore REMANDS it to the 162nd District Court of Dallas County, Texas for further adjudication.

SO ORDERED.

2002 WL 265075 (N.D.Tex.)

**Motions, Pleadings and Filings** **(Back to top)**

• 3:01cv02218 (Docket)
(Nov. 05, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, M.D. Pennsylvania.
Marie J. KRINER, Individually and on behalf of all those similarly situated, Plaintiffs
v.
GTE PRODUCTS CORP., Defendant.
**No. 1:CV-89-907.**

July 10, 1990.

*OPINION*

MUIR, District Judge.

***1** This case is on the September, 1990, trial list. On May 17, 1989, Plaintiff Marie J. Kriner initiated this action by filing a complaint seeking individual and class relief in the Court of Common Pleas of Lycoming County against Defendant GTE Products Corporation (GTE). On June 14, 1989, GTE filed a notice of removal of the case to this Court. GTE claimed that the complaint alleged an entitlement to benefits under a severance pay plan which is an employee welfare benefit plan as defined in the Employee Retirement Income and Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, et seq. (1985). By order dated June 27, 1990, the Court determined that this case would not be maintained as a class action.

Both parties filed motions for summary judgment and briefs on the motions. By order dated April 25, 1990, the Court directed the parties to file supplemental briefs on the issue of whether Kriner had exhausted her administrative remedies or why she was not required to do so. Kriner filed a supplemental brief on May 2, 1990. GTE filed a supplemental brief in response to Kriner's brief on May 11, 1990. Kriner was entitled to file a supplemental reply brief by May 18, 1990, but elected not to file one.

Kriner states that she was an employee at the GTE plant in Montoursville, Pennsylvania, and that GTE laid off her and approximately 80 other employees on or about November 25, 1988. Kriner alleges that GTE formed a contract with her and the other employees in 1981 when it established a severance pay policy for hourly employees in the event of a plant closing. According to Kriner in early November, 1988, before GTE laid her off and laid off the other employees, GTE distributed an Employee Handbook which summarized the procedures established in 1981. Kriner contends that after GTE laid her off it established a new procedure regarding severance pay on January 6, 1989, but did not communicate the procedure to the employees. Kriner states that GTE approved the closing of the Montoursville plant on January 31, 1989, and notified employees on or about February 6, 1989, that it would close the plant on or about August 9, 1989. Kriner further states that when she and the other employees who were laid off on November 25, 1988, learned that GTE intended to close the plant, they contacted GTE to receive the severance pay which they thought they were entitled to under the policy in effect at the time of their lay-off. Kriner states that GTE denied her request for severance pay and claimed that she was ineligible for severance pay under the policy which was in effect as of January 6, 1989. Kriner seeks as relief severance pay, interest, and costs.

GTE denies that in 1981 it announced a procedure for hourly employees regarding severance pay in the event of a plant closing. GTE contends that the 1981 policy was part of a policy manual which was not distributed generally to employees and was distributed only to certain management and administrative personnel. GTE disputes that the policy regarding severance pay which was effective January 6, 1989, was not communicated to Kriner. GTE argues that the Employee Handbook is not an employment contract and is only provided for the purpose of providing general

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information to employees. According to GTE, the official policy regarding severance pay in the event of a plant closing provides that employees who are laid off on the date that GTE announces a six-month notice of a plant closing are not eligible for benefits. Because Kriner and the other employees were laid off when the plant closing was announced, GTE claims that they are not entitled to severance pay.

***2** Summary judgment is appropriate only when there is no genuine issue of material fact which is unresolved and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is an extreme remedy and should not be granted when there is a disagreement about the facts or the proper inferences which a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982). "When a motion for summary judgment is made and supported as provided in ... [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading...." Fed.R.Civ.P. 56(e). The adverse party must show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. *Id.* Because summary judgment is a severe remedy, the Court must resolve any doubt about the existence of genuine issues of fact against the moving party. *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981).

The United States Supreme Court has stated that in motions for summary judgment a material fact is one which might affect the outcome of the suit under relevant substantive law. *See Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510 (1986). The Supreme Court also stated in *Anderson* that a dispute about a material fact is "genuine" if "the evidence is such that a reasonable party could return a verdict for the non-moving party." *Id.* at 2510. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 106 S.Ct. 1348, 1356 (1986).

In cases where cross-motions for summary judgment have been filed, each side essentially contends that no issue of material fact exists from its particular point of view. The Court should consider each motion for summary judgment on its own merits. *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1391 (Fed.Cir.1987). Because each side is moving for summary judgment, each side bears the burden of establishing a lack of genuine issues of material fact. "Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination [of] whether genuine issues of material fact exist." *Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *see also* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2720 at pp. 16-19 (1983). In light of these principles, we will address Kriner's motion first.

ERISA applies to any "employee benefit plan" which is established by an employer engaged in commerce or industry. 29 U.S.C. § 1003(a)(1). The term "employee benefit plan" encompasses the term "employee welfare benefit plan." 29 U.S.C. § 1002(3). An employer's policy of providing benefits to employees upon termination of employment in the form of severance pay is an "employee welfare benefit plan" within the meaning of ERISA. *Ulmer*, 884 F.2d at 99; *Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir.1989). The Court of Appeals has determined that the interpretation of a written severance pay plan presents a question of law for the Court. *Ulmer v. Harsco Corp.*, 884 F.2d 98, 102 (3d Cir.1989). Because ERISA preempts any state laws relating to the enforceability or lack of enforceability of an employee welfare benefit plan, *see* 29 U.S.C. § 1144(a), *Pane*, 868 F.2d at 635, the Court is of the view that Kriner is not entitled to judgment as a matter of law on her state law claims.

***3** ERISA requires that an employee benefit plan provide a beneficiary whose claim for benefits has been denied with adequate notice in writing of the specific reasons for such denial and:

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 U.S.C. § 1133. This Court should apply a *de novo* standard on review to determine whether GTE's denial of severance pay to Kriner was in accordance with the terms of the plan unless the plan administrator or fiduciary has discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Company v. Bruch,* 109 S.Ct. 948 (1989).

The Court's use of a *de novo* standard of review, however, presumes that Kriner has had an administrative review of her claim in accordance with Section 1133. GTE submitted an affidavit signed by Gary Egge, the Director of Employee/Labor Relations, and a copy of a letter which Egge states "was sent to each employee who was on lay off on the date of notification of the plant closing and who was not paid plant closing separation pay." With respect to severance pay this letter states:

> Given the fact that the plant will be closing, you will be permanently separated from GTE on *June 1, 1989* and not subject to recall. Since your layoff was prior to the closure announcement, you are not eligible for GTE Plant Closing benefits.

There is no evidence in this letter or elsewhere in the record that GTE conducted a "full and fair review" of Kriner's claim for severance pay.

Normally, we would remand this matter to the trustee for the appropriate review because federal courts generally do not entertain an action under ERISA to recover benefits when the party bringing the action has failed to exhaust administrative remedies. *Wolf v. National Shopmen Pension Fund,* 728 F.2d 182, 185 (3d Cir.1984); *Kross v. Western Electric Co., Inc.,* 701 F.2d 1238 (7th Cir.1983). The Court, however, may excuse a claimant seeking benefits under an ERISA plan from exhausting administrative remedies where resort to such administrative remedies would be futile or the remedy would be inadequate. *Amato v. Bernard,* 618 F.2d 559, 568 (9th Cir.1980). Because GTE is the plan administrator and because GTE has stated that Kriner is not entitled to benefits, the Court is of the view that requiring Kriner to submit her claim to GTE for administrative review is futile.

GTE states in its motion for summary judgment that Kriner's entitlement to severance pay is governed by GTE's policy dated January 6, 1989. The Employee Handbook incorporates by reference the policy dated January 6, 1989. In conducting a *de novo* review of GTE's decision to deny Kriner benefits, the Court should interpret the plan documents and other evidence under ordinary principles of contract and trust law. *Firestone Tire and Rubber Company v. Bruch,* 109 S.Ct. 948 (1989). A principle of contract interpretation is that the best evidence of the intent of the parties is the plain language in the written agreement. *Brokers Title Company, Inc. v. St. Paul Fire & Marine Insurance Company,* 610 F.2d 1174, 1181 (3d Cir.1979).

***4** The policy dated January 6, 1989, was in effect at the time that GTE announced the plant closing and states, inter alia, as follows:

> 3.0 *Benefit Eligibility*
> Employees eligible for plant closing benefits include all active full time employees who are separated from employment in response to business needs on or after the date of the six month notice ("eligible employees"). One year of accredited service is required in either situation. Employees on layoff on the date of the six month notice will not be eligible for benefits.

The parties do not dispute that on or about February 6, 1989, GTE gave Kriner the six-month notice that the plant would be closed on or about August 9, 1989. Because the policy states that employees on lay-off on the date of the six-month notice will not be eligible for benefits and because Kriner was on lay-off on February 6, 1989, Kriner was not entitled to plant closing benefits under the policy dated January 6, 1989.

Kriner argues that GTE was not permitted to change the severance pay benefits once Kriner's right to those benefits vested. ERISA, however, does not impose on employee welfare benefit plans the strict vesting requirements which ERISA imposes on pension benefits. *Young v. Standard Oil (Indiana),* 849 F.2d 1039, 1045 (7th Cir.), *cert. denied,* 109 S.Ct. 529 (1988). ERISA defines an accrued benefit as an "annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). Accrued benefits under ERISA do not include severance payments. *Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406, 410 (4th Cir.1983), *cert. denied,* 104 S.Ct. 2387

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1984). Thus, GTE was free to amend its severance pay policy to exclude employees on layoff on the date of the six-month notice even though doing so was in GTE's interest.

Kriner was also not entitled to severance benefits because when an employer amends a severance pay plan to change the class of persons entitled to benefits or to reduce the level of benefits a determination of whether an employee is entitled to benefits is based on the plan in effect on the date when the events occurred which initiated the right to severance pay. *Brown v. AMPCO-Pittsburgh Corp.*, 876 F.2d 546, 551 (6th Cir.1989). When Kriner was laid off on November 25, 1988, GTE had not closed the Montoursville plant or announced the plant closing. GTE amended the severance pay plan before it announced the plant closing and when it did announce the plant closing on February 6, 1989, the new policy dated January 6, 1989, was in effect. Thus, the January 6, 1989, policy applied to Kriner and under that policy she was ineligible for benefits.

Kriner claims that GTE did not notify her that it had enacted the policy dated January 6, 1989. Regardless of whether GTE notified Kriner the January 6, 1989, policy existed and had legal effect. *Young*, 849 F.2d at 1045-47. A violation of procedural requirements under ERISA such as the disclosure of plan provisions does not generally provide a reason to grant participants substantive relief. *Ashenbaugh v. Crucible, Inc.*, 854 F.2d 1516, 1532 (3d Cir.1988), *cert. denied*, 109 S.Ct. 3155, *reh. denied*, 110 S.Ct. 12 (1989). While understandably this may seem unfair to a loyal employee of many years standing who has only recently been laid off, GTE was within its legal rights in adopting the new policy on January 6, 1989. The Court will grant GTE's motion for summary judgment.

***5** An appropriate order will be entered.

*ORDER*

1. Kriner's motion for summary judgment is denied.

2. GTE's motion for summary judgment is granted.

3. This case is dismissed.

4. The Clerk of Court will close the file in this case.

1990 WL 597393 (M.D.Pa.)

**Motions, Pleadings and Filings** **(Back to top)**

- 1:89CV00907 (Docket) (Jun. 14, 1989)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C
Only the Westlaw citation is currently available.

United States District Court,
M.D. Florida,

Fort Myers Division.
Thomas C. LEONARD, Plaintiff,
v.
The BEN HOGAN COMPANY, Defendant.
**No. 92-48-CIV-FTM-17D.**

July 1, 1992.

Robert E. Tardif, Duncan, Engvalson & Mitchell, Ft. Myers, Fla., John F. Potanovic, Jr., Henderson, Franklin, Starnes & Holt, Ft. Myers, Fla., for plaintiff.

Christopher Scott Knopik, Yerrid, Knopik & Valenzuela, P.A., Tampa, Fla., Sheila Gladstone, Haynes and Boone, Fort Worth, Tex., for defendant.

ORDER ON NOTION TO DISMISS AND NOTION TO STRIKE

KOVACHEVICH, District Judge.

***1** This cause is before the Court on Defendant, The Ben Hogan Company's, Partial Motion to Dismiss filed February 3, 1992, on Plaintiff's Opposition, and on Counterdefendant, Thomas C. Leonard's, Motion to Strike filed February 18, 1992.

Defendant is a Texas corporation authorized to do business in the State of Florida. Defendant, The Ben Hogan Company, ("Hogan") employed Plaintiff, Thomas Leonard, as a sales representative from June, 1988 to November 2, 1991, at which time he was terminated. Defendant advised Mr. Leonard that his open company accounts which included a personal account, sample account, and District Manager Inventory account, must be closed within thirty days. The company offered Leonard the following termination package: unused vacation pay, normal commission on orders shipped by November 15, 1991, minus balances on Mr. Leonard's open accounts, and a neutral reference to prospective employers.

On January 15, 1992, Mr. Leonard filed suit in Florida's 20th Judicial Circuit Court for Lee County against Hogan. The case was removed to the Federal District Court on February 6, 1992, because it involved a federal question and diversity of citizenship. Mr. Leonard alleges that he is entitled to severance pay pursuant to the Defendant's employee benefit plan and unpaid commissions earned.

Defendant has counterclaimed for the unpaid balances of Mr. Leonard's company accounts. Defendant alleges that Mr. Leonard must either pay the balance or return the merchandise represented by those figures.

Defendant has moved to dismiss the portion of Mr. Leonard's claim that relates to the Hogan severance pay policy. Mr. Leonard as the counterdefendant moves to strike the counterplaintiff's request for attorney fees requested in Hogan's countercomplaint alleging Mr. Leonard's failure to settle his open accounts with the company.

DISCUSSION

I. *Partial Motion to Dismiss*

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that Plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A trial court, in ruling on a motion to dismiss, is required to view the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232 (1974).

The complaint in this case was filed to recover severance pay from the Defendant following Mr.Leonard's termination from the company and to recover his commissions due. Defendant seeks to have Plaintiff's request for severance pay dismissed from the complaint for failure to state a claim upon which relief can be granted Fed.R.C.P. 12(b)6. Defendant asserts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this claim on grounds that the Court lacks jurisdiction because: 1) state law has been preempted by the Employee Retirement Income Security Act of 1974 (ERISA), Section 502 et. seq. (28 U.S.C. § 1001 et seq.); 2) Plaintiff has failed to plead exhaustion of administrative remedies; and 3) Plaintiff failed to name the proper parties as defendants.

(1) Federal Preemption

***2** Defendant alleges that Mr. Leonard's original complaint fails to allege that entitlement to severance pay pursuant to Defendant's severance pay policy is preempted by section 514(a) *et seq.* of the Employee Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Section 514(a) provides that ERISA supersedes all state law insofar as it relates to any employee benefit plan. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987). ERISA preempts state common law breach of contract and tort claims for benefits under ERISA-regulated benefit plans, even when the ERISA statute itself is not mentioned in the pleading. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987). Furthermore, ERISA preempts all such laws regardless of whether they conflict with any specific provision of ERISA. *O'Reilly v. Ceuleers*, 912 F.2d 1383 (11th Cir.1990).

Unfunded severance pay policies of a company, such as that which Defendant has provided, is considered an employee benefit plan encompassed by the provisions of ERISA. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101. Section 1002 specifically includes severance pay arrangements in its definition of welfare plans under ERISA. *See also* *O'Rielly v. Ceuleers*, 912 F.2d 1383 (11th Cir.1990). Section 1132(e) of 29 U.S.C.A. provides that except for actions to recover benefits under § 1132(a)(1)(B), which could be termed breach of contract actions, the federal courts have exclusive jurisdiction in actions arising under ERISA. Plaintiff's claim to enforce provisions of Defendant's severance policy is encompassed by ERISA. Therefore, this Court is the proper Court authorized under federal statutes to decide a properly pleaded claim under ERISA.

(2) Failure to Exhaust Administrative Remedies

Next, Defendant contends that Plaintiff has failed to exhaust his administrative remedies as required by federal case law under ERISA. Leonard alleges that the Defendant does not provide any internal procedures for appealing claims regarding the severance pay policies or any similar company benefits. Section 1133 of 29 U.S.C.A. provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall ...
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The Department of Labor has issued regulations which cover what must be provided in a benefit plan for appeal procedures. These regulations are found at 29 C.R.F. §§ 2506.503-1 *et seq.* The record does not demonstrate that Defendant's plan provides such procedures.

Defendant cites *Amato v. Bernard*, 618 F.2d 559 (9th Cir.1980) for the proposition that such administrative procedures must exhausted. However, the court in *Amato* states that "*where administrative procedures have been instituted* for the resolution of disputes between parties to a collective bargaining agreement or other agreement, the courts will generally require exhaustion of *those* procedures" before exercising jurisdiction. Defendant has not alleged what procedures Plaintiff has failed to exhaust before appealing to this Court.

***3** The administrative exhaustion requirement has developed several exceptions which include the futility of such action and a denial of access to such internal remedies. Similarly, where a nonjudicial remedy is clearly inadequate the exhaustion requirement has been waived. *See* *Amato v. Bernard*, 618 F.2d 559 (9th Cir.1980), *Lucas v. Warner & Swazey Co.*, 475 F.Supp. 1071 (E.D. Pa. 1979). An implicit assumption to the exhaustion of administrative remedies requirement is that such remedies are available. Where no such procedure exists it is implausible that such a procedure must be exhausted. Alternatively, the Plaintiff may be seen to have exhausted all available internal procedures. Defendant's failure to comply with regulations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requiring the implementation of administrative procedures undermines its contention that the plaintiff failed to exhaust internal remedies.

(c) Failure to Name Plan or Administrators as Defendants

Defendant contends that the Plaintiff's claim should be dismissed for failing to name the Plan or Administrators as defendants. Plaintiff alleges that the Plan is unnamed and has no identifiable administrators. Construing the facts in the light most favorable to Plaintiff and his allegation that no such names exist, the Court finds it improbable that the Plaintiff could identify such persons as defendants. Additionally, an employer has been held to be a Plan administrator in the absence any designation for the purposes of ERISA. *Thioneine v. McNeil-Akron, Inc.*, 661 F.Supp. 1252 (N.D.Ohio 1986). Where the employer assumes sole responsibility, authority and control for the Plan and disbursement its benefits, then he also assumes its associated fiduciary responsibilities. From the record, it appears that no other persons share this responsibility and dismissal would inappropriate for the failure to name such persons or plan.

II. Motion to Strike

Counterdefendant, Mr. Leonard, moves the Court to strike the counterplaintiff, The Ben Hogan Company's request for attorney fees in conjunction with their claim for damages for Mr. Leonard's failure to settle open accounts. Hogan claims attorney fees pursuant to Florida Statute 686.201(3)(b). Section 686.201(3)(a) and (b) states that:

> (a) When the contract between a sales representative and a principal is terminated and the contract was not reduced to writing, all commissions due shall be paid within 30 days.
> (b) In the event a principal fails to comply with the provisions of paragraph (a), the sales representative has a cause of action for damages equal to double the amount of commission found to be due. The prevailing party in any such action is entitled to an award of reasonable attorney fees and court costs.

This statute does not provide for a cause of action against the sales representative. This statute provides for an award of attorney fees where the sales representative sues for recovery of commissions due but this is not the premise of counterplaintiff's claim. Instead the Hogan company has filed suit against Mr. Leonard regarding his open accounts with the company. These accounts do not constitute "commissions" within the meaning of § 686.201(1)(a) which defines commissions as:

> *4 compensation accruing to a sales representative for payment by a principal, the rate of which compensation is expressed as a percentage of the dollar amount of orders of sales.

The open accounts do not constitute "commissions" as defined above. The counterplaintiff's suit does not fall within the parameters of the statute. Therefore, the counterplaintiff can not be granted an award of attorney fees pursuant to Fla. Stat. 686.201 in its claim against Mr. Leonard's open accounts. However, should this Court award judgment in favor of Hogan in Plaintiff's original suit, then as the prevailing party, Hogan may be entitled to recover reasonable attorney fees under another theory or statute.

Counterplaintiff also claims attorney fees pursuant to Florida Statute 448.08 which states:

> The court may award to the prevailing party in an action for unpaid wages costs of the action and a reasonable attorney's fee.

As above, Hogan asks for attorneys fees in relation to its counterclaim against Mr. Leonard. This is not an unpaid wages action but a suit for money due on an open account. As above, this statute does not authorize an award of attorney's fees in relation to Defendant's counterclaim. Even Plaintiff's original action does not request back pay but instead seeks recover for severance pay pursuant to the company plan. Attorney's fees are only awarded to successful litigants in actions for unpaid wages.

CONCLUSION

As far as, Defendant's motion to dismiss challenges the sufficiency of Plaintiff's complaint for failing to allege his claims under ERISA, Plaintiff is directed to amend the original complaint and to state with particularity his cause of action as it relates to ERISA. Secondly,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant challenges Plaintiff's failure to exhaust administrative remedies. The Court finds that the exhaustion requirement is inappropriate where such internal procedures do not exist as a result of Defendant's own failure to comply with ERISA. Thirdly, Defendant challenges Plaintiff's failure to name the Plan and its Administrators as defendants. However, Plaintiff alleges such information and persons do not exist, the Court will not dismiss the complaint on these grounds. Lastly, Counterplaintiff's motion to strike Hogan's request for attorney fees is sufficiently established but only in connection with the countercomplaint. Accordingly, it is

ORDERED that Plaintiff be granted ten (10) days from the date of this order to submit an amended complaint to this Court. The amended complaint must comply with Rule 4.1, United States Defendant's motion to dismiss is denied on the grounds that Plaintiff failed to exhaust his administrative remedies and that he failed to include the Plan and Administrators as Defendants. Lastly, Counterplaintiff's motion to strike Hogan's request for attorney fees is granted but only as it relates to Hogan's countercomplaint.

DONE and ORDERED.

1992 WL 436351 (M.D.Fla.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





H
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Dawn C. MANLEY, M.D., Plaintiff,
v.
ASSOCIATES IN OBSTETRICS AND GYNECOLOGY, P.A., James E. Bradfield, M.D., Robert L. Hickok, Jr., M.D., and Gregory W. DeMeo, D.O., Defendants.
**No. CIV.A.00C-049-JOH.**

Argued: Feb. 21, 2001.
Submitted: Feb. 22, 2001.
Decided: July 27, 2001.

Plaintiff's Motion for Summary Judgment to Bar Extrinsic Evidence--Granted. Plaintiff's Motion for Summary Judgment on Breach of Contract and Anticipatory Repudiation--Granted. Plaintiff's Motion for Statutory Costs and Fees Pursuant to Wage Payment and Collection Act--Granted. Defendants' Motion to Dismiss Violation of Wage Payment and Collection Act Claim--Denied. Defendants' Motion to Dismiss Civil Conspiracy Claim--Denied. Defendants' Motion to Dismiss Bad Faith Claim--Granted.

Francis G.X. Pileggi, Esq., of Fox, Rothschild, O'Brien & Frankel, LLP, attorney for plaintiff.

Paul M. Lukoff, Esq., of Prickett, Jones & Elliott, attorney for defendants.

MEMORANDUM OPINION

HERLIHY, J.

*1 Plaintiff Dawn C. Manley, M.D., was formerly employed by Associates in Obstetrics and Gynecology, P.A., [AOG]. She voluntarily ended her employment with AOG and signed an agreement providing she would receive four annual payments. The first two installments were paid but the second two were not.

She has sued AOG and her former associates in AOG, James E. Bradfield, M.D., Robert L. Hickok, Jr., M.D., and Gregory W. DeMeo, D.O., for, among other things, breach of contract. She contends the contract unambiguously entitled her to the last two payments. [FN1] The defendants assert, on the other hand, there is extrinsic evidence to show there was an agreed-upon condition precedent to payment which justifies the nonpayment. Dr. Manley has moved to bar that extrinsic evidence and for summary judgment on the final two payments.

FN1. When this case was briefed and argued, the final payment was not due. Dr. Manley has a claim for anticipatory breach. The due date for that payment has passed and there is no indication the last payment was made. This will be discussed *infra* at 13.

In addition to the contract claims, Dr. Manley sued the defendants for civil conspiracy, breach of the Wage Payment and Collection Act and bad faith/punitive damages. The defendants have moved for summary judgment on these claims.

The Court holds the contract is unambiguous, extrinsic evidence will not be allowed and Dr. Manley is entitled to a judgment on the last two payments. Her motions on these points are GRANTED. The Court holds there are genuine issues of material fact as to the civil conspiracy claims that Dr. Manley is entitled to relief provided by the Wage and Payment Collection Act but she is not entitled to punitive damages. The defendants' motion is DENIED, in part, and GRANTED, in part.

FACTUAL BACKGROUND

On December 18, 1995, Dr. Manley entered into an employment agreement with AOG, a professional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corporation, in which the individual defendants are shareholders. The employment agreement provided for deferred compensation upon her termination. It was to be payable in equal monthly installments for sixty months following termination and would be an amount equal to her total compensation as reported on her W-2 statement for the most recently ended fiscal year with AOG.

Dr. Manley voluntarily terminated her employment on December 19, 1997 and later entered into an amendment [Amendment] to the 1995 employment agreement relating to the deferred compensation. Counsel for the defendants prepared both the employment agreement and the Amendment. The record also shows, however, that Dr. Manley received advice from her own counsel when the Amendment was being negotiated and reviewed. The Amendment provides, in pertinent part:

> "9. (a) *Deferred Compensation Obligation.* [AOG] agrees to pay [Dr. Manley], as deferred compensation, the sum of Two Hundred Ninety Thousand Dollars ($290,000), payable in four (4) annual installments of Seventy-Two Thousand Five Hundred Dollars ($72,500), with the first payment due on May ___, 1998, and continuing annually on the ___ day of May for four (4) years until May ___, 2001. This obligation to pay deferred compensation shall continue in the event of [Dr. Manley's] death, and in such case the payments shall be made to the beneficiary designated by [Dr. Manley] in a writing filed by [Dr. Manley] with [AOG]. This obligation shall not be affected by any actions or omissions of Spectrascan Network Partners VI, LLP, or any of its agents, assigns, or affiliates. [FN2]

FN2. Amendment at 1.

***2** Dr. Manley received the first two payments of $72,500, but the defendants failed to tender the 2000 payment and advised the 2001 payment would not be honored.

In responding to Dr. Manley's complaint, AOG provided an affidavit of Helen McCullough, M.D., president of AOG. She said, in part:

> 3. At the time the Employment Agreement and the Amendment to the Employment Agreement were undertaken, it was contemplated that AOG's commitment to make deferred compensation payments to Dr. Manley was, in turn, dependent upon sufficient income to the medical practice, such that there would be money available to pay both the physicians remaining in the practice, as well as Dr. Manley.
>
> * * *
>
> 5. Under the Staffing Services Agreement, dated April 30, 1997, by which the medical practice of AOG is operated, Woman's Health Medical Partners, P.A. ("WHMP"), as manager of the practice is obligated to perform certain duties, including the timely payment to AOG in cash, on a monthly basis, a percentage of the practice's fee collections, which serves as a potential funding source for the deferred compensation to the plaintiff.
>
> 6. Dr. Manley recognized, prior to the execution of the Amendment to her Employment Agreement, that fulfillment of the Staffing Service Agreement by the medical practice's manager, WHMP, was critical to the ability of AOG to pay compensation, whether deferred or otherwise, to both its medical practitioners and her. [FN3]

FN3. Affidavit of Helen McCullough, M.D. (October 18, 2000) at 2.

Defendants Drs. Hickok and DeMeo were deposed. Dr. DeMeo stated, in relevant part:

> A. Oh, in that regard. I believe I hold the position--I believe everybody holds the position of vice president.
>
> * * *
>
> A. Because the unfortunate thing, I believe, is that we are taking everything at face value and not extrapolating the true meaning of the agreement and the discussions. The fact of the matter is--in my opinion, is that our company [AOG], would love to pay Dr. Manley if, in fact, the company had the financial ability to do such. We, however, have responsibilities to ourselves and our patients that require that--at the present time the money that is going in is going out as fast as it goes in and,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

therefore, there is no left over. And so, therefore, if there was money that was present, I would gladly have that go towards Dr. Manley's claim, but unfortunately, that's not how the situation is presently going. And the way I see it, you know, there is a basic partnership principle to that which we all hold.

* * *

A. From a layman's point of view and at face value, that means that AOG is-- my assumption is--responsible to pay Dr. Manley the $72,500 in May of subsequent years.

* * *

Q. Are you aware of Dr. Manley's position that she was not interested in signing this Amendment to Employment Agreement unless the last sentence on page 1 of the agreement was added to the agreement?
A. I am aware of that position. [FN4]

FN4. DeMeo Deposition (December 6, 2000) at 23, 65, 87 and 120.

Dr. Hickok stated, in relevant part:
Q. And are you aware that the corporation, AOG, has not paid Dr. Manley the payment that she was seeking in May of 2000?
***3** A. Yes.

* * *

Q. Now, tell me again why you have not made the payment to Dr. Manley that was due in May of 2000?
A. The payment wasn't made simply because the corporation has no money to pay her.

* * *

Q. And tell me why they don't have the money.
A. Because our business venture with Spectrascan proved very unprofitable.
Q. So your position is that in May of 2000, AOG had no money at all?
A. Essentionally, we have very little to no money, that's correct.

* * *

A. It's a general understanding that we all equally entered into a business venture with our eyes open and proper advice from appropriate people, and that we all lost. We all were hurt by it.

* * *

Q. Somewhere between Lynn [Grasgowski] and Dr. DeMeo decisions are made to pay at least within the past few months almost three-quarters of a million dollars to somebody that AOG owes money to; right?
A. Yes. [FN5]

FN5. Hickok Deposition (October 18, 2000) at 49, 53, 60 and 68-69.

Geoffrey M. Langdon, accountant for the defendants, testified in a deposition that the return of capital is sometimes treated as compensation for tax purposes; occurring when a corporation is liquidated or purchased. In a separate affidavit, he contended:

7. There is nothing contrary to accepted accounting principals in treating payments for a buy-out of the equity of a former principal of a small professional corporation as salary income. In fact it is a common practice with medical practices. In form, these payments were treated as compensation to each of the principals. In substance, they were a return of capital to the original owners. [FN6]

FN6. Langdon Affidavit (February 15, 2001) at 3.

The Court heard oral argument on February 21, 2001. The defendants argued that WHMP, the manager of the practice, is responsible for the payments Dr. Manley. The defendants, through answers to Dr. Manley's third set of interrogatories, also stated WHMP is not an affiliate of Spectrascan. Dr. Manley responded, regardless of WHMP, AOG owes the money pursuant to the Amendment to the employment agreement.

## APPLICABLE STANDARD

Summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN7] The Court must view the evidence in the light most favorable to the non-moving party. [FN8] Summary judgment is inappropriate if a material fact is in dispute or if inquiry into the facts is necessary in order to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

clarify the application of the law. [FN9] Once a moving party properly supports the motion, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact and it cannot rely upon unverified allegations or bare assertions. [FN10]

FN7. *Wilson v. Joma, Inc.*, Del.Supr., 537 A.2d 187 (1988).

FN8. *State v. Regency Group, Inc.*, Del.Super., 598 A.2d 1123, 1126 (1991).

FN9. *Ebersole v. Lowengrub*, Del.Supr., 180 A.2d 467, 470 (1962).

FN10. *Martin v. Nealis Motors, Inc.*, Del.Supr., 247 A.2d 831, 833 (1968).

DISCUSSION

*Parol Evidence*

Dr. Manley has moved to bar introduction of parol evidence concerning the interpretation of her original 1995 employment agreement and the Amendment. Her motion seeks to prevent extrinsic evidence that she and the other doctors understood a debt on another venture would have to be paid before the obligation to her. She contends the agreements do not lend themselves to an interpretation other than she is to be paid.

*4 The defendants, on the other hand, argue the contract provisions are ambiguous and that genuine issues of material fact exist as to the meaning of the contracts. They note that Dr. Manley has offered contradictory views of whether the payments due her are wages or possibly return of capital. They also say that she knew the venture with the third party was a risk and accepted that any liability to that third party could affect the payments due her. They refer to their own testimony and Dr. Manley's deposition and an affidavit in support of their arguments. They also argue, correctly, that Dr. Manley's motion to bar parol evidence is a motion to have this Court determine she is owed the payment as a matter of law. [FN11]

FN11. When the parties filed their various motions and as of the date of oral argument, the May 2001 payment had not been due. The issue raised as of that time was of anticipatory breach. That issue will be addressed in section "Amounts Due," *infra* at 13.

Dr. Manley's motion necessarily requires the Court to interpret the two contracts. The proper interpretation of a contract is purely a question of law. [FN12] The principles of interpretation are well-settled. Contracts are to be interpreted as a whole to give effect to the intention of the parties. [FN13] When contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. [FN14] A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. [FN15] The true test is not what the parties intended, but what a reasonable person in the same position of the parties would have thought it meant. [FN16] Where a contract is not ambiguous, however, extrinsic evidence will not be used to interpret it. [FN17]

FN12. *Rhone-Poulenc v. American Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1195 (1992).

FN13. *Northwestern National Ins. Co. v. Esmark, Inc.*, Del.Supr., 672 A.2d 41, 43 (1996).

FN14. *Johnston v. Talley-Ho, Inc.*, Del.Super., 303 A.2d 677, 679 (1973).

FN15. *ABB Flakt, Inc. v. National Union Fire Ins. Co.*, Del.Supr., 731 A.2d 811, 816 (1999).

FN16. *Rhone-Poulenc*, 616 A.2d at 1196.

FN17. *E.I. duPont de Nemours & Co. v. Allstate Ins. Co.*, Del.Supr., 693 A.2d 1059, 1061 (1997).

Dr. Manley asserts the Amendment is clear on its face and there is no reason to rely on extrinsic evidence to construe the meaning of the Amendment. The Court agrees.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A simple reading of the Amendment and a reasonable person would conclude that Dr. Manley is to receive four payments of $72,500, totaling $290,000. The obligation to pay is explicitly not affected by any "actions or omissions of Spectrascan Network Partners IV, LLP, or any of its agents, assigns, or affidavits." [FN18] Nothing more could be interpreted from reading the Amendment. There is only one plausible meaning.

FN18. Amendment to Employment Agreement at 1.

Even the defendants have conceded on this point. In Dr. Hickok's deposition, he said:

Q. Sure. In light of reading Exhibit 2, is your position reconcilable in your view that whatever happened to Spectrascan or whatever Spectrascan did or did not do, is an explanation for AOG not paying Dr. Manley?
A. No. Associates in AOG owe Dr. Manley the money.
Q. Okay, So you agree that they owe.
A. Yes.
Q. Well, explain to me why the aren't paying.
A. Because they don't have the money. [FN19]

FN19. Hickok Deposition (October 18, 2000) at 65.

Dr. DeMeo, in his deposition, stated, "[f]rom a layman's point of view and at face value, that means that AOG is--my assumption is--responsible to pay Dr. Manley the $72,500 in May of subsequent years ." [FN20]

FN20. DeMeo Deposition (December 6, 2000) at 87.

The defendants contend Dr. DeMeo also believed that all of the AOG principals, including Dr. Manley, prior to selling their business to the other entity, understood that there were significant risks involved which could undermine the completion of the buy outs of their equity in AOG. [FN21] Additionally, the defendants, in their responses to two interrogatories posed by Dr. Manley, stated the only documents that set forth the understanding as to the amount of compensation Dr. Manley would receive and when she would receive it were the 1995 employment agreement and the Amendment. [FN22]

FN21. *Id.* at 73, 74, 80, 88-89.

FN22. Defendants' Answers to Interrogatories at ¶¶ 6 and 7.

***5** The defendants argue the contract is ambiguous as evidenced by Dr. Manley's motion to determine "deferred compensation" as meaning "wages." This does not make the contract ambiguous. "Deferred compensation" may be open to several interpretations, but in this contract, it simply means the money that Dr. Manley is owed. Whether wages or return on capital, there is no room to interpret either or both of the contracts as creating a condition precedent to the final two payments.

Ambiguity does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." [FN23] There is no ambiguity in this contract which would permit the extrinsic evidence which the defendants seek. Dr. Manley's motion to bar such evidence is GRANTED.

FN23. *Rhone-Poulenc,* 616 A.2d at 1196 (*citing* *Holland v. Hannan,* D.C.App., 456 A.2d 807, 815 (1983)).

Additionally, the defendants contend, through an affidavit of defense, [FN24] that Dr. Manley understood she would not receive the deferred compensation unless WHMP performed certain obligations under a Staff Services Agreement. These certain obligations refer to the payment of a percentage of the practice's fee collections, which would serve "as a potential funding source for the deferred compensation to [Dr. Manley]." [FN25] The defendants also argue that WHMP is not an affiliate of Spectrascan, therefore, it may affect the Amendment to the employment agreement. Dr. Manley asserts that regardless whether WHMP is affiliated to Spectrascan, the defendants have presented no legally recognized

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defense to nonpayment of the amounts due.

FN24. Affidavit of Helen McCullough, M.D. (October 18, 2000) at 2.

FN25. *Id.*

As previously stated, the contract is unambiguous. Dr. Manley was to receive deferred compensation that was not to be affected by any actions or omissions of Spectrascan, or any of its agents, assigns or affiliates. Nor is the contract, as the defendants suggest, conditioned on WHMP rendering payments to AOG. If this was to have been a condition precedent to the payment of the deferred compensation, it should have been stated in the contract. [FN26] Additionally, this condition precedent to the payment of deferred compensation is contrary to the agreement, as it does not contain any condition precedents.

FN26. *See Liberto v. Bensinger,* Del.Ch., C.A.No. 1411-K, Strine, V.C. (December 28, 1999) (The plaintiffs should have included a condition precedent in the land sale contract stating that a building permit must be issued, if they wanted to later avoid acceptance of the contract if the building permit was not issued.)

Traditionally, the parol evidence rule precludes evidence of additional terms to a written contract, when that contract is a complete integration of the agreement of the parties. The harshness of the parol evidence rule, however, has been mitigated to a certain extent as the courts have recognized a number of exceptions to it, such as where the court seeks aid in its interpretation of ambiguous terms in a written contract, or where a party seeks to prove that a writing was only a partial integration of the contract or that a collateral or separate agreement exists.
It has long been accepted in Delaware that parol evidence is admissible to show conditions precedent which relate to the taking effect of a written instrument. Such evidence does not constitute an oral contradiction or modification of the written instrument, rather it goes to the very existence of the contract and tends to show that no valid and effective contract ever existed. However, if the condition precedent is inconsistent with, or contrary to, the written instrument, parole evidence of the agreement will not be admitted. [Citations omitted.] [FN27]

FN27. *Engle v. Oney,* Del.Ch., C.A.No. 1249, Hartnett, V.C. (April 25, 1989).

***6** The contract is unambiguous and was the complete agreement between the parties. If the parties contemplated a condition precedent to the agreement it would have been included in the agreement. The defendants' argument that the agreement was controlled by a condition precedent is unpersuasive.

*Amount Due*

Having determined that the contract is unambiguous, the next issue is whether Dr. Manley is entitled to a judgment of $145,000 as a matter of law. As noted earlier, [FN28] when the parties briefed and argued their motions, the May 2001 payment had not become due. Based on the contract provisions just interpreted, it would now be due. The Court, not having been informed otherwise, will assume it was not paid.

FN28. Footnote 1 at 1.

The only defense to nonpayment offered by the defendants is two statements made in the depositions of Drs. Hickok and DeMeo. Dr. Hickok believed there was an understanding that all four principals of AOG had entered into a business venture with open eyes, but the venture failed. Dr. DeMeo believed that all of the AOG principals, including Dr. Manley, prior to selling their business to the other entity, understood that there were significant risks involved which could undermine the completion of the buy outs of their equity in AOG.

Both Drs. Hickok and DeMeo have testified, however, that AOG owes Dr. Manley the money. As noted earlier, Dr. Hickok testified Dr. Manley was not paid because AOG had insufficient funds to pay her and he stated, from a layman's point of view, the money is owned to her.

The Amendment and the defendants' admissions demonstrate that Dr. Manley is entitled to the 2000 and 2001 payments. The 2001 payment was not yet due

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

when this case was submitted. But Count II of the complaint asserts anticipatory repudiation of the 2001 payment. "[T]he law generally has acknowledged for more than one hundred years that an unequivocal statement by a promisor that he will not perform his promise gives 'the injured party an immediate claim to damages for total breach, in addition to discharging the remaining duties of performance." ' [FN29] The contract is clear on its face and a reasonable person would understand the money is overdue. Now that even the due date in the agreement has passed and the final payment has not been made, it is overdue.

FN29. *Carteret Bancorp, Inc. v. Home Group, Inc.,* Del.Ch., C.A.No. 9380, Allen, C. (January 13, 1988).

Dr. Manley's motion for summary judgment on the 2000 and 2001 claims is, therefore, GRANTED. The Court awards judgment in the amount of $145,000 in her favor.

*Wage Payment and Collection Act*

One of Dr. Manley's causes of action against the defendants is for the extra relief provided by the Wage Payment and Collection Act [Act]. [FN30] Since she had to bring this action to obtain a judgment for the last two payments, which she says are wages due, she has invoked the extra relief provided by the Act.

FN30. 19 *Del.C.* § 1101, *et seq.*

> Any judgment entered for a plaintiff in an action brought under this section shall include an award for the costs of the action, the necessary costs of prosecution and reasonable attorney's fees, all to be paid by the defendant. [FN31]

FN31. 19 *Del.C.* § 1113(c).

*7 The defendants dispute Dr. Manley's entitlement to this relief. To get it, they argue, she must seek to recover wages and what she is after does not fall within the Act's definition of wages. They contend she seeks deferred compensation or severance pay and the latter is not included in the Act's definition of wages. As support, they cite *Department of Labor v. Green Giant Co.,* [FN32] because it says deferred compensation or severance pay is not included within the statutory definition of wages. [FN33] The court there was referring to the term wages found in 19 *Del. C.* § 1101(2), which provides:

FN32. Del.Super., 394 A.2d 753 (1978).

FN33. *Id.* at 755.

> "Wages" means compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation. [FN34]

FN34. 19 *Del.C.* § 1101(a)(2).

The defendants' citation to *Green Giant* is correct up to a point. But they miss the primary holding in the case. *Green Giant* did concern severance pay. The Department of Labor was seeking to enforce severance pay due several Green Giant workers. This Court noted that, while the original definition of wages in § 1101(a)(2) did not include severance pay, a subsequently enacted § 1109 did, which provided:

> (a) Any employer who is party to an agreement to pay or provide benefits or wage supplements to any employee shall pay the amount or amounts necessary to provide such benefits or furnish such supplements within 30 days after such payments are required to be made; provided however, that this section shall not apply to employers subject to Part I of the Interstate Commerce Act [49 U.S.C. § 10101 et seq.].
> (b) As used herein, "benefits or wage supplements" means compensation for employment other than wages, including, but not limited to, reimbursement for expenses, health, welfare or retirement benefits, and vacation, separation or holiday pay, but not including disputed amounts of such compensation subject to handling under dispute procedures established by collective bargaining agreements. [FN35]

FN35. 19 *Del. C.* § 1109.

The definition of "wages" in § 1109(b), the Court noted, was broader than found in § 1101(a)(2). To

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

make § 1109 meaningful, its requirements needed a remedy and that remedy was § 1113. [FN36] The Court said the remedies in § 1113 were for the same for an employee as for the Department of Labor. [FN37] It went on to say:

FN36. *Green Giant,* 394 A.2d at 756-57.

FN37. *Id.* at 757.

In other words, § 1113 provided civil remedies to the employee and the Department [of Labor] to recover in all instances where payments required under the statute had not been timely made. [FN38]

FN38. *Id.*

The Court concluded the Department of Labor could pursue an action for severance pay. [FN39]

FN39. *Id.* at 758.

Dr. Manley's remedies, as the *Green Giant* case held, are coextensive with those of the Department of Labor. She argues that the payments to her were treated as wages because the defendants treated two of the payments she did receive as wages, as payroll taxes were deducted. The defendants, of course, contend this treatment does not convert the payments to wages. Further, at one point in their argument, they refer to the payments as severance pay. They even cite to a provision in the unamended portion of her original employment agreement referring to the payments as separation pay. [FN40] They so characterize them in an effort to exclude them from § 1101(a)(2) and any enforcement remedies in Chapter 11.

FN40. Section 9(c)(4) of the Employment Agreement.

***8** The defendants invocation of the original contract is curious. They cite it as authority to deduct payroll taxes from Dr. Manley's four payments. Yet, the provisions they cite, § 9(c)(4) has no such apparent authority. But, more importantly, § 9(c)(4) grants authority to the defendants to make certain deductions should Dr. Manley voluntarily terminate by giving less than ten months' notice. She gave, however, only fourteen days' notice. [FN41] Without defendants' contradiction, her December 19, 1997 letter says they waived that ten-month notice requirement. Further, the record before the Court shows none of the payments made to her reflect any of the deductions § 9(c)(4) allowed the defendants to make if the notice requirements were not met.

FN41. Dr. Manley letter to defendants (December 19, 1997); Dr. Manley Affidavit (October 11, 2000) at ¶ 4.

The Court need not untangle the dispute over the label to be applied to the two remaining installments due Dr. Manley. The non-exclusive definition in § 1109(b) of benefits or wage supplements is broad enough to encompass the payments due Dr. Manley. If successful in her action to collect, the additional relief provided in § 1113 is available to her. On that basis, the defendants' motion for summary judgment on this claim is DENIED.

One of the potential open issues created by the availability of § 1113 to Dr. Manley is whether the individual physician defendants could be personally liable. The Act creates that possibility.

For the purpose of this chapter the officers of a corporation and any agents having the management thereof who knowingly permit the corporation to violate this chapter shall be deemed to be the employers of the employees of the corporation. [FN42]

FN42. 19 *Del.C.* § 1101(b); *Department of Labor v. Mattes Electric, Inc.,* Del.Super., C.A.No. 99M-08-031, Del Pesco, J. (May 5, 2000).

Since that section uses "chapter," it means all of Chapter 11. Chapter 11, obviously, includes § 1109. The record shows the physician defendants knew payments were not made to Dr. Manley and may have authorized that nonpayment. What is somewhat unclear, based on the current record, is what their official capacity and/or management responsibility was at any appropriate time relevant to the remaining two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payments. The record is even murkier about whether any or all of them "knowingly permitted" AOG to violate the Act. These issues, of course, cannot be settled on summary judgment with this record.

*Civil Conspiracy*

Dr. Manley claims Drs. Bradfield, Hickok and DeMeo conspired to commit a breach of contract. The breach, of course, is the failure to make the final payments to her. The defendants argue that she has not presented any evidence of an "underlying *unlawful* purpose." [FN43] Civil conspiracy requires three elements:

FN43. Defendants' Motion for Summary Judgment ¶ 5.

(1) A confederation or combination of two or more persons;
(2) An unlawful act done in furtherance of the conspiracy; and
(3) Actual damage. [FN44]

FN44. *Zerby v. Allied Signal, Inc.*, Del.Super., C.A.No. 00C-07-068, Silverman, J. (February 2, 2001) (citing *Nicolet v. Nutt*, Del.Supr., 525 A.2d 146, 149-150 (1987)).

The conspiracy must stem from an underlying wrong and is not, in itself, a separate cause of action. [FN45] A party must "set forth specific facts such as meetings, conferences, telephone calls or joint signatures on written recommendations ... to indicate a conspiracy." [FN46] Circumstantial evidence, as well as direct evidence, may prove a conspiracy. Thus, reasonable latitude may be permitted in establishing facts from which the conspiracy may be inferred. [FN47]

FN45. *Ramunno v. Cawley*, Del.Supr., 705 A.2d 1029, 1039 (1998).

FN46. *Id.* at 1039 (citing *Petula v. Mellody*, Pa.Cmwlth., 588 A.2d 103, 107 (1981)).

FN47. *Connolly v. Labowitz*, Del.Supr., 519 A.2d 138, 144 (1986).

***9** In *Elder v. El Di, Inc.*, [FN48] the plaintiff alleged the defendants conspired with the unlawful purpose of inducing one defendant to break its lease with the plaintiff. The court determined the underlying wrongs alleged were the breach of the lease agreement and the malicious interference with contractual relations. There is no malicious interference claim here, but there is a claim of breach of contract.

FN48. Del.Super., C.A.No. 96C-09-007, Graves, J. (April 24, 1997).

Here, the evidence addressed so far is that AOG breached its contract with Dr. Manley by not making at least the May 2000 payment. It should be noted, now, that the May 2001 payment is overdue, payment of that could constitute either a separate or an ongoing breach. *Elder v. El Di, Inc.*, holds that a breach can constitute an unlawful act which is one of the three elements of civil conspiracy.

The issue, therefore, is to what extent the record at this time shows any of the defendants agreed to have AOG not make payments to Dr. Manley as specified in her Amendment. Looking at the record in a light most favorable to her, as the Court must, she has shown enough to create a genuine issue of material fact preventing summary judgment in the defendants' favor. [FN49]

FN49. *In re Asbestos Litigation*, Del.Supr., 673 A.2d 159, 163 (1996).

The deposition testimony of Drs. DeMeo and Hickok shows an awareness of the payments to Spectrascan and obligation to Dr. Manley, but the choice to pay Spectrascan rather than honor the contractual obligation(s) to her. The record is less clear as to Dr. Bradfield's knowledge and participation in those decisions. That AOG or the defendants may have chosen to pay a larger debt to Spectrascan rather than Dr. Manley, however, if this was the case, it is no defense.

For these reasons, the defendants' motion for summary judgment on the civil conspiracy claim is DENIED.

*Bad Faith*

The defendants also move to dismiss Dr. Manley's claim for bad faith punitive damages. The record shows her claim arises out of an employment contract dispute. She argues the defendants have exhibited a "I don't care" attitude toward her demands for payment and the contractual obligation to her which remain unfulfilled. Insomuch that such an attitude potentially makes one liable for punitive damages, Dr. Manley is correct. [FN50]

FN50. *Cloroben Chemical Corp. v. Comegys,* Del.Supr., 464 A.2d 887, 891 (1983).

But, while true as a rule in other contexts, its application in an employment contract dispute is another matter. In *E.I. duPont de Nemours and Co. v. Pressman,* [FN51] the Delaware Supreme Court held that punitive damages are not available for breach of an employment contract. [FN52] A primary basis for this rule is that damages in contract actions are normally limited to the non-breaching party's expectation interest. [FN53] Here, Dr. Manley's expectation was clear; that she would be paid a specific sum of money.

FN51. Del.Supr., 679 A.2d 436 (1996).

FN52. *Id.* at 488.

FN53. *Id.* at 445-46.

She, however, relies upon some dicta in *Schumann v. Lenape Associates Builders, Inc.,* [FN54] for authority that a non-breaching party may be entitled to punitive damages. There, this Court, in a home construction dispute, spoke of punitive damages possibly arising out of willful, wanton, fraudulent or malicious conduct. [FN55] At worst, the breaching party's conduct in the *Schumann* case was the "I don't care" attitude here. This Court still found this insufficient to create liability for punitive damages.

FN54. Del.Super., C.A.No. 91C-01-057, Babiarz, J. (May 15, 1997).

FN55. *Id.* at 29.

***10** *Schumann,* of course, did not invoke an employment contract. *Pressman* did. There is no need to look beyond that. The Supreme Court even described the conduct which the employee encountered as "consistently ... shabby." [FN56] The defendants' conduct here does not come close to that, even examining the evidence in a light most favorable to Dr. Manley. The record is they chose to pay other creditors before they paid her. This is not wilful, wanton, fraudulent or malicious. She is not entitled to punitive damages, therefore, defendant's motion for summary judgment on this claim is GRANTED.

FN56. *Pressman,* 679 A.2d at 447.

## CONCLUSION

For the reasons stated herein: (1) Dr. Manley's motion for summary judgment to bar extrinsic evidence is GRANTED; (2) Dr. Manley's motion for summary judgment on the breach of contract claim and the anticipatory repudiation claim is GRANTED; (3) Dr. Manley's motion for statutory costs and fees, pursuant to the Wage Payment and Collection Act, is GRANTED; (4) the defendants' motion to dismiss the violation of the Wage Payment and Collection Act claim is DENIED; (5) the defendants' motion to dismiss the civil conspiracy count of the complaint is DENIED; and (6) the defendants' motion to dismiss the bad faith claim is GRANTED.

IT IS SO ORDERED.

2001 WL 946489 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.





United States District Court, D. Alaska.
Kenneth W. THAYER, Joe Stanford, and MaryAlyce Sager, individually and on behalf of all others similarly situated, Plaintiffs,
v.
ALASKA TEAMSTER-EMPLOYER PENSION TRUST, and John Forceskie, John Creed, Gary Dixon, William C. James, Ernest E. Webb, Charles Kegley, William Meehan, Louis Ridle, James Staples, Norman L. Schwalb, Joe Pinzone, Gary Atwood, Richard Boyles, Mark Johnson, Robert Sinnett, Jack Slama, Gary Tanghe, Leighton Thetford, C. Lee Wareham, its named fiduciaries, Defendants.
**No. A90-147 Civil.**

Feb. 9, 1993.

Robert K. Stewart, Richard J. Birmingham, and Bruce Lamka of Davis Wright Tremaine, Anchorage, AK, for plaintiffs.

Ronald L. Bliss of Bliss & Riordan, Anchorage, AK, for defendants.

ORDER

SINGLETON, District Judge.

***1** Kenneth Thayer, Joe Stanford, and Maryalyce Sager bring this action individually and on behalf of approximately 3,000 class members similarly situated. The members of the class are former members of Teamsters Local 959, most of whom were employed in the 1970s in work relating to construction of the Trans-Alaska Pipeline System ("TAPS"). Through their employment, class members were participants in the Alaska Teamster-Employer Pension Trust ("Trust"), a collectively-bargained, joint management-labor pension fund which is administered by a board of trustees ("Trustees") and governed by a Pension Trust Agreement ("the Plan"). The Plan had an employer-contribution element; and participants in the Plan were entitled to a fixed benefit at retirement.

Under the original Plan, which was established in 1966, an employee became vested after 10 to 15 years. Under the language of the Plan, when an employee became vested, his benefits became nonforfeitable. Effective July 1, 1975, the Plan was amended pursuant to the guidelines of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. 93-406, 88 Stat. 832 (1974) (as amended), to permit full vesting after 10 years. The new Plan also provided that in the event the Plan experienced a partial or complete termination, benefits of affected workers would be nonforfeitable.

The Plan was subsequently amended by the Trustees several times in the late 1970s. In 1976, employee participation in the Plan peaked; and between 1976 and 1980, over 6,000 workers were laid off, causing the number of participants in the Plan to decrease by approximately 53 percent. Additional significant decreases in participation occurred between 1983 and 1986. Plaintiffs assert that partial terminations occurred during both of these periods, and contend that under the circumstances, a three-year vesting schedule would have been more appropriate than the ten-year vesting schedule of ERISA.

The Trustees amended the Plan in 1978, 1980, 1982 and 1983, progressively increasing the benefits of vested members. Plaintiffs contend that these increases were made possible by the decrease in the number of participants the Plan counted as vested; and that the Trustees changed their method of counting to show a higher level of participation following an Internal Revenue Service ("IRS") investigation into whether a partial termination had occurred. The IRS investigation ceased in April of 1984 due to legislation introduced as the Deficit Reduction Act of 1984 ("DRA"), Pub.L. No. 98-369, § 552, 98 Stat. 896, 896-97 (1984). This legislation specifically exempted from ERISA vesting requirements partial terminations associated with the construction of TAPS.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs allege that the Plan never communicated to them any decision regarding whether a partial termination had occurred. Defendants counter that their annual reports filed on May 14, 1984, and February 25, 1987, which were required by law, gave plaintiffs constructive notice of the Trustees' position as to whether a partial termination had occurred during the periods in question.

***2** Plaintiffs filed suit in district court on April 23, 1990, alleging that the Plan violated section 411(d)(3) of the Internal Revenue Code of 1986, as amended, which requires full vesting upon partial termination of a plan. They further contend that the DRA is unconstitutional because it operates retroactively to divest Alaskan Pipeline workers of previously-vested pension rights, and that the Trustees breached their fiduciary duty to plaintiffs by using trust funds to lobby for that legislation. They seek a declaration of their rights under the Plan and an injunction prohibiting the Trustees from liquidating or distributing Trust assets in an unjust manner.

The defendants have moved to dismiss Thayer's partial termination claim at Docket No. 107, on the grounds that: (1) the claim was filed after the running of ERISA's three-year statute of limitations for breaches of fiduciary duty; and (2) judicial review is barred by Thayer's failure to exhaust administrative remedies. Magistrate Judge Roberts has considered these motions and has issued a Report and Recommendation at Docket No. 167, in which he recommends that the defendants' motion for dismissal at Docket No. 107 be denied. I have reviewed Magistrate Roberts' Report and Recommendation, in addition to the briefs and objections filed by the parties, and have conclude that I substantially agree with his position, for the reasons set forth herein.

DISCUSSION

I. WHEN PLAINTIFFS' CAUSE OF ACTION ACCRUES.

Defendants argue that plaintiffs' partial termination claims are barred by the three-year statute of limitations for fiduciary actions in Section 413 of ERISA, 29 U.S.C. § 1113. However, plaintiffs' cause of action with respect to their request for declaratory and injunctive relief on the partial termination issue arises under Section 502 of ERISA, 29 U.S.C. § 1132. Therefore, I conclude that the six-year statute of limitations for contract actions in AS 09.10.050 should apply. *See Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan,* 713 F.2d 247, 251 (7th Cir.1983).

The defendants argue that plaintiffs had constructive knowledge of their position with respect to whether a partial termination had occurred by virtue of their annual reports, which described the decline in Plan participation and set forth the number of years required for vesting; and that therefore, the statute of limitations should run from the dates these reports were filed. They reason that because the "gravamen" of plaintiffs' claim is that there was a decline in Plan participation, knowledge of this fact should have caused plaintiffs to realize their cause of action. The defendants also assert that plaintiffs had actual knowledge of the alleged violation in 1980, because at least three of the named plaintiffs were aware of the Plan's vesting requirements and knew that they had failed to vest at that time. Plaintiffs argue in response that the occurrence of a partial termination does not constitute a breach of the pension contract.

***3** Magistrate Roberts concluded that the statute of limitations begins to run when there has been "a clear and continuing repudiation of rights under the pension plan which is made known to the beneficiary," quoting *Martin v. Construction Laborer's Pension Trust,* 947 F.2d 1381, 1384 (9th Cir.1991). I agree that this is the appropriate standard to be applied in this case, and conclude that a clear and convincing repudiation of rights was not given to plaintiffs merely by virtue of their having been aware of vesting requirements and of certain background facts. *See Menhorn v. Firestone Tire and Rubber Co.,* 738 F.2d 1496 (9th Cir.1984).

II. EXHAUSTION OF INTERNAL REMEDIES.

The defendants also contend, in the alternative, that plaintiffs' lawsuit is not ripe for review because they have failed to exhaust their non-judicial remedies. This position comports with the general rule that exhaustion is required before judicial review is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

permitted under ERISA. *See* Amato v. Bernard, 618 F.2d 559, 566 (9th Cir.1980).

The defendants maintain that under the procedures of the Plan, participants are required to seek relief first from the Plan Administrator, and then from the Board of Trustees. Plaintiffs respond that their examination of the language of the Plan revealed no provisions for obtaining declaratory judgments in advance regarding participants' benefit rights, and that the only review provisions contained in the Plan apply to benefit determinations made after a participant's retirement. From my review of the Trust Agreement at Docket No. 113, Exhibit 5, I conclude that there were no procedural provisions for the type of review envisioned by 29 U.S.C. § 1132, and that therefore, plaintiffs had no internal remedies to exhaust. [FN1] Consequently, the Trustees' motion at Docket No. 107 is denied.

IT IS THEREFORE ORDERED:

Defendants' motion to dismiss plaintiffs' partial termination claims, at Docket No. 107, is DENIED.

FN1. Thus, there appears to be no need to make the determination supporting Magistrate Roberts' conclusion that the exhaustion requirement was satisfied based upon his reasoning that further exhaustion would be futile. *See* Docket No. 167 at 9.

1993 WL 173710 (D.Alaska), 16 Employee Benefits Cas. 1877

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.