# EXHIBIT A

**Westlaw.**

Not Reported in A.2d                                                                                                 Page 1
2001 WL 946489 (Del.Super.)
**(Cite as: 2001 WL 946489 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Dawn C. MANLEY, M.D., Plaintiff,
v.
ASSOCIATES IN OBSTETRICS AND GYNECOLOGY, P.A., James E. Bradfield, M.D., Robert
L. Hickok, Jr., M.D., and Gregory W. DeMeo, D.O., Defendants.
No. CIV.A.00C-049-JOH.

Argued: Feb. 21, 2001.
Submitted: Feb. 22, 2001.
Decided: July 27, 2001.

Plaintiff's Motion for Summary Judgment to Bar Extrinsic Evidence--Granted. Plaintiff's Motion for Summary Judgment on Breach of Contract and Anticipatory Repudiation--Granted. Plaintiff's Motion for Statutory Costs and Fees Pursuant to Wage Payment and Collection Act--Granted. Defendants' Motion to Dismiss Violation of Wage Payment and Collection Act Claim--Denied. Defendants' Motion to Dismiss Civil Conspiracy Claim--Denied. Defendants' Motion to Dismiss Bad Faith Claim--Granted.

Francis G.X. Pileggi, Esq., of Fox, Rothschild, O'Brien & Frankel, LLP, attorney for plaintiff.

Paul M. Lukoff, Esq., of Prickett, Jones & Elliott, attorney for defendants.

MEMORANDUM OPINION

HERLIHY, J.

\*1 Plaintiff Dawn C. Manley, M.D., was formerly employed by Associates in Obstetrics and Gynecology, P.A., [AOG]. She voluntarily ended her employment with AOG and signed an agreement providing she would receive four annual payments. The first two installments were paid but the second two were not.

She has sued AOG and her former associates in AOG, James E. Bradfield, M.D., Robert L. Hickok, Jr., M.D., and Gregory W. DeMeo, D.O., for, among other things, breach of contract. She contends the contract unambiguously entitled her to the last two payments. [FN1] The defendants assert, on the other hand, there is extrinsic evidence to show there was an agreed-upon condition precedent to payment which justifies the nonpayment. Dr. Manley has moved to bar that extrinsic evidence and for summary judgment on the final two payments.

> FN1. When this case was briefed and argued, the final payment was not due. Dr. Manley has a claim for anticipatory breach. The due date for that payment has passed and there is no indication the last payment was made. This will be discussed *infra* at 13.

In addition to the contract claims, Dr. Manley sued the defendants for civil conspiracy, breach of the Wage Payment and Collection Act and bad faith/punitive damages. The defendants have moved for summary judgment on these claims.

The Court holds the contract is unambiguous, extrinsic evidence will not be allowed and Dr. Manley is entitled to a judgment on the last two payments. Her motions on these points are GRANTED. The Court holds there are genuine issues of material fact as to the civil conspiracy claims that Dr. Manley is entitled to relief provided by the Wage and Payment Collection Act but she is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 2
2001 WL 946489 (Del.Super.)
**(Cite as: 2001 WL 946489 (Del.Super.))**

not entitled to punitive damages. The defendants' motion is DENIED, in part, and GRANTED, in part.

FACTUAL BACKGROUND

On December 18, 1995, Dr. Manley entered into an employment agreement with AOG, a professional corporation, in which the individual defendants are shareholders. The employment agreement provided for deferred compensation upon her termination. It was to be payable in equal monthly installments for sixty months following termination and would be an amount equal to her total compensation as reported on her W-2 statement for the most recently ended fiscal year with AOG.

Dr. Manley voluntarily terminated her employment on December 19, 1997 and later entered into an amendment [Amendment] to the 1995 employment agreement relating to the deferred compensation. Counsel for the defendants prepared both the employment agreement and the Amendment. The record also shows, however, that Dr. Manley received advice from her own counsel when the Amendment was being negotiated and reviewed. The Amendment provides, in pertinent part:

> "9. (a) *Deferred Compensation Obligation.* [AOG] agrees to pay [Dr. Manley], as deferred compensation, the sum of Two Hundred Ninety Thousand Dollars ($290,000), payable in four (4) annual installments of Seventy-Two Thousand Five Hundred Dollars ($72,500), with the first payment due on May ___, 1998, and continuing annually on the ___ day of May for four (4) years until May ___, 2001. This obligation to pay deferred compensation shall continue in the event of [Dr. Manley's] death, and in such case the payments shall be made to the beneficiary designated by [Dr. Manley] in a writing filed by [Dr. Manley] with [AOG]. This obligation shall not be affected by any actions or omissions of Spectrascan Network Partners VI, LLP, or any of its agents, assigns, or affiliates. [FN2]

> FN2. Amendment at 1.

*2 Dr. Manley received the first two payments of $72,500, but the defendants failed to tender the 2000 payment and advised the 2001 payment would not be honored.

In responding to Dr. Manley's complaint, AOG provided an affidavit of Helen McCullough, M.D., president of AOG. She said, in part:

> 3. At the time the Employment Agreement and the Amendment to the Employment Agreement were undertaken, it was contemplated that AOG's commitment to make deferred compensation payments to Dr. Manley was, in turn, dependent upon sufficient income to the medical practice, such that there would be money available to pay both the physicians remaining in the practice, as well as Dr. Manley.

* * *

> 5. Under the Staffing Services Agreement, dated April 30, 1997, by which the medical practice of AOG is operated, Woman's Health Medical Partners, P.A. ("WHMP"), as manager of the practice is obligated to perform certain duties, including the timely payment to AOG in cash, on a monthly basis, a percentage of the practice's fee collections, which serves as a potential funding source for the deferred compensation to the plaintiff.

> 6. Dr. Manley recognized, prior to the execution of the Amendment to her Employment Agreement, that fulfillment of the Staffing Service Agreement by the medical practice's manager, WHMP, was critical to the ability of AOG to pay compensation, whether deferred or otherwise, to both its medical practitioners and her. [FN3]

> FN3. Affidavit of Helen McCullough, M.D. (October 18, 2000) at 2.

Defendants Drs. Hickok and DeMeo were deposed. Dr. DeMeo stated, in relevant part:

> A. Oh, in that regard. I believe I hold the position--I believe everybody holds the position of vice president.

* * *

> A. Because the unfortunate thing, I believe, is that we are taking everything at face value and not extrapolating the true meaning of the agreement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 3

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

and the discussions. The fact of the matter is--in my opinion, is that our company [AOG], would love to pay Dr. Manley if, in fact, the company had the financial ability to do such. We, however, have responsibilities to ourselves and our patients that require that--at the present time the money that is going in is going out as fast as it goes in and, therefore, there is no left over. And so, therefore, if there was money that was present, I would gladly have that go towards Dr. Manley's claim, but unfortunately, that's not how the situation is presently going. And the way I see it, you know, there is a basic partnership principle to that which we all hold.

\* \* \*

A. From a layman's point of view and at face value, that means that AOG is-- my assumption is--responsible to pay Dr. Manley the $72,500 in May of subsequent years.

\* \* \*

Q. Are you aware of Dr. Manley's position that she was not interested in signing this Amendment to Employment Agreement unless the last sentence on page 1 of the agreement was added to the agreement?
A. I am aware of that position. [FN4]

> FN4. DeMeo Deposition (December 6, 2000) at 23, 65, 87 and 120.

Dr. Hickok stated, in relevant part:
Q. And are you aware that the corporation, AOG, has not paid Dr. Manley the payment that she was seeking in May of 2000?
*3 A. Yes.

\* \* \*

Q. Now, tell me again why you have not made the payment to Dr. Manley that was due in May of 2000?
A. The payment wasn't made simply because the corporation has no money to pay her.

\* \* \*

Q. And tell me why they don't have the money.
A. Because our business venture with Spectrascan proved very unprofitable.
Q. So your position is that in May of 2000, AOG had no money at all?
A. Essentionally, we have very little to no money, that's correct.

\* \* \*

A. It's a general understanding that we all equally entered into a business venture with our eyes open and proper advice from appropriate people, and that we all lost. We all were hurt by it.

\* \* \*

Q. Somewhere between Lynn [Grasgowski] and Dr. DeMeo decisions are made to pay at least within the past few months almost three-quarters of a million dollars to somebody that AOG owes money to; right?
A. Yes. [FN5]

> FN5. Hickok Deposition (October 18, 2000) at 49, 53, 60 and 68-69.

Geoffrey M. Langdon, accountant for the defendants, testified in a deposition that the return of capital is sometimes treated as compensation for tax purposes; occurring when a corporation is liquidated or purchased. In a separate affidavit, he contended:
7. There is nothing contrary to accepted accounting principals in treating payments for a buy-out of the equity of a former principal of a small professional corporation as salary income. In fact it is a common practice with medical practices. In form, these payments were treated as compensation to each of the principals. In substance, they were a return of capital to the original owners. [FN6]

> FN6. Langdon Affidavit (February 15, 2001) at 3.

The Court heard oral argument on February 21, 2001. The defendants argued that WHMP, the manager of the practice, is responsible for the payments Dr. Manley. The defendants, through answers to Dr. Manley's third set of interrogatories, also stated WHMP is not an affiliate of Spectrascan.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

Page 4

Dr. Manley responded, regardless of WHMP, AOG owes the money pursuant to the Amendment to the employment agreement.

### APPLICABLE STANDARD

Summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN7] The Court must view the evidence in the light most favorable to the non-moving party. [FN8] Summary judgment is inappropriate if a material fact is in dispute or if inquiry into the facts is necessary in order to clarify the application of the law. [FN9] Once a moving party properly supports the motion, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact and it cannot rely upon unverified allegations or bare assertions. [FN10]

> FN7. *Wilson v. Joma, Inc.,* Del.Supr., 537 A.2d 187 (1988).
>
> FN8. *State v. Regency Group, Inc.,* Del.Super., 598 A.2d 1123, 1126 (1991).
>
> FN9. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).
>
> FN10. *Martin v. Nealis Motors, Inc.,* Del.Supr., 247 A.2d 831, 833 (1968).

### DISCUSSION
*Parol Evidence*

Dr. Manley has moved to bar introduction of parol evidence concerning the interpretation of her original 1995 employment agreement and the Amendment. Her motion seeks to prevent extrinsic evidence that she and the other doctors understood a debt on another venture would have to be paid before the obligation to her. She contends the agreements do not lend themselves to an interpretation other than she is to be paid.

*4 The defendants, on the other hand, argue the contract provisions are ambiguous and that genuine issues of material fact exist as to the meaning of the contracts. They note that Dr. Manley has offered contradictory views of whether the payments due her are wages or possibly return of capital. They also say that she knew the venture with the third party was a risk and accepted that any liability to that third party could affect the payments due her. They refer to their own testimony and Dr. Manley's deposition and an affidavit in support of their arguments. They also argue, correctly, that Dr. Manley's motion to bar parol evidence is a motion to have this Court determine she is owed the payment as a matter of law. [FN11]

> FN11. When the parties filed their various motions and as of the date of oral argument, the May 2001 payment had not been due. The issue raised as of that time was of anticipatory breach. That issue will be addressed in section "Amounts Due," *infra* at 13.

Dr. Manley's motion necessarily requires the Court to interpret the two contracts. The proper interpretation of a contract is purely a question of law. [FN12] The principles of interpretation are well-settled. Contracts are to be interpreted as a whole to give effect to the intention of the parties. [FN13] When contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning. [FN14] A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. [FN15] The true test is not what the parties intended, but what a reasonable person in the same position of the parties would have thought it meant. [FN16] Where a contract is not ambiguous, however, extrinsic evidence will not be used to interpret it. [FN17]

> FN12. *Rhone-Poulenc v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1195 (1992).
>
> FN13. *Northwestern National Ins. Co. v. Esmark, Inc.,* Del.Supr., 672 A.2d 41, 43 (1996).
>
> FN14. *Johnston v. Talley-Ho, Inc.,* Del.Super., 303 A.2d 677, 679 (1973).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

Page 5

> FN15. *ABB Flakt, Inc. v. National Union Fire Ins. Co.,* Del.Supr., 731 A.2d 811, 816 (1999).
>
> FN16. *Rhone-Poulenc,* 616 A.2d at 1196.
>
> FN17. *E.I. duPont de Nemours & Co. v. Allstate Ins. Co.,* Del.Supr., 693 A.2d 1059, 1061 (1997).

Dr. Manley asserts the Amendment is clear on its face and there is no reason to rely on extrinsic evidence to construe the meaning of the Amendment. The Court agrees.

A simple reading of the Amendment and a reasonable person would conclude that Dr. Manley is to receive four payments of $72,500, totaling $290,000. The obligation to pay is explicitly not affected by any "actions or omissions of Spectrascan Network Partners IV, LLP, or any of its agents, assigns, or affidavits." [FN18] Nothing more could be interpreted from reading the Amendment. There is only one plausible meaning.

> FN18. Amendment to Employment Agreement at 1.

Even the defendants have conceded on this point. In Dr. Hickok's deposition, he said:
  Q. Sure. In light of reading Exhibit 2, is your position reconcilable in your view that whatever happened to Spectrascan or whatever Spectrascan did or did not do, is an explanation for AOG not paying Dr. Manley?
  A. No. Associates in AOG owe Dr. Manley the money.
  Q. Okay, So you agree that they owe.
  A. Yes.
  Q. Well, explain to me why the aren't paying.
  A. Because they don't have the money. [FN19]

> FN19. Hickok Deposition (October 18, 2000) at 65.

Dr. DeMeo, in his deposition, stated, "[f]rom a layman's point of view and at face value, that means that AOG is--my assumption is--responsible to pay Dr. Manley the $72,500 in May of subsequent years ." [FN20]

> FN20. DeMeo Deposition (December 6, 2000) at 87.

The defendants contend Dr. DeMeo also believed that all of the AOG principals, including Dr. Manley, prior to selling their business to the other entity, understood that there were significant risks involved which could undermine the completion of the buy outs of their equity in AOG. [FN21] Additionally, the defendants, in their responses to two interrogatories posed by Dr. Manley, stated the only documents that set forth the understanding as to the amount of compensation Dr. Manley would receive and when she would receive it were the 1995 employment agreement and the Amendment. [FN22]

> FN21. *Id.* at 73, 74, 80, 88-89.
>
> FN22. Defendants' Answers to Interrogatories at ¶¶ 6 and 7.

*5 The defendants argue the contract is ambiguous as evidenced by Dr. Manley's motion to determine "deferred compensation" as meaning "wages." This does not make the contract ambiguous. "Deferred compensation" may be open to several interpretations, but in this contract, it simply means the money that Dr. Manley is owed. Whether wages or return on capital, there is no room to interpret either or both of the contracts as creating a condition precedent to the final two payments.

Ambiguity does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." [FN23] There is no ambiguity in this contract which would permit the extrinsic evidence which the defendants seek. Dr. Manley's motion to bar such evidence is GRANTED.

> FN23. *Rhone-Poulenc,* 616 A.2d at 1196 ( citing *Holland v. Hannan,* D.C.App., 456 A.2d 807, 815 (1983)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 6
2001 WL 946489 (Del.Super.)
**(Cite as: 2001 WL 946489 (Del.Super.))**

Additionally, the defendants contend, through an affidavit of defense, [FN24] that Dr. Manley understood she would not receive the deferred compensation unless WHMP performed certain obligations under a Staff Services Agreement. These certain obligations refer to the payment of a percentage of the practice's fee collections, which would serve "as a potential funding source for the deferred compensation to [Dr. Manley]." [FN25] The defendants also argue that WHMP is not an affiliate of Spectrascan, therefore, it may affect the Amendment to the employment agreement. Dr. Manley asserts that regardless whether WHMP is affiliated to Spectrascan, the defendants have presented no legally recognized defense to nonpayment of the amounts due.

>    FN24. Affidavit of Helen McCullough, M.D. (October 18, 2000) at 2.

>    FN25. *Id.*

As previously stated, the contract is unambiguous. Dr. Manley was to receive deferred compensation that was not to be affected by any actions or omissions of Spectrascan, or any of its agents, assigns or affiliates. Nor is the contract, as the defendants suggest, conditioned on WHMP rendering payments to AOG. If this was to have been a condition precedent to the payment of the deferred compensation, it should have been stated in the contract. [FN26] Additionally, this condition precedent to the payment of deferred compensation is contrary to the agreement, as it does not contain any condition precedents.

>    FN26. *See Liberto v. Bensinger,* Del.Ch., C.A.No. 1411-K, Strine, V.C. (December 28, 1999) (The plaintiffs should have included a condition precedent in the land sale contract stating that a building permit must be issued, if they wanted to later avoid acceptance of the contract if the building permit was not issued.)

Traditionally, the parol evidence rule precludes evidence of additional terms to a written contract, when that contract is a complete integration of the agreement of the parties. The harshness of the parol evidence rule, however, has been mitigated to a certain extent as the courts have recognized a number of exceptions to it, such as where the court seeks aid in its interpretation of ambiguous terms in a written contract, or where a party seeks to prove that a writing was only a partial integration of the contract or that a collateral or separate agreement exists.

It has long been accepted in Delaware that parol evidence is admissible to show conditions precedent which relate to the taking effect of a written instrument. Such evidence does not constitute an oral contradiction or modification of the written instrument, rather it goes to the very existence of the contract and tends to show that no valid and effective contract ever existed. However, if the condition precedent is inconsistent with, or contrary to, the written instrument, parole evidence of the agreement will not be admitted. [Citations omitted.] [FN27]

>    FN27. *Engle v. Oney,* Del.Ch., C.A.No. 1249, Hartnett, V.C. (April 25, 1989).

\*6 The contract is unambiguous and was the complete agreement between the parties. If the parties contemplated a condition precedent to the agreement it would have been included in the agreement. The defendants' argument that the agreement was controlled by a condition precedent is unpersuasive.

*Amount Due*
Having determined that the contract is unambiguous, the next issue is whether Dr. Manley is entitled to a judgment of $145,000 as a matter of law. As noted earlier, [FN28] when the parties briefed and argued their motions, the May 2001 payment had not become due. Based on the contract provisions just interpreted, it would now be due. The Court, not having been informed otherwise, will assume it was not paid.

>    FN28. Footnote 1 at 1.

The only defense to nonpayment offered by the defendants is two statements made in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

Page 7

depositions of Drs. Hickok and DeMeo. Dr. Hickok believed there was an understanding that all four principals of AOG had entered into a business venture with open eyes, but the venture failed. Dr. DeMeo believed that all of the AOG principals, including Dr. Manley, prior to selling their business to the other entity, understood that there were significant risks involved which could undermine the completion of the buy outs of their equity in AOG.

Both Drs. Hickok and DeMeo have testified, however, that AOG owes Dr. Manley the money. As noted earlier, Dr. Hickok testified Dr. Manley was not paid because AOG had insufficient funds to pay her and he stated, from a layman's point of view, the money is owened to her.

The Amendment and the defendants' admissions demonstrate that Dr. Manley is entitled to the 2000 and 2001 payments. The 2001 payment was not yet due when this case was submitted. But Count II of the complaint asserts anticipatory repudiation of the 2001 payment. "[T]he law generally has acknowledged for more than one hundred years that an unequivocal statement by a promisor that he will not perform his promise gives 'the injured party an immediate claim to damages for total breach, in addition to discharging the remaining duties of performance." ' [FN29] The contract is clear on its face and a reasonable person would understand the money is overdue. Now that even the due date in the agreement has passed and the final payment has not been made, it is overdue.

>   FN29. *Carteret Bancorp, Inc. v. Home Group, Inc.,* Del.Ch., C.A.No. 9380, Allen, C. (January 13, 1988).

Dr. Manley's motion for summary judgment on the 2000 and 2001 claims is, therefore, GRANTED. The Court awards judgment in the amount of $145,000 in her favor.

*Wage Payment and Collection Act*
One of Dr. Manley's causes of action against the defendants is for the extra relief provided by the Wage Payment and Collection Act [Act]. [FN30]

Since she had to bring this action to obtain a judgment for the last two payments, which she says are wages due, she has invoked the extra relief provided by the Act.

>   FN30. 19 *Del.C.* § 1101, *et seq.*

Any judgment entered for a plaintiff in an action brought under this section shall include an award for the costs of the action, the necessary costs of prosecution and reasonable attorney's fees, all to be paid by the defendant. [FN31]

>   FN31. 19 *Del.C.* § 1113(c).

*7 The defendants dispute Dr. Manley's entitlement to this relief. To get it, they argue, she must seek to recover wages and what she is after does not fall within the Act's definition of wages. They contend she seeks deferred compensation or severance pay and the latter is not included in the Act's definition of wages. As support, they cite *Department of Labor v. Green Giant Co.,* [FN32] because it says deferred compensation or severance pay is not included within the statutory definition of wages. [FN33] The court there was referring to the term wages found in 19 *Del. C.* § 1101(2), which provides:

>   FN32. Del.Super., 394 A.2d 753 (1978).

>   FN33. *Id.* at 755.

"Wages" means compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation. [FN34]

>   FN34. 19 *Del.C.* § 1101(a)(2).

The defendants' citation to *Green Giant* is correct up to a point. But they miss the primary holding in the case. *Green Giant* did concern severance pay. The Department of Labor was seeking to enforce severance pay due several Green Giant workers. This Court noted that, while the original definition of wages in § 1101(a)(2) did not include severance

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

Page 8

pay, a subsequently enacted § 1109 did, which provided:
(a) Any employer who is party to an agreement to pay or provide benefits or wage supplements to any employee shall pay the amount or amounts necessary to provide such benefits or furnish such supplements within 30 days after such payments are required to be made; provided however, that this section shall not apply to employers subject to Part I of the Interstate Commerce Act [49 U.S.C. § 10101 et seq.].
(b) As used herein, "benefits or wage supplements" means compensation for employment other than wages, including, but not limited to, reimbursement for expenses, health, welfare or retirement benefits, and vacation, separation or holiday pay, but not including disputed amounts of such compensation subject to handling under dispute procedures established by collective bargaining agreements. [FN35]

> FN35. 19 *Del. C.* § 1109.

The definition of "wages" in § 1109(b), the Court noted, was broader than found in § 1101(a)(2). To make § 1109 meaningful, its requirements needed a remedy and that remedy was § 1113. [FN36] The Court said the remedies in § 1113 were for the same for an employee as for the Department of Labor. [FN37] It went on to say:

> FN36. *Green Giant,* 394 A.2d at 756-57.

> FN37. *Id.* at 757.

In other words, § 1113 provided civil remedies to the employee and the Department [of Labor] to recover in all instances where payments required under the statute had not been timely made. [FN38]

> FN38. *Id.*

The Court concluded the Department of Labor could pursue an action for severance pay. [FN39]

> FN39. *Id.* at 758.

Dr. Manley's remedies, as the *Green Giant* case held, are coextensive with those of the Department of Labor. She argues that the payments to her were treated as wages because the defendants treated two of the payments she did receive as wages, as payroll taxes were deducted. The defendants, of course, contend this treatment does not convert the payments to wages. Further, at one point in their argument, they refer to the payments as severance pay. They even cite to a provision in the unamended portion of her original employment agreement referring to the payments as separation pay. [FN40] They so characterize them in an effort to exclude them from § 1101(a)(2) and any enforcement remedies in Chapter 11.

> FN40. Section 9(c)(4) of the Employment Agreement.

*8 The defendants invocation of the original contract is curious. They cite it as authority to deduct payroll taxes from Dr. Manley's four payments. Yet, the provisions they cite, § 9(c)(4) has no such apparent authority. But, more importantly, § 9(c)(4) grants authority to the defendants to make certain deductions should Dr. Manley voluntarily terminate by giving less than ten months' notice. She gave, however, only fourteen days' notice. [FN41] Without defendants' contradiction, her December 19, 1997 letter says they waived that ten-month notice requirement. Further, the record before the Court shows none of the payments made to her reflect any of the deductions § 9(c)(4) allowed the defendants to make if the notice requirements were not met.

> FN41. Dr. Manley letter to defendants (December 19, 1997); Dr. Manley Affidavit (October 11, 2000) at ¶ 4.

The Court need not untangle the dispute over the label to be applied to the two remaining installments due Dr. Manley. The non-exclusive definition in § 1109(b) of benefits or wage supplements is broad enough to encompass the payments due Dr. Manley. If successful in her action to collect, the additional relief provided in § 1113 is available to her. On that basis, the defendants' motion for summary judgment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

Page 9

on this claim is DENIED.

One of the potential open issues created by the availability of § 1113 to Dr. Manley is whether the individual physician defendants could be personally liable. The Act creates that possibility.

> For the purpose of this chapter the officers of a corporation and any agents having the management thereof who knowingly permit the corporation to violate this chapter shall be deemed to be the employers of the employees of the corporation. [FN42]
>
> > FN42. 19 *Del.C.* § 1101(b); *Department of Labor v. Mattes Electric, Inc.,* Del.Super., C.A.No. 99M-08-031, Del Pesco, J. (May 5, 2000).

Since that section uses "chapter," it means all of Chapter 11. Chapter 11, obviously, includes § 1109. The record shows the physician defendants knew payments were not made to Dr. Manley and may have authorized that nonpayment. What is somewhat unclear, based on the current record, is what their official capacity and/or management responsibility was at any appropriate time relevant to the remaining two payments. The record is even murkier about whether any or all of them "knowingly permitted" AOG to violate the Act. These issues, of course, cannot be settled on summary judgment with this record.

*Civil Conspiracy*

Dr. Manley claims Drs. Bradfield, Hickok and DeMeo conspired to commit a breach of contract. The breach, of course, is the failure to make the final payments to her. The defendants argue that she has not presented any evidence of an "underlying *unlawful* purpose." [FN43] Civil conspiracy requires three elements:

> FN43. Defendants' Motion for Summary Judgment ¶ 5.

(1) A confederation or combination of two or more persons;
(2) An unlawful act done in furtherance of the conspiracy; and
(3) Actual damage. [FN44]

> FN44. *Zerby v. Allied Signal, Inc.,* Del.Super., C.A.No. 00C-07-068, Silverman, J. (February 2, 2001) (citing *Nicolet v. Nutt,* Del.Supr., 525 A.2d 146, 149-150 (1987)).

The conspiracy must stem from an underlying wrong and is not, in itself, a separate cause of action. [FN45] A party must "set forth specific facts such as meetings, conferences, telephone calls or joint signatures on written recommendations ... to indicate a conspiracy." [FN46] Circumstantial evidence, as well as direct evidence, may prove a conspiracy. Thus, reasonable latitude may be permitted in establishing facts from which the conspiracy may be inferred. [FN47]

> FN45. *Ramunno v. Cawley,* Del.Supr., 705 A.2d 1029, 1039 (1998).
>
> FN46. *Id.* at 1039 (citing *Petula v. Mellody,* Pa.Cmwlth., 588 A.2d 103, 107 (1981)).
>
> FN47. *Connolly v. Labowitz,* Del.Supr., 519 A.2d 138, 144 (1986).

*9 In *Elder v. El Di, Inc.,* [FN48] the plaintiff alleged the defendants conspired with the unlawful purpose of inducing one defendant to break its lease with the plaintiff. The court determined the underlying wrongs alleged were the breach of the lease agreement and the malicious interference with contractual relations. There is no malicious interference claim here, but there is a claim of breach of contract.

> FN48. Del.Super., C.A.No. 96C-09-007, Graves, J. (April 24, 1997).

Here, the evidence addressed so far is that AOG breached its contract with Dr. Manley by not making at least the May 2000 payment. It should be noted, now, that the May 2001 payment is overdue, payment of that could constitute either a separate or an ongoing breach. *Elder v. El Di, Inc.,* holds that a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

Page 10

breach can constitute an unlawful act which is one of the three elements of civil conspiracy.

The issue, therefore, is to what extent the record at this time shows any of the defendants agreed to have AOG not make payments to Dr. Manley as specified in her Amendment. Looking at the record in a light most favorable to her, as the Court must, she has shown enough to create a genuine issue of material fact preventing summary judgment in the defendants' favor. [FN49]

> FN49. *In re Asbestos Litigation,* Del.Supr., 673 A.2d 159, 163 (1996).

The deposition testimony of Drs. DeMeo and Hickok shows an awareness of the payments to Spectrascan and obligation to Dr. Manley, but the choice to pay Spectrascan rather than honor the contractual obligation(s) to her. The record is less clear as to Dr. Bradfield's knowledge and participation in those decisions. That AOG or the defendants may have chosen to pay a larger debt to Spectrascan rather than Dr. Manley, however, if this was the case, it is no defense.

For these reasons, the defendants' motion for summary judgment on the civil conspiracy claim is DENIED.

*Bad Faith*

The defendants also move to dismiss Dr. Manley's claim for bad faith punitive damages. The record shows her claim arises out of an employment contract dispute. She argues the defendants have exhibited a "I don't care" attitude toward her demands for payment and the contractual obligation to her which remain unfulfilled. Insomuch that such an attitude potentially makes one liable for punitive damages, Dr. Manley is correct. [FN50]

> FN50. *Cloroben Chemical Corp. v. Comegys,* Del.Supr., 464 A.2d 887, 891 (1983).

But, while true as a rule in other contexts, its application in an employment contract dispute is another matter. In *E.I. duPont de Nemours and Co.*

*v. Pressman,* [FN51] the Delaware Supreme Court held that punitive damages are not available for breach of an employment contract. [FN52] A primary basis for this rule is that damages in contract actions are normally limited to the non-breaching party's expectation interest. [FN53] Here, Dr. Manley's expectation was clear; that she would be paid a specific sum of money.

> FN51. Del.Supr., 679 A.2d 436 (1996).
>
> FN52. *Id.* at 488.
>
> FN53. *Id.* at 445-46.

She, however, relies upon some dicta in *Schumann v. Lenape Associates Builders, Inc.,* [FN54] for authority that a non-breaching party may be entitled to punitive damages. There, this Court, in a home construction dispute, spoke of punitive damages possibly arising out of willful, wanton, fraudulent or malicious conduct. [FN55] At worst, the breaching party's conduct in the *Schumann* case was the "I don't care" attitude here. This Court still found this insufficient to create liability for punitive damages.

> FN54. Del.Super., C.A.No. 91C-01-057, Babiarz, J. (May 15, 1997).
>
> FN55. *Id.* at 29.

*10 *Schumann,* of course, did not invoke an employment contract. *Pressman* did. There is no need to look beyond that. The Supreme Court even described the conduct which the employee encountered as "consistently ... shabby." [FN56] The defendants' conduct here does not come close to that, even examining the evidence in a light most favorable to Dr. Manley. The record is they chose to pay other creditors before they paid her. This is not wilful, wanton, fraudulent or malicious. She is not entitled to punitive damages, therefore, defendant's motion for summary judgment on this claim is GRANTED.

> FN56. *Pressman,* 679 A.2d at 447.

CONCLUSION

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 11

2001 WL 946489 (Del.Super.)

**(Cite as: 2001 WL 946489 (Del.Super.))**

For the reasons stated herein: (1) Dr. Manley's motion for summary judgment to bar extrinsic evidence is GRANTED; (2) Dr. Manley's motion for summary judgment on the breach of contract claim and the anticipatory repudiation claim is GRANTED; (3) Dr. Manley's motion for statutory costs and fees, pursuant to the Wage Payment and Collection Act, is GRANTED; (4) the defendants' motion to dismiss the violation of the Wage Payment and Collection Act claim is DENIED; (5) the defendants' motion to dismiss the civil conspiracy count of the complaint is DENIED; and (6) the defendants' motion to dismiss the bad faith claim is GRANTED.

IT IS SO ORDERED.

2001 WL 946489 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.