# GORDON, FOURNARIS & MAMMARELLA, P.A.

### ATTORNEYS AT LAW
### 1925 LOVERING AVENUE
### WILMINGTON, DELAWARE  19806

PETER S. GORDON*
THOMAS MAMMARELLA
EMMANUEL G. FOURNARIS*
ROBERT A. PENZA
BRYAN E. KEENAN*
PETER M. SWEENEY
FRANCIS X. GORMAN
MICHAEL M. GORDON**

    * ALSO PENNA. BAR
   **ALSO MARYLAND BAR
    ⁺ ALSO NEW YORK BAR

TELEPHONE NUMBER:
(302) 652-2900
TELECOPIER NUMBERS:
(302) 652-1142
(302) 652-2348

_____

SPECIAL COUNSEL
GROVER C. BROWN

August 29, 2006

**VIA ELECTRONIC FILING**

The Honorable Gregory M. Sleet
U.S. District Court
For the District of Delaware
844 North King Street, Room 4209
Lock Box 31
Wilmington, DE  19801

> **Re:  Tilton v. Radiation Oncologists, et al.**
> **Civil Action No.:  05-00251 (GMS)**

Dear Judge Sleet:

I am in receipt of your notice of a scheduling/status teleconference on Friday, September 1, 2006 at 10:00 a.m.  As the Plaintiff's counsel, I will initiate the call.  The purpose of this letter is to notify the Court that briefing concerning the Defendant's Motion to Quash Subpoena Duces Tecum (filed March 14, 2006) has been completed and is ripe for argument before the Court.  This motion was in response to Plaintiff's Subpoena Duces Tecum issued to William J. Martin, III, on March 1, 2006.  We filed a responsive brief on July 13, 2006, and Defendants followed with a Reply memorandum on August 3, 2006.

Therefore, at the scheduling teleconference we will request the Court to please provide counsel with a convenient date and time the Court is available to hear oral argument on the Motion, either before the Court or by teleconference.

The Honorable Gregory M. Sleet
U.S. District Court
    For The District Of Delaware
August 29, 2006
Page 2
_____

    In addition, kindly find enclosed copy of the deposition of
William J. Martin, III, taken on July 20, 2006.  Please note
that we are also seeking, as part of the Court's ruling, the
scope of the further discovery that may be had of Mr. Martin in
this case.  In his deposition, Mr. Martin noted that he did have
personal knowledge and/or written records pertaining to certain
critical issues in the case, but was unable to speak to the
substance of these matters due to objection by Defendant's
counsel.  Specifically, I would refer the Court to the questions
on pages 58 through 72 of the deposition, particularly the
following portions:

    • p. 58, Line 19 through p. 60, Line 13
    • p. 63, Line 24 through p. 64, Line 14
    • p. 66, Line 1  through p. 66, Line 18
    • p. 71, Line 20 through p. 72, Line 1

Additionally, Mr. Martin has indicated that he would provide the
information and records requested in the Subpoena if so ordered
by the Court.

    I am available at the Court's convenience if any further
information regarding this matter is needed.


                          Respectfully,

                          **/s/ Robert A. Penza**

                          Robert A. Penza (DSB #2769)
                          rpenza@gfmlaw.com

RAP/cnc
Enclosure

cc:  Donald C. Tilton, D.O. (w/encl.)
     William H. Sudell, Jr., Esquire (w/encl.)(VIA ELECTRONIC
FILING)
        Curtis S. Miller, Esquire (w/encl.)(VIA ELECTRONIC FILING)

William Martin, Esq.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DONALD C. TILTON, D.O.,          )
                                 )
          Plaintiff,             )
                                 )
v.                               )
                                 )
RADIATION ONCOLOGISTS, P.A.,     )     Civil Action No.
VIROON DONAVANIK, M.D.,          )     05-251 (SLR)
MICHAEL F. DZEDA, M.D.,          )
CHRISTOPHER KOPROWSKI, M.D.,     )
ADAM RABEN, M.D., SUNJAY         )
SHAH, M.D., and MICHAEL D.       )
SORENSEN, M.D.                   )
                                 )
          Defendants.            )

          Deposition of WILLIAM J. MARTIN, ESQ., taken
pursuant to notice at the law offices of Gordon,
Fournaris & Mammarella, P.A., 1925 Lovering Avenue,
Wilmington, Delaware, beginning at 1:55 p.m. on Thursday,
July 20, 2006, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          ROBERT A. PENZA, ESQ.
          GORDON, FOURNARIS & MAMMARELLA, P.A.
            1925 Lovering Avenue
            Wilmington, Delaware  19806
            for the Plaintiff,

                    CORBETT & WILCOX
               Registered Professional Reporters
          230 North Market Street     Wilmington, DE 19801
                       (302) 571-0510
                    www.corbettreporting.com

William Martin, Esq.

2 (Pages 2 to 5)

Page 2

1  APPEARANCES (CONT'D):
2      WILLIAM H. SUDELL, JR., ESQ.
       MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
3      1201 North Market Street
       Wilmington, Delaware 19801
4      for the Defendants.
5          - - - - -
6      WILLIAM J. MARTIN, ESQ.,
7      the witness herein, having first been
8      duly sworn on oath, was examined and
9      testified as follows:
10 BY MR. PENZA:
11     Q. Mr. Martin, good afternoon. I'm Robert Penza.
12 I represent Donald Tilton in a certain action that's
13 pending in Federal Court in which Donald Tilton has
14 brought claims against Radiation Oncologists, P.A., for
15 payment of certain deferred compensation benefits that he
16 thinks he's entitled to pursuant to his employment
17 agreement when he was employed by Radiation Oncologists,
18 P.A.
19         Prior to the start of this deposition,
20 current counsel for ROPA, you and I had some discussion,
21 because it's apparent that you were former counsel for
22 ROPA. And the concern that we discussed is making sure
23 that the client, ROPA, does not feel concerned that any
24 attorney-client privilege communications that have

Page 3

1  happened in this case are revealed in this discovery
2  process. Therefore, it's my understanding that
3  Mr. Sudell, as current counsel for ROPA, will assert the
4  attorney-client privilege if I were to ask any question
5  that would tend to require an answer in which attorney-
6  client communications occurred.
7          And as a practical matter, the mechanism
8  that I think we've agreed upon is, if I ask a question
9  that you think involves something that you said to one of
10 the three officers of ROPA at the time that Don Tilton
11 was there -- and the other two would be Dr. Donavanik and
12 Dr. Hulick -- you will let us know if you actually have
13 some recollection of a communication. And if so, it's my
14 understanding that for today's purposes that
15 communication will not be revealed based upon the
16 attorney-client privilege.
17         If, on the other hand, the question
18 involves some communication that may have occurred but
19 you have no recollection, if you tell us that, then that
20 will not be something that we need to debate from a legal
21 standpoint with the Court as to whether discovery with
22 that question should be revealed in discovery since the
23 answer will be that you don't know or don't remember.
24         Accordingly, it's my understanding we'll

Page 4

1  proceed with that basis. Any questions I ask that could
2  involve communication -- you'll let us know if you have
3  some recollection or not. If you do, I understand that
4  you will not answer the question based upon the
5  privilege, and I'll move on to the next line of
6  questioning.
7          MR. PENZA: Mr. Sudell, have I
8  accurately stated our understanding?
9          MR. SUDELL: I believe so. But let me
10 just say a few words.
11         Mr. Martin, I represent ROPA currently,
12 of course. As a general matter, ROPA has not waived the
13 attorney-client privilege, and I will endeavor to object
14 to questions that appear to me clearly to involve answers
15 that would invade the attorney-client privilege area.
16         I may not on all occasions, though, know
17 what your answer would be, so I just advise and ask you
18 to keep in mind that the privilege has not been waived.
19 And as Mr. Penza said, if the answer would involve
20 revealing communications, then I now generally instruct
21 you not to answer. If, on the other hand, as he said,
22 you just don't have a recollection, there's no reason for
23 us to beat that horse. And I understand Mr. Penza will
24 not argue that my not objecting or you saying you don't

Page 5

1  recall is in some way a waiver as to that question.
2          Correct?
3          MR. PENZA: Correct.
4          THE WITNESS: May I comment?
5          MR. PENZA: Yes, please.
6          THE WITNESS: Okay. My name is William
7  Martin. And it's true that I acted as counsel for ROPA
8  probably starting in the late '70s and continuing up
9  until 2004-2005. As a former client, it's my
10 understanding that I have an ethical obligation to assert
11 any privilege that would be applicable with respect to
12 questions that are posed to me here today. It was my
13 hope and expectation that Mr. Sudell, who represents the
14 corporation now -- and I understand he will attempt to do
15 so -- to assert any privilege with respect to any
16 question Mr. Penza should pose to me.
17         I also understand that Mr. Sudell and
18 Mr. Penza can't read my mind. And to the extent that an
19 answer to a question might involve me discussing a
20 communication or an e-mail or letter or a telephone
21 conversation that I would have with any of the three
22 officers of the corporation who were the owners at the
23 time, Mr. Sudell is directing me that that is a
24 privileged communication and I am not to discuss that at

William Martin, Esq.

3 (Pages 6 to 9)

Page 6

1  today's deposition.
2          MR. SUDELL: That's correct.
3          THE WITNESS: I also understand that, as
4  between counsel at the table, there may be some benefit
5  to me providing you with information. If I don't
6  recollect certain questions, that may help refine the
7  issues.
8          I understand that -- Mr. Sudell, you
9  don't have a problem with me basically advising the two
10 of you if I have no recollection.
11         MR. SUDELL: That's correct.
12         THE WITNESS: Then I'll do my best to
13 try to work within those parameters.
14         MR. PENZA: Thank you.
15 BY MR. PENZA:
16     Q.  And it's my position, if I wasn't clear, that
17 I believe that, even if there were some communications by
18 you to one of the three officers of ROPA when Don Tilton
19 was there that such a communication may not be privileged
20 or, even if there is a privilege, the privilege may not
21 preclude the discovery of such evidence for a variety of
22 reasons. But we will resolve that legal dispute at a
23 later date with the Court and not try and resolve it
24 today.

Page 7

1          Tell me your educational background,
2  please.
3      A.  I went to college at the University of
4  Delaware and graduated in 1975. I attended and graduated
5  Rutgers University Law School in 1978. I was admitted to
6  a -- as a member of the Delaware Bar in December of 1978.
7  I have worked in the state ever since. I attended night
8  school at Georgetown University Law School and received
9  my master's in tax law in 1987.
10     Q.  Are you licensed to practice law in any
11 jurisdictions other than the State of Delaware?
12     A.  Yes. I'm licensed to practice law in
13 Pennsylvania and in Delaware.
14     Q.  How are you currently employed?
15     A.  I am a member of a law firm known as Martin,
16 Conaty & Lunger located in Wilmington, Delaware.
17     Q.  How long has that firm been in existence?
18     A.  Since December of 2005.
19     Q.  What would you say is your area of practice
20 with Martin, Conaty & Lunger?
21     A.  I think I would describe my general background
22 as a business attorney who provides tax advice and
23 general business advice to small businesses and
24 individuals.

Page 8

1      Q.  Where were you employed prior to December of
2  2005?
3      A.  Immediately prior to December of '05, I was a
4  member and a director of Prickett, Jones and Elliott, a
5  law firm in Wilmington, Delaware. I began my work at
6  Prickett Jones in 1996. Prior to that I was a sole
7  practitioner. For the two years prior to that, from '94
8  to '96, I had a sole proprietorship. And prior to 1994 I
9  was a partner and director of Williams, Gordon & Martin,
10 which was a Wilmington, Delaware law firm.
11     Q.  What years were you with Williams, Gordon and
12 Martin?
13     A.  From the very start of my career until 1994.
14 So it was from 1978 until 1994.
15     Q.  How long would you say the description of your
16 areas of practice that you earlier gave us, which is your
17 current areas of business attorney, tax advice, business
18 advice for small business and individuals -- how long
19 would you say that description fits what you've done with
20 your prior employment with either Prickett Jones, as a
21 sole practitioner, or with Williams, Gordon & Martin?
22     A.  I think it's been pretty consistent over my
23 entire career. I've had some specialized training in
24 what I do work on -- qualified retirement plans. But,

Page 9

1  again, I consider that part of business planning and
2  advice for small businesses.
3      Q.  What type of specialized training have you had
4  with qualified retirement plans?
5      A.  Well, it was from the start of my career in
6  1978. I was the attorney at the firm that was
7  responsible for assisting people with their retirement
8  plans -- adopting, implementing plans, amending them.
9  And as a consequence, I would go to quite a bit of
10 continuing legal education. A lot of the seminars that
11 we are required to go to -- I would focus on qualified
12 retirement plans. And I've pretty much done that my
13 entire career.
14     Q.  Would you say you've specialized in any other
15 areas other than qualified retirement plans?
16     A.  I don't know that I've specialized in anything
17 other than general tax advice and business and personal
18 advice. I provided contract services. In other words,
19 we provided, negotiated and drafted contracts for
20 clients. I do quite a bit of that and always have. And
21 personal estate planning. That type of thing.
22     Q.  Drafting employment contracts for
23 businesses -- has that been a large area of your
24 practice?

William Martin, Esq.

4 (Pages 10 to 13)

Page 10

1    A.  Yes.  There's no question.  I've drafted many
2  employment agreements for doctors, in particular.
3    Q.  And when you say "doctors, in particular,"
4  would that cover a broad spectrum of types of doctors or
5  more of one type than another?
6    A.  For what -- I'm not sure I understand the
7  question.  But for whatever reason, my practice has
8  always had a large number of physicians that I've
9  represented.  But I've represented anyone from a solo
10  practitioner all the way up to a multi-member -- you
11  know, 25-member physician groups.  That's just been a
12  focus of my practice.
13    Q.  What I'm getting at is:  You can have
14  different categories of doctors such as your primary care
15  physicians, or you could have your specialists -- your
16  cardiologists.  Or you could have surgeons.
17        Would you say your practice has involved
18  all of them and every other type of field that's out
19  there, or do you find yourself pulling your work in more
20  of one of those than another?
21    A.  At any given time in my practice, I've
22  probably worked for every type of medical doctor.  So,
23  no, I don't have any -- I don't limit my practice to any
24  particular type of physician practice.  And just in

Page 11

1  general, I've worked for a very, very wide array of
2  medical specialties.
3    Q.  So what other types of documents or contracts
4  or agreements would you provide for these different solo
5  physicians or physician groups other than employment
6  contracts?
7    A.  We would prepare and help negotiate or draft
8  everything from the certificate of incorporation for a
9  group that was incorporating a practice, the bylaws to
10  deal with internal governance.  In an incorporated
11  medical group, we would prepare a shareholders' agreement
12  or a buy/sell agreement to delineate the obligations of
13  the shareholders to each other and to the corporation.
14  We would prepare employment agreements.  We would prepare
15  minutes of meetings that typically occur at the end of
16  each fiscal year.  And we would prepare contract
17  negotiation with third parties.  In a doctor situation,
18  insurance companies have disputes with doctors, and we
19  get involved and have been involved with negotiations as
20  to contracts with insurance carriers.
21    Q.  You mentioned earlier something about
22  qualified retirement plans.  Do you do qualified
23  retirement plans for physician groups as well?
24    A.  Yes.  Quite frankly, we did a lot of that in

Page 12

1  the '70s and the '80s.  And to a great extent now, it's
2  being done by third-party administrators.  Non-legal
3  organizations are -- can be involved in administering
4  plans and setting up retirement plans.  So the extent
5  that I do that is much less now.
6    Q.  Have you, for your physician groups, assisted
7  them with any types of retirement plans other than
8  qualified retirement plans?
9    A.  Qualified retirement plans would be a special
10  type of retirement plan.  And there's no doubt that most
11  of my work, if not all of my work, is in the qualified
12  retirement plan area.  But from time to time, a client
13  will ask about a deferred compensation plan, and we will
14  discuss and sometimes implement either deferred
15  compensation or a voluntary termination incentive program
16  severance package.  And that can either be done in a
17  separate document or it could be as part of negotiations
18  related to an employment agreement that physicians might
19  enter into.
20    Q.  How would you describe a deferred compensation
21  plan?
22    A.  In a physician's business setting?
23    Q.  Yes.
24    A.  A deferred compensation arrangement, either a

Page 13

1  plan or in an employment agreement, would provide for
2  some continuation of compensation -- some continuation of
3  either salary or bonus or benefits after, in this case,
4  the physician has either retired or passed away or become
5  totally disabled or left the practice.
6    Q.  How would a deferred compensation plan be
7  different for a client of yours that's not in any
8  physician business setting, if at all?
9    A.  That's a broad question.  I'll try to answer
10  it by saying that physician practices are unique in that
11  oftentimes they don't involve the acquisition of a lot of
12  property.  A physician's office oftentimes are rented --
13  sometimes from a third party; sometimes from a related
14  organization.  But the practice itself typically doesn't
15  own real estate.  It may own some equipment or furniture,
16  but for the most part, unlike other businesses, the
17  profitability of a physician's practice is a function of
18  the service that it provides to its, in this case,
19  patients.  So the value of a physician's practice is
20  typically made up of some components that would be
21  different than the components that you might use if you
22  were valuing a company that manufactured a product.
23        As a lawyer, I would look at things like
24  how much they're -- not only their hard assets, but

William Martin, Esq.

5 (Pages 14 to 17)

## Page 14

1 furniture and the medical equipment. But I'd look at
2 things like accounts receivable, which can be a
3 significant asset in a medical practice, because it may
4 take many months to collect for the services that a
5 physician has provided. I would also look at -- in
6 addition to cash on hand, I'd look at the value of
7 intangibles, such as goodwill. And that is a subjective
8 determination. But in many medical practices,
9 particularly in the '80s and the '90s, value of goodwill
10 is a significant portion of what the value of a
11 corporation -- a medical corporation or a medical
12 practice might have.
13     Q. So is the purpose of providing an employee
14 physician with deferred compensation to compensate him
15 for some of these factors of the value of a practice if
16 he gives up his value of the practice to the remaining
17 physicians?
18     A. Well, we're talking hypothetically here. And
19 I suppose I'm here as a fact witness as opposed to an
20 expert witness. But I will try to answer your question.
21 I'm not -- I'm just not sure that -- hopefully, I'll
22 cover everything.
23         In general, in a medical practice, if a
24 physician leaves the group -- if a physician is

## Page 15

1 particularly someone -- or a physician who has become an
2 owner in a medical practice who has put in the time and
3 effort to grow a practice, if that physician, or lawyer
4 or accountant or any other service provider, for that
5 matter, does proper planning, they're thinking about what
6 will happen when they have to leave the practice, whether
7 it's voluntarily or involuntarily. I mentioned death and
8 disability. Those would be involuntary reasons for
9 leaving the practice. Retirement at normal retirement
10 age or an early retirement age would be voluntary. And,
11 again, you also have to consider what happens if they
12 just decide to leave.
13         But, typically, in an established
14 medical practice, the owners want to know that if they do
15 retire, die or they're disabled, that they will be fairly
16 compensated for the effort and the time and the
17 investment that they've placed in their particular
18 medical practice. And so the agreements tend to provide
19 a structure for all the owners to, in essence, have some
20 security and know how the company will treat them or how
21 their fellow owners will treat them if they do retire,
22 they die or they're disabled.
23     Q. So if I understand you, as part of a deferred
24 compensation plan that an owner physician may have in

## Page 16

1 place for one of these voluntary or involuntary
2 terminations from the practice, you would consider the
3 value of the intangibles, such as the goodwill, the cash
4 on hand, the AR and the furniture or fixtures that may be
5 owned by the practice group as part of the calculus in
6 coming up with the fair amount of deferred compensation
7 benefit.
8     A. Well, let me ask -- try to rephrase the
9 question and then answer it. It's not just a question of
10 what's deferred compensation. I mean, the concept is
11 trying to determine what value there is in a medical
12 practice -- just focusing on doctors -- and how to fairly
13 compensate the owners for that medical practice if they
14 have to leave, again, whether it's death, disability or
15 retirement.
16         Now, how you go about that deferred
17 compensation or severance pay is just one mechanism. You
18 know, the other one that you would commonly use would be
19 to provide for the repurchase of their shares in the
20 corporation; repurchase of stock, if it's a medical
21 corporation; or repurchase of a limited liability company
22 interest, if it was an LLC.
23         And so -- although we're trying to focus
24 on -- if we're representing a client, we're focusing on

## Page 17

1 what the value is and how to fairly compensate an owner.
2 It doesn't necessarily have to be paid as deferred
3 compensation. It could be paid as a repurchase of
4 whatever ownership interest that departing physician has.
5 And there are, of course, tax ramifications based on the
6 choice as to whether it's paid for stock or whether it's
7 paid as ongoing salary for some period of time. And
8 those are things that need to be evaluated. And
9 ultimately, the client makes the decision as to how they
10 want to structure their particular fair arrangement.
11     Q. Is there anything else other than a deferred
12 compensation payment or a payment for repurchase of stock
13 that can be used as a mechanism to compensate a
14 terminating owner physician from a practice group once
15 you determined what you think is a value of that group
16 he's giving up?
17     A. Well, those are probably the two primary
18 mechanisms. There's a question as to who pays in a
19 situation like that. Sometimes you'll have an entity
20 purchased. In other words, the business itself would
21 agree that if an owner departs the business will
22 reacquire their stock or will pay them deferred
23 compensation or severance. Other times you might have
24 the co-owners take on the obligation to, say, buy the

Corbett & Wilcox

William Martin, Esq.

6 (Pages 18 to 21)

**Page 18**

1 stock back.
2          But, you know, ultimately, it would
3 require the transfer of value from either the company or
4 the co-owners. And other than severance pay and payment
5 for the asset -- in this case, stock -- you know, I don't
6 think -- you know, occasionally, you'll have a
7 continuation of benefits for some period of time. You
8 might have health insurance continue for X number of
9 years or months, if the health insurance plan permits it.
10 But in general, those are the two primary mechanisms.
11     Q.  Is there a rule-of-thumb formula that you
12 apply on this compensation which would be the total
13 amount paid for repurchase of shares in deferred comp
14 when looking at the physicians' groups' assets that we
15 talked about earlier being the value of the intangibles,
16 the goodwill, the cash on hand, the AR and the fixed
17 assets?
18     A.  Is there a rule of thumb as to how to value a
19 professional practice in that case? Is that the
20 question?
21     Q.  Yes.
22     A.  Okay. Well, the -- it's very subjective as to
23 certain elements of how you value a professional practice
24 in my opinion. There are some things that are readily

**Page 19**

1 available.
2          Usually, there's never a dispute as to
3 the value of assets, such as furniture, fixtures and
4 equipment. You get an appraiser come in. Or a used
5 furniture company can tell you what your furnishings are
6 worth. And your medical equipment -- you put a number on
7 that.
8          But the other things -- in terms of a
9 bank statement, you can get a financial statement showing
10 how much cash is on hand, how much -- you know, if there
11 are loans that -- liabilities that the business has.
12 Those are things that are usually pretty easy to put your
13 finger on.
14          The harder question is what the
15 intangible values are, and that would be goodwill of the
16 practice and its value as an ongoing business concern.
17 Its profitability factors into that. And in a medical
18 practice, you tend to see it all over the place.
19          I don't know that there's a rule of
20 thumb that you can point to. It depends on -- as an
21 attorney, I think it depends on how you look at it.
22 Goodwill may or may not be a large value in a practice.
23 It depends on things like contracts, exclusivity and
24 arrangements that the medical practice might have, how

**Page 20**

1 the practice is -- how it's basically -- its reputation
2 in the community. And those are all intangibles.
3          So ultimately, in my practice, the value
4 of goodwill is something that's negotiated by the
5 parties. You might have a negotiation with a new
6 doctor -- someone who's coming right out of medical
7 school. It's the same issue in a case like that. If you
8 have a new doctor coming in, a lot of times you'll want
9 to establish not necessarily the buy-out price but in
10 that case the buy-in price. And new doctors coming out
11 of medical school, in particular, don't seem to give a
12 whole lot of value to goodwill. On the other hand, a
13 physician who's been in practice for 30 or 35 years and
14 has built the practice up is going to feel 180 degrees
15 different -- that there is value in an established
16 medical practice.
17     Q.  So does it make a difference, then, if you
18 have a new doctor coming into the practice when you take
19 a look at what that doctor would be paying to become an
20 owner of that practice with the exiting doctor as to what
21 they're receiving on their way out as compensation?
22     A.  The question is: Is there some connection
23 between the thought process that an attorney or advisors
24 go through when calculating what a buy-in might be with a

**Page 21**

1 new doctor versus what the buy-out might be with a
2 departing doctor? Is there some connection in the
3 thought process?
4     Q.  Yes.
5     A.  And I think the answer is yes. My advice to
6 clients is to have some consistency. If you're going to
7 buy in -- if you're going to require that physicians buy
8 in to a practice -- that the value of the practice when a
9 doctor buys in should be calculated in the same manner at
10 least. It doesn't necessarily have to be the same dollar
11 amount because practices can change over the course of
12 time. But the process, either a formula or the
13 methodology for establishing value, for people buying in
14 should be similar to the methodology that you use when
15 you have a doctor going out.
16     Q.  Can you help me with an example of that?
17     A.  Well, if you have a doctor who -- well, the
18 most common situation would be a physician who's coming
19 out of medical school and is a good physician that a
20 practice wants to entice and have them join the group.
21 And yet when the practice -- if the practice were to
22 charge that new physician the actual value of the
23 practice -- to have -- and this is assuming that there's
24 been a couple year period where the doctor has worked as

William Martin, Esq.

Page 22

1  an associate and there's been an opportunity to
2  clinically evaluate that person to make sure that they --
3  he or she is a likely candidate to become an owner. So
4  once we get over that hurdle, the question is: How do we
5  bring in a new physician?
6        If you were to value the medical
7  practice using the methodology that I just discussed, you
8  might have a large number that would be a very -- would
9  be a financial burden on the newer physician,
10 particularly someone who's coming out and trying to buy a
11 house at the same time with a young family.
12       So oftentimes what's done is the
13 corporation will establish a buy-in that's relatively
14 nominal with the thought that that new physician will
15 work for a number of years at a reduced salary -- take
16 less than an owner would otherwise get. And with the two
17 components, you know, paying maybe something for -- for
18 example, hard assets but taking less -- maybe taking
19 75 percent of what an opener would take for the first
20 year they're an owner and maybe 85 percent the next
21 second year and 95 the third year. And then after the
22 fourth year, they become a full owner. And that's just
23 an example.
24       The thought would be that then that's a

Page 23

1  relatively painless way for a new physician to come into
2  ownership. From a tax perspective, it's actually
3  somewhat of an advantage because the new physician is not
4  having to save aftertax dollars to make a large payment
5  for their stock -- in this case, if it's a corporation.
6  And the companies or the people that are already owners
7  in the company are deriving value from the fact that this
8  new owner is taking otherwise less than what would be
9  otherwise paid to him or her in the first three or four
10 years. And that means that there's more money to
11 distribute to the other owners.
12       Q. Would you call that sort of an arrangement an
13 earn-in arrangement? Is that a term that you would use?
14       A. I've never used it, but I would have no
15 problems with it. Yes, it's an earn-in. That's fine.
16       Q. Okay. So if I were to use actual numbers, to
17 follow your example, if the parties were to agree that if
18 you took a look at the financial statements, as you have
19 cash on hand, fixed assets where there's not much of a
20 dispute about the numbers, add to that something for the
21 intangibles, and you came up with a value of a million
22 dollars, hypothetically, which this young doctor who's
23 trying to buy a house couldn't write a check for a
24 million dollars or couldn't easily pay that over a short

Page 24

1  period of time -- do I understand what you're saying is
2  he may receive a reduced salary or total compensation for
3  a number of years? He'll be an owner, but he'll be
4  receiving -- or before he's an owner, he'll be receiving
5  a reduced salary for a number of years. And that's the
6  way he earned into the practice.
7        A. I think that -- again, it's not necessarily
8  what's done in every case. But it's happened.
9        It's relatively common for someone who
10 wants to join a medical practice to have a period of time
11 when their compensation is less than they would receive
12 if they were a full owner and had been in the practice
13 for seven or ten years. I suppose it's no different in
14 law firms in that regard too. You take less in your
15 early years. And therefore, you're contributing to --
16 you're contributing back to the practice profitability
17 that then can be used to compensate the other owners.
18 And it minimizes the aftertax dollars that this young
19 hypothetical doctor would otherwise have to come up with
20 if he or she were to buy in, in this case, a
21 million-dollar practice.
22       Q. Okay. When that doctor is on his way out or
23 when any of the existing senior doctors that have been
24 there are on their way out, then they can be compensated

Page 25

1  in the form of either deferred comp or repurchase of
2  their stock with the total number being the value of the
3  components of that practice -- the goodwill, the cash,
4  the AR and the other fixed assets. Is that correct?
5        MR. SUDELL: I object to the form of the
6  question. I don't think that's from the testimony.
7        MR. PENZA: Okay.
8        THE WITNESS: Do you want to try to
9  restate it?
10 BY MR. PENZA:
11       Q. Help me follow through on your understanding
12 of how this most common earn-in arrangement works. I
13 understand that for the doctor coming in, the young
14 doctor that can't afford to pay the value -- his share of
15 the value that the company is going to own -- how does
16 that translate to what the exiting doctor gets, the
17 senior doctor?
18       A. The -- I mean, the concept of how much a
19 practice is worth -- what's the value of being either a
20 new owner or an older owner is, as I mentioned -- I think
21 I testified that there should be some consistency. A
22 practice is worth what it's worth.
23       And if a young doctor, through whatever
24 earn-in or buy-in process, contributes towards a share of

William Martin, Esq.

8 (Pages 26 to 29)

Page 26

1  that value, then that doctor, in particular -- but I
2  suppose any other doctor -- is going to want to know that
3  if they have to leave the practice they'll be similarly
4  treated fairly so that the -- the value of the
5  practice -- in this case, the earn-in that you
6  characterize it as -- that there will be some mechanism
7  to fairly compensate a departing doctor. And it does not
8  necessarily have to be the same calculation. Again, it's
9  a matter of having consistent methodologies, I think.
10      But the doctor who departs might receive
11  some sort of severance package from the company's
12  perspective. That's a tax advantage. You get a
13  deduction for paying deferred salary or compensation. Or
14  they might pay for the stock. They might buy the stock
15  back. If the stock is bought back in this earn-in
16  situation, you do have a disconnect between the stock
17  price at the new doctor's level -- and if you have a
18  higher stock price -- I've never been able to reconcile
19  that.
20      I have a concept that I've described
21  many, many times as easy-in-easy-out. If a physician
22  acquires shares for a hundred dollars when they come,
23  then when they retire they should get the same hundred
24  dollars or some nominal value. And if there's something

Page 27

1  to be paid that it be paid in a different way, not
2  necessarily paid for the stock.
3      Again, that's not the only way to do it.
4  You can have -- you can require that a physician coming
5  into a practice pay -- if they're going to be a one-
6  quarter, you can value the corporation and charge them
7  one-quarter of the value of the corporation as a required
8  stock price or capital -- and put the capital in the
9  corporation. And when they leave, you do a similar
10  valuation and you pay them out for their stock. But
11  it's -- you know, you can do it any different -- any
12  number of different ways. But the two that I described
13  are probably the two that I'm most familiar with.
14      Q. In trying to come up with a methodology for
15  what the young doctors are going to be paying or not
16  paying in the form of an earn-in and what the exiting
17  doctors are going to be receiving, what factors are
18  considered to determine what would be fair to the company
19  when it has to pay the exiting doctors?
20      A. The -- I think the factors in valuing the
21  practice are the same factors that you apply when you
22  determine the buy-in. In other words, what -- the
23  inherent value of a corporation or medical practice is
24  going to be the same whether you're buying in or you're

Page 28

1  selling your interest, in my opinion. So I think they're
2  the same factors.
3      Q. I'm not asking what are the factors in
4  determining what the value of the compensation for the
5  exiting doctor as opposed to the value of the incoming
6  doctor. What I'm asking is: What factors do you
7  consider once you come up with the price that the exiting
8  doctor is going to be paid to make sure that that price
9  will be fair to the corporation?
10      A. Well, at least in my practice, I act as an
11  attorney. I mean, I'm a lawyer. I'm a Scribner. I
12  draft agreements based on what my clients -- in a typical
13  situation, whatever business agreements they've come up
14  with.
15      I would -- if a client came to me and
16  said this is what we're going to do, we would determine
17  the price. We want to pay a departing physician X amount
18  of dollars. I would -- and I have in many cases said,
19  well, let's talk about how you're going to pay that. Is
20  it going to be paid over time or is it going to be paid
21  in a lump sum? Lump sum payments are very, very
22  difficult. And I've never -- to be quite frank, you
23  don't see them. Because a company, if it's going to
24  particularly buy out stock -- if they're going to redeem

Page 29

1  the stock, it would have to use aftertax dollars. So,
2  oftentimes, the payment -- if it were a lump sum, you
3  would have tax on top of the cash stream that a lump sum
4  payment would require.
5      So these -- the buy-outs in a physician
6  practice are almost always done over time. And the
7  number of years is a function of -- at least I would
8  suggest to a client -- a function of what can the
9  practice afford. And typically, it's going to be between
10  a three- and a five-year buy-out. Sometimes with
11  interest. Sometimes without interest. If there's no
12  interest provided -- which the parties can certainly
13  agree to. But if there's no interest provided, then
14  there's a tax adjustment that has to be made. But that's
15  a tax decision. It's what we call imputed interest.
16      The other element that I would always
17  raise with a client if there was going to be a deferred
18  payout would be some sort of a cap or a limitation on the
19  amount of funds that would be paid to a doctor or doctors
20  that would be departing. And that would, again, be to
21  acknowledge that if you had -- particularly, if you had a
22  couple people at the same time leave or a number of
23  people leave. You might -- and the corporation were
24  making payments on a deferred basis, the cash flow might

William Martin, Esq.

9 (Pages 30 to 33)

---

**Page 30**

1  be impacted to the point where the company is no longer
2  profitable, not able to, you know, afford paying the
3  salaries for the people that are there working.
4      So we oftentimes talk about a cap or a
5  limitation. The cap in my practice is usually a cap in
6  which if a certain percentage of -- and then you can pick
7  it. It can be gross revenue or income -- net income.
8  But if that cap was exceeded or it would be exceeded,
9  then the excess would be deferred and paid in a later
10  year. So you might have agreed in a business setting to
11  a three- to five-year payout. But if caps were
12  implicated, you might have the funds paid out over a
13  longer period of time. But they would be paid out
14  eventually. It's just over a longer time frame.
15      Q. How do the physicians determine what the
16  practice can afford for setting that cap?
17      MR. SUDELL: I object. You make it
18  sound like there's one answer.
19      A. Yeah. I'm not really sure I would be able to
20  answer it, anyway. I mean, there's people -- there's a
21  team involved. There's accountants. And as I said, I'm
22  the attorney. I'm drafting what they told me to do.
23      Q. Well, it sounded like physicians may come to
24  you and say we've agreed -- we have a senior doctor. He

**Page 31**

1  wants to leave. We want to pay him $2 million. And it
2  sounded like from your testimony that you said, okay,
3  that's very nice that you've agreed to that, but I'd like
4  to talk about, you know, how you're going to pay that so
5  that you can make sure that if I draft a document that
6  says that that what you're agreeing to can be done
7  without harming the practice. And it sounded like you
8  said that you would want to consider a payout over years.
9  You would want a cap.
10      So what I'm getting at is: It sounds
11  like, once they've come up with a number, you know,
12  you've talked to them about putting some mechanisms in
13  place -- I take it that would go into your document -- so
14  that the company -- so that the practice could afford to
15  make the payment that they've agreed to.
16      So my question is: Give me more details
17  on what sorts of things you would consider with the
18  practice group to help them, if they ask for your help,
19  to create the cap percentage or the payment term or
20  number of years.
21      THE WITNESS: I can comment on it
22  generally.
23      MR. SUDELL: If you can comment on it
24  generally, fine.

**Page 32**

1      THE WITNESS: What I've tried to
2  explain -- and I'm not sure that in every case it's
3  always going to happen this way. But as a lawyer, if a
4  client comes to us and says, well, this is what we want
5  to do, I think all of us would say, all right, well,
6  let's consider, you know, what's the effect of it. What
7  are the implications?
8      And one of the implications that I think
9  is important for everyone in a case like that is the
10  company, or the other shareholders, if the other
11  shareholders are going to undertake this obligation -- or
12  if it's the company, is it going to be able to do what
13  you want?
14      So, you know, clients tend to look to
15  lawyers to say, well, what do other people do in that
16  circumstance? Or what should we be thinking of? And
17  what I've tried to say is -- one of the -- two things
18  that I specifically discuss with clients are paying it
19  out over time and also putting some sort of limitation on
20  it just so the business will be able to afford this
21  obligation that you're telling me you want to somehow
22  document. You mentioned, presumably, in an agreement.
23  Yes, it should always be in an agreement.
24      To answer -- to comment on, you know,

**Page 33**

1  the factors that come into account in terms of setting a
2  cap, I really don't -- that's not what I do for a client.
3  In order words, I would say to the client -- I don't know
4  their business. And I can't tell them what kind of a cap
5  they should or shouldn't have. There's know rule of
6  thumb that I'm aware of as to what limits they should
7  have on paying out funds if they have a departing member
8  or departing members. But the whole thought would be you
9  need to think about that so what you want to implement is
10  going to be doable.
11      Q. Well, it would seem to me that one of the
12  things that would come up in that discussion is you may
13  first ask the doctors: What are you contractually
14  obligated to pay to your existing physicians here,
15  because your cash flow needs to cover that? Also, what
16  are the other monthly or annual expenses that the company
17  has other than payment to physicians, because your cash
18  flow needs to cover that? And then, how much cash flow
19  do you have left over that you perhaps bonus out? That
20  would be one pool of money that could be available to
21  make this deferred comp payment coupled with the
22  shareholder repurchase amount on the departing doctor.
23  Or if that available cash flow isn't available, then
24  you'd have to get financing, if you really wanted to do

William Martin, Esq.

10 (Pages 34 to 37)

Page 34

1 it, because you won't have the cash.
2           Is any of that part of the discussion
3 that you get involved in with these physician groups in
4 helping them set a cap?
5           MR. SUDELL:  Ever?  Generally?
6           MR. PENZA:  Either way.
7 BY MR. PENZA:
8      Q.   Have you ever gotten in that sort of
9 discussion?  Or do you generally get involved in that
10 sort of discussion?
11      A.   Well, you know, we're all lawyers here.  And I
12 think what you laid out certainly is a plausible analysis
13 of whether a company can afford to make payments.
14           In a medical practice, you know, you
15 have a certain amount of revenue and you have a certain
16 amount of overhead that's fixed.  And to the extent that
17 your fixed overhead -- and I'm talking about things like
18 rent, staff -- non-physician staff, malpractice
19 insurance -- things that you can't control -- to the
20 extent that your revenue exceeds your fixed overhead
21 expenses, you have profitability.  Some years you have a
22 good year.  Some years you may not have a good year.
23           So I think it's different than a
24 manufacturing company where you can get a financial

Page 35

1 statement and say we have X amount of dollars available
2 pay out the parting physicians, because, you know,
3 frankly, the difference between your revenue and your
4 fixed operating expenses is the amount that's available
5 for the owners to compensate them.  And that's a number
6 that can fluctuate.  And it could be that owners, you
7 know, on -- in good years they take out more, and then
8 poor to middling years they take out less.
9           It strikes me that's what you have to
10 consider.  And you want to structure an agreement like
11 this in a way that will, you know, essentially allow the
12 corporation to continue to compensate the people that are
13 doing the work so that the funds are available to
14 undertake all these obligations.
15           But, you know, as you mentioned, there's
16 another good -- and I haven't raised that point.  But
17 there's another possibility that you go out and borrow
18 the money.  But medical practices tend to want to avoid
19 to do that.  In a way, by agreeing to a three- to five-
20 year payback -- and remember, when these discussions
21 occurred, if it's a three-man, a four-man or five-man
22 medical group -- you know, this applies to everyone.  I
23 mean, you never know who's going to die or become
24 disabled or retire.  So it's a good time to focus on it.

Page 36

1 And typically, if clients will agree to a three- to
2 five-year payout of monies when they -- when a doctor
3 leaves -- you know, the doctor's leaving affects the
4 bank.  They're financing this payout.
5      Q.   Is there a range, if there isn't a rule of
6 thumb, that you find is used for a cap for your
7 physicians' groups?
8      A.   I'm not aware of any range that I could
9 testify to.
10      Q.   You used the number three to five years for a
11 payout period, and I was wondering if there was some cap
12 percentage number of gross revenue that is more common or
13 not common that you encounter like the three- to
14 five-year payout range?
15      A.   Not that I'm aware of.  I think it's -- in my
16 practice it's something that the practice itself sets.
17 The three to five years, I think, is sort of an
18 understandable standard because you've got competing
19 interests.  You've got a physician that may be retiring,
20 and that physician wants to know that they're going to be
21 compensated on some sort of a reasonably fast basis.  And
22 yet lump sum is not going to be palatable to the
23 corporation.
24           So it -- I will say I think there is a

Page 37

1 standard of three to five years on these buyouts.  But I
2 cannot testify that there's any kind of similar standard
3 for caps.  Some -- you know, some clients may not have
4 caps.  But my point was I would have --- I hope I would
5 have brought the discussion around to that point to at
6 least consider whether or not one was appropriate.
7      Q.   Well, it sounds like once the physicians'
8 group comes to you and they say we've agreed upon a
9 number that we want to pay whoever may exit us and you
10 talk to them about let's make sure you the company can do
11 that, and then you talk about a term of years -- and
12 let's say they come up with four years as a payout term.
13 And then you discuss with them, well, you may want to
14 make sure you have a cap in place since you don't want
15 the physician practice group to be contractually
16 obligated to make a cash payment to an existing doctor
17 that is going to interfere with the physicians' group's
18 ability to pay its fixed expenses and compensation to
19 doctors.  And so you discuss with them the idea of a cap
20 so that the physician group has the ability to defer the
21 payment to future years when it has the cash flow if you
22 exceed the cap.  And let's say they come up with a number
23 that they think for the cap that they can handle other
24 gross revenue, and that's 25 percent.

William Martin, Esq.

Page 38

1    Do you then further get into with the
2 physician let's take a look at that and let's think about
3 what that means? Is that further part of your discussion
4 or do you end the discussion there and figure you've
5 covered, you know, all of the advice that you need to
6 provide to them?
7    MR. SUDELL: I object to the form of the
8 question. I don't think you're fairly characterizing his
9 testimony. You're making it sound like he's got a
10 schedule he goes through every time. I don't think
11 that's what the testimony has been.
12 BY MR. PENZA:
13    Q. Well, help me understand how far you go with
14 it. I know that, you know, yes, you're the Scribner.
15 They come to you and they say we want to pay $2 million
16 to an exiting doctor. You don't just blindly say, fine,
17 I'll put in your employment contracts that whoever dies,
18 becomes disabled, decides to retire or decides to leave
19 is going to get $2 million. You don't just do that
20 without having some discussion with the physicians about
21 these concepts that we've been talking about -- making
22 sure the practice can afford it, paying out over time,
23 having caps in place.
24    So I just want to know more about that

Page 39

1 process that you go through with these physician groups
2 once they've come along with a number or a formula for a
3 number, number of years and you explain the concept of
4 having had a cap in place and they say, "That sounds like
5 a good idea. Let's do that too."
6    Where do you go with the cap concept?
7    A. Well, just to clarify, I mean, you said you
8 don't just do those things. And I don't just do those
9 things. I mean, what I do is what I've testified for the
10 last half-hour in terms of a process. And I told you why
11 I would go through that. And I'm sure it's the same
12 reason you would go through it.
13    You have a client. You want them to
14 think through the impact of the decisions that they make.
15 And if I had a client that came to me and said, well, we
16 want to put a cap in that's one percent of our gross
17 revenues, after they've discussed it, I'm fairly certain
18 that that's so extreme that I would say, well, let's
19 think about that. What are your gross revenues? And are
20 you really saying you want it to be limited to one
21 percent?
22    If I had a client that came back and
23 said we want it to be 95 percent, I think I would do the
24 same thing. Is it really worth having a cap in that

Page 40

1 case?
2    But there is no -- I mean, I have to say
3 I think each practice stands on its own. Different --
4 particularly within different medical specialties. I
5 don't know that there's any rule of thumb that I would
6 have other than to have the clients go through the
7 process of, you know, what is fair.
8    And I think most people are not so much
9 concerned with one doctor leaving. If you have a ten-
10 man or ten-woman medical group and five people qualified
11 for retirement -- they were OB/GYNs, for example. They
12 all wanted to move to Florida. The cap is more
13 important, I think, in a case like that. Typically, the
14 cap is not necessarily meant to limit what, you know, one
15 individual who retires gets. It's is this going to be a
16 viable entity if we have a number of owners leave?
17    And I think -- and other than to raise
18 the issue -- and maybe it means I'm not a particularly
19 good attorney. But I don't think it's my job to say, oh,
20 you need to use X percent cap because I think it's going
21 to vary from case to case the number of physicians you
22 have in the group, the value of the practice, its ability
23 to generate income, what other assets it might have.
24 And, again, I'm a lawyer. I'm not an appraiser. I've

Page 41

1 never tried to get involved in valuing a corporation. If
2 they want to go out and hire their accountants, the
3 accountants can do pro formas and go through that process
4 with them.
5    Q. I understand your two examples of one percent
6 would sound like if you implement that you may be barely
7 paying anything to the exiting doctor and whoever ends up
8 being an exiting doctor is going to be upset, you know.
9 Or if you put in the 95 percent cap -- if that was the
10 90-some percent number you gave -- then you're
11 effectively not having any protection with a cap; because
12 if you had five out of ten physicians leave, the
13 physician group has to pay it contractually.
14    How would you say a cap of 25 percent
15 for total aggregate payments of a number of physicians
16 would compare to what you've seen with employment
17 agreements that you've drafted for a number of your
18 physician groups over the years?
19    A. I think I've already testified that it's all
20 over the place, and I can't tell you that -- I think I've
21 testified there is no standard. And so I can't really
22 comment that 25 percent is in the range. My testimony is
23 I think it's very factual driven by the particular
24 corporation. And as I said, they may not even want a

William Martin, Esq.

12 (Pages 42 to 45)

Page 42

1  cap.  Whether they have a cap or they don't have a cap is
2  a client-driven decision.
3          But I would raise the question with a
4  client, particularly a larger group, as to what happens
5  if, you know, more than one person leaves, because at
6  that point a cap starts to make sense.  And then it's a
7  question of, well, what cap are you, individually,
8  willing to live with in that case.
9          And then you have people that -- you
10  know, again, with a group of people, it's just as common,
11  you know, disability might strike one of them.  Even
12  though they're younger, maybe they have the same concerns
13  that the older person does.  But they can usually wear
14  both hats.  But the hat of, well, what's it going to be
15  like if I'm the one that departs and what's it going to
16  be like if, you know, we have to stay and a couple of our
17  partners or co-owners depart -- but I cannot testify that
18  25 percent fits somewhere in or outside of some range.
19      Q.  All right.  Going back to this example, which
20  I thought you said was one of the most common examples
21  with physicians, where you have a young physician and the
22  value of what you would get in the practice could be a
23  high number that you, as a physician group, wouldn't
24  expect that doctor to pay in a lump sum that year but

Page 43

1  rather enable him to pay through an earn-in with a
2  reduced compensation, whatever the exiting doctor is
3  going to be paid would naturally come from the cash of
4  the physician group available presumably after the
5  revenues of the physician group less its fixed expenses,
6  which, in essence, would be otherwise the money of the
7  existing owners.
8          Is that fair to say?
9      A.  Could you restate that, please?
10      Q.  Sure.
11          The payment that would go to an exiting
12  doctor in the form of this combination of a deferred
13  compensation benefit and compensation for repurchase of
14  the shares, that total compensation amount that's paid to
15  the exiting physician would naturally come from the cash
16  available to the physician group that would otherwise go
17  to the existing physician owners of the practice because
18  that would be coming out of the cash that is left over
19  after the revenues of the company come in and the fixed
20  expenses are paid.
21          Is that fair to say?
22      A.  Well, let me try to answer the question this
23  way.  I think I understand your question.  If a doctor
24  departs and is going to be paid something by the

Page 44

1  corporation, it's the corporation.  That the funds that
2  are used to pay that doctor are either going to come from
3  the cash on hand, which could be attributable to accounts
4  receivable that were owned when the physician who is
5  departing was working for the practice, or they could be
6  accounts receivable and probably be in some portion of
7  that doctor who is departing -- has -- and they never
8  depart and collect all their accounts receivable the next
9  day.  So a doctor who departs typically has a certain
10  amount of work in progress in accounts receivable that
11  are going to be collected.  And the company has accounts
12  receivable.  So it's not just that doctor's accounts
13  receivable.
14          So the cash that's paid to a doctor
15  who's retired or deceased or disabled is going to come
16  from cash you have on hand, earnings that maybe we have
17  earned but haven't been collected when that doctor left,
18  or earnings that would otherwise go on to the doctors
19  that stayed.  I think this was your question.  The
20  doctors that stayed in the practice and worked, they're
21  going to get less now, because it's zero sum formula.
22  It's got to come from somewhere.  But, you know, again,
23  it could come from accounts receivables that were earned
24  but not yet paid while that doctor was still in the

Page 45

1  practice.
2      Q.  I guess what I'm driving at is:  Even if it
3  just came right out of the cash on hand and was paid to
4  the exiting doctor, if that payment wasn't made to the
5  exiting doctor from the cash on hand, that's cash that
6  would otherwise have been available for either dividend
7  or bonus distributions to the existing owners who
8  didn't leave.  Is that fair to say?
9      A.  Usually that would be a bonus, yes.
10      Q.  So whatever the amount of the payment is to
11  the exiting doctor, in the form of deferred compensation
12  or repurchase of his stock, is going to be coming from
13  money that would otherwise go to the existing owners of
14  the company if that payment wasn't made.  Is that fair to
15  say?
16      A.  I think that's true in -- yes.  You could --
17  it's either going to go to the doctors that are the
18  owners or it's going to be used by those doctors to buy
19  new equipment or expand the office.  I mean, it doesn't
20  necessarily have to go to them.  But it's there and under
21  their control.  Most practices are going to take it out
22  as additional bonus.
23      Q.  And if these physician groups have come up
24  with their number, it sounds to me like it can be either

William Martin, Esq.

13 (Pages 46 to 49)

Page 46

1 a stated number of an amount of what is going to be paid
2 for a deferred comp benefit and an amount for what his
3 shares will be -- or it sounds like a formula could be
4 used for both of those.  Does that sound fair to say?
5     A.  It could be a formula.  It could be a stated
6 number, or it could be a combination of the two -- a
7 formula with a maximum amount.
8     Q.  Do you help these physician groups with any
9 guidance if they want to come up with a formula on how to
10 do that?
11     A.  No.  I think my role actually is, as the
12 drafter of documents -- clients come to me and say this
13 what we want to -- this is the deal we want to at least
14 structure.  And an attorney would not really get involved
15 in the valuing of corporations.  I would be surprised and
16 I'd probably recommend that they talk to their
17 accountants.  And the accountant could do that.
18       Or in some cases, doctors do this less
19 than, say, dentists.  Dentists tend to be more
20 businesspersons -- business-oriented.  They can hire
21 consultants to help them value their practices.  Doctors
22 can do the same thing, but typically they come up with
23 the numbers on their own with the help of an accountant.
24     Q.  Well, what if -- and this has probably

Page 47

1 happened, I would imagine, in your practice.  You discuss
2 with them the concept of creating some formula to have
3 some consistency.  And you introduced that concept to
4 them.  They say that sounds good.  Since you represent a
5 lot of doctors and you have a lot of experience doing
6 that, give me some idea as to what other doctors have
7 used for a deferred compensation formula so that we're
8 not trying to reinvent the wheel.  And when that
9 questions comes up, how do you answer it?
10     A.  I think the way I answered it earlier is that,
11 as I said, the valuation of a medical practice is
12 subjective.  There are certain elements that we never
13 have any contradictory on.  There are other things --
14 primarily, it's about the intangible value of goodwill.
15 And I cannot tell a client what the intangible goodwill
16 value of their practice is.  If they -- and I would
17 suggest they go to a consultant.  There are -- I'm not
18 sure how helpful it is.  There is a registry of data
19 that's available.  Consultants collect factors.
20 Typically, it might be characterized as a percentage of
21 one year's gross.  If you look at your one year gross
22 revenue in a medical percentage, what percentage of that
23 would be a fair approximation of the goodwill value?  And
24 there are registries in which you can obtain some

Page 48

1 information.  But I tell my clients that those are very
2 subjective.
3       And a lot of times you can't apply rules
4 of thumb because what was reported in 1990 is different
5 than the value in 2006.  The impact of insurance
6 companies on reimbursement has -- and whether a patient
7 considers themselves -- a patient of a particular
8 doctor's group is much different than it was 20 years ago
9 or 15 or even 5 years ago.  So the client that wants to
10 focus on what the goodwill value of their practice is is
11 not going to get that information from me.  I might
12 suggest that they talk to their accountant.  I might
13 suggest that they talk to their piers, if they've got
14 doctors who have retired and who has gone through this
15 process.  But I don't help my clients with the valuation
16 of goodwill.
17       I might use the 1 percent/95 percent
18 formula again if a client came -- you know, a very low
19 number for goodwill.  Or a very high number, you know,
20 might say, well, we ought to reconsider that.  But I
21 leave that to the clients.
22       And in the particular case where you
23 got, you know, a number of doctors who are owners in the
24 group -- maybe I'm wrong.  But I think they know what the

Page 49

1 value of their practice is.  I mean, who are the best
2 people to value a medical practice than people who have
3 made their living out of it in that practice?  They know
4 what the strong points and what the weak parts are.  So
5 it wouldn't be uncommon for me to say look inward.  You
6 tell me.  And, remember it's a negotiation.  You're all
7 agreeing to this value.  And it may be that this is what
8 your wife gets or your family gets.  And I think that
9 tends to bring about some consensus.
10     Q.  Did you know who the accountant was for ROPA
11 when you were counsel for them?
12     A.  Yes, I do.  In the early years up until
13 probably 1994, it was Benedict Lebovitz.  Ben was a
14 longtime accountant going back to the '70s.  And then
15 around 1995-1996 Linda Tabling is -- was -- up until when
16 I no longer represented ROPA was their accountant --
17 their CPA.
18     Q.  Was Linda Tabling their CPA through the time
19 that you were counsel for ROPA or was there a change to
20 another person before you were no longer counsel for
21 ROPA?
22       MR. SUDELL:  You mean after 1995?
23       MR. PENZA:  Well --
24     A.  You mean after 2005?

William Martin, Esq.

14 (Pages 50 to 53)

Page 50

1    Q.  Yeah.
2    A.  I don't know, because I didn't represent them.
3  So I don't know who their accountant was.  She was the
4  accountant from '95 until I no longer worked for them.
5    Q.  That was through 2004-2005.  Is that correct?
6    A.  Yeah.  I believe it was probably early 2005
7  that I no longer served as counsel.
8    Q.  Do you know whether Linda Tabling was the type
9  of accountant that could provide assistance to her
10  clients in coming up with values of goodwill or formulas
11  for determining deferred comp?
12    A.  If you're asking my opinion, yes, she's a very
13  competent CPA.  And I think she could certainly have
14  helped a client go through that analysis.
15    Q.  Do you know whether Linda Tabling helped your
16  ROPA clients with that sort of analysis?
17        MR. SUDELL:  Bear in mind --
18        THE WITNESS:  If I don't know the
19  answer, I can answer that.
20        MR. SUDELL:  Yes.
21        THE WITNESS:  I don't know the answer to
22  that.
23        MR. SUDELL:  Could we take a break
24  here --

Page 51

1        MR. PENZA:  Yeah.
2        MR. SUDELL:  -- for a couple of minutes?
3        MR. PENZA:  That's fine.
4        (A recess was taken.)
5        - - - - -
6        WILLIAM J. MARTIN, resumes
7  BY MR. PENZA:
8    Q.  I want to talk to you about Radiation
9  Oncologists, P.A., which sometimes I referred to as ROPA.
10  Do you recall who were the owners of the company when you
11  first represented ROPA?
12    A.  Yes.
13        Do you want their names?
14    Q.  Please.
15    A.  Carlos Cuccia, C-u-c-c-i-a, Ekkehard Schubert
16  and Donald Tilton.
17    Q.  I understand that before the current company
18  which we're referring to as ROPA had that name it had a
19  different name of Cuccia, Schubert & Tilton.  Do you
20  recall that?
21    A.  The actual name, I believe, was Cuccia,
22  Schubert, Tilton - Radiation Oncologists, P.A.  I think
23  that was the name of the corporation when I started in
24  the late '70s.

Page 52

1    Q.  Did you form that company?
2    A.  No.
3    Q.  Who was their counsel before you?
4    A.  I don't know.
5    Q.  What was the ownership allocation when you
6  first started representing them?
7    A.  I don't recall.  I would want to refresh my
8  memory by looking at the minute book in terms of how much
9  stock each of the three owners had at that time.
10    Q.  When you first started representing those
11  three, did they have any other associate doctors working
12  for them?
13    A.  I think -- I believe that Dr. Donavanik was
14  employed as an associate when I first started working.
15  If not in the late '70s, at some point in the early '80s
16  Dr. Donavanik joined the group, yes, as an associate.
17    Q.  Whenever Dr. Donavanik joined the group as an
18  associate, was he the only associate that you recall when
19  you first started representing the group?
20    A.  In the time frame in the '80s, yes, I think
21  Dr. Donavanik was the only associate.  I could be
22  mistaken, but I believe he was the only associate.
23    Q.  When is the next time that you recall the
24  group bringing on another associate after Dr. Donavanik?

Page 53

1    A.  I'm not going to be able to recall specific
2  dates and the names of when various associates joined.  I
3  would have to refer to either my file or the minute book,
4  in which we have copies of employment agreements.  And I
5  certainly can't remember who came at one point,
6  unfortunately.  And I cannot remember at what point stock
7  ownership adjusted other than giving you vague
8  recollections, and I don't think you want me to do that.
9        MR. SUDELL:  And I might add there are
10  certainly people who would be much more familiar with who
11  the other doctors were in their practice -- and we've
12  deposed those people -- than a lawyer who is representing
13  them periodically throughout that period.
14  BY MR. PENZA:
15    Q.  Well, let me move up to the last ten years.
16  Around 1995 -- let's just talk about that time frame.
17  How frequently were you involved with meeting with this
18  client and doing various things?
19    A.  Well, from 1995 on it's probably accurate to
20  say that I would meet with them the end of each year.  At
21  some point in the last ten years of my representation,
22  probably towards the end of that -- the last four or five
23  years, we would have more formal quarterly -- "quarterly"
24  may be too -- they tried to have regular board

William Martin, Esq.

15 (Pages 54 to 57)

Page 54

1  meetings -- business meetings. And they were -- I think
2  they called them board meetings. But sometimes we might
3  not have them. Others we might have three or four during
4  the course of the year.
5      Q.  If you met with them at least at the end of
6  each year, did you put minutes in the minute book as to
7  what occurred or some of what occurred?
8      A.  The minutes that I would have prepared would
9  have only been the end-of-the-year minutes, which
10 typically were minutes of end-of-the-year business
11 decisions -- things like how much the dividend, if any,
12 was, whether there was a bonus to be paid to the doctors,
13 if there was. I can't recall exactly how their
14 minutes -- who the officers were definitely. We would
15 re-elect the directors. They were all shareholders, and
16 they would be re-elected as directors. But the minutes
17 of the end-of-the-year meeting tended to be pretty basic.
18     Q.  When you started having these more formal or
19 quarterly meetings, do you recall if an agenda was
20 prepared for the meeting?
21     A.  Yeah. You said "more formal." They're
22 actually more informal and more frequent. I would not
23 have prepared an agenda for those meetings. The client
24 would have prepared the agenda and brought that to the

Page 55

1  meeting. I'm sure that at least in most of the cases
2  they would have sent the agenda to me ahead of time so
3  that I wouldn't have to come in blind. But the client
4  set the agendas for the frequent board meetings.
5      Q.  All right. Was that always the practice --
6  that there be an agenda once you started having these,
7  roughly, quarterly meetings in the last four to five
8  years?
9      A.  I don't know that there's always been an
10 agenda. I don't think we can say that. But there was
11 oftentimes an agenda.
12     Q.  I have several documents, some of which, I
13 believe, you drafted from the initial -- where we are at
14 this time frame where current counsel for ROPA has asked
15 that you not reveal anything that you said to the
16 officers of ROPA or them to me. I will try to avoid
17 questions like that and see how much we can go over with
18 some of these documents.
19         The first thing I want to show you is a
20 letter that was previously marked Donavanik 3. I'll
21 represent it was a letter from you dated August 31, 2000,
22 and it enclosed with that a number of documents.
23         Before I ask you any questions about
24 that, I want to also show you a document that was

Page 56

1  previously marked Tilton 7, which is a stockholders'
2  agreement, and it has an effective date of January 1,
3  2000. Looking at your August 31, 2000 letter, can you
4  tell if Tilton 7 is the stockholders' agreement that
5  you're referring to in paragraph 3 of your August 31,
6  2000 letter?
7      A.  I'm not going to read it and compare it word
8  for word with what would be in my file, but this looks to
9  be -- it's properly -- it's consistently dated with the
10 information. I believe this is the stockholders'
11 agreement that is referred to in the August 31, 2000
12 letter marked Donavanik 3.
13     Q.  And I could tell you on page 10, if it's
14 helpful to you, where the signatures are for the
15 stockholders --
16     A.  Yeah.
17     Q.  -- I see "In witness whereof" this agreement
18 has been signed July 7th, 2000 with effective January 1.
19         It seems to be contemporaneous with this
20 August 31 letter, but...
21     A.  Yeah. As I said, it looks to me as if it's
22 that document, but I am not comparing them word for word.
23 So...
24     Q.  Now, it's my understanding that as a result of

Page 57

1  this stockholders' agreement, at least in part, the
2  owners of the company at that time would be Dr. Tilton,
3  Dr. Hulick and Dr. Donavanik in an equal one-third
4  ownership of the company. Is that correct?
5      A.  My recollection is that about this time it was
6  agreed that the three would be equal owners, yes.
7      Q.  Do you recall who owned the company prior to
8  this change that occurred pursuant to the stockholders'
9  agreement?
10     A.  My recollection is that their were three
11 owners. Tilton, Hulick and Donavanik were the
12 stockholders in differing amounts than shown on the
13 stockholders' agreement that you're referring in January
14 of 2000. I cannot recall what number of shares Don
15 Tilton, Peter Hulick and Viroon Donavanik had. My
16 recollection was that Dr. Donavanik had significantly
17 less. And one of the things that this agreement did was
18 to equalize the number of shares for all three of the
19 shareholders.
20     Q.  Well, whatever shares they had prior to this
21 shareholder agreement, would there actually be stock
22 certificates that would tell us exactly their
23 proportionate amount?
24     A.  I believe if you look at the minute book in

William Martin, Esq.

16 (Pages 58 to 61)

Page 58

1  the stock register this would be documented, yes.
2       Q.  Would there be any other place that we could
3  look to determine what exactly the three of them owned
4  prior to this shareholders' agreement other than the
5  stock certificates?
6       A.  The minute book itself should have a ledger
7  that indicates when stock is issued.  And I would look
8  there.
9       Q.  That would be the most accurate place to
10 determine the ownership?
11      A.  Well, that and this stockholders' agreement in
12 and of itself.  I mean, this clearly indicates that as of
13 January 2000 each of the three were considered as equal
14 60 share owners of the corporation.
15      Q.  I don't know what the ownership was prior to
16 this.
17      A.  Again, I would look at the stock ledger.  And
18 I'd be surprised if it doesn't tell you.
19      Q.  Okay.  Do you recall if Dr. Donavanik and
20 Dr. Hulick owned less of the company prior to this
21 shareholders' agreement if they paid any form of
22 compensation to Dr. Tilton for acquiring some of his
23 shares?
24           MR. SUDELL:  Again, bear in mind the

Page 59

1  admonition that you not reveal anything that you learned
2  from any of them in your role as counsel.
3  BY MR. PENZA:
4       Q.  Well, I'm not asking you what they told you or
5  you told them.  I'm now just asking if --
6       A.  Well, it's a good question to pose the issue
7  that I think we're all trying to grapple with, which is:
8  When an attorney for a corporation assists a client in
9  issuing new shares -- I mean, I'm acting as the attorney
10 in that case.  And there's no communication necessarily
11 that I would be testifying to.  But I am being asked to
12 testify as to acts that I took on behalf of a client, in
13 this case, the corporation, in terms of issuing shares.
14 And I think that would normally be an attorney-client
15 privilege.  So I think it's very difficult for me to
16 answer that without concern that I have that I would be
17 violating some sort of an ethical -- not some sort -- an
18 ethical obligation that I have not to disclose the
19 business affairs of a client -- former client without an
20 effective waiver or consent or without the Court ordering
21 me to do so.
22      Q.  As you know from our discussion that took
23 place just prior to the deposition -- the discussion we
24 put on the record -- I want to be very sensitive about

Page 60

1  not creating an issue for you from a professional
2  standpoint with anything that I may ask now until we get
3  further clarification from the Court on this.
4           So let me ask it this way without you
5  telling me what the answer is:  Do you know whether
6  anything was paid or not?  And I'm not asking whether
7  anything was paid or not.  Do you know whether anything
8  was paid or not by Drs. Hulick or Donavanik to Dr. Tilton
9  for any ownership they required in the company as a
10 result of the stockholders' agreement?
11      A.  I think I have information that would be
12 relevant to answer that question as to what Hulick and
13 Donavanik paid, if anything.
14      Q.  Okay.  Let me show you some more documents.
15 This one was previously marked as Tilton 3, which is an
16 employment agreement for Dr. Tilton; a document
17 previously marked Hulick 1, which is an employment
18 agreement for Dr. Hulick.  And this is a document marked
19 Donavanik 4.  It is an employment agreement for
20 Dr. Donavanik.  And all of these are dated with different
21 months but all in the year 2000.
22           On page 3 of each of these employment
23 agreements, there is a salary number of total
24 compensation, 400,000, which appears identical to me.

Page 61

1  And on page 4 paragraph 5 (c) has a deferred compensation
2  benefit, I believe, that appears identical to me.
3           Is the deferred compensation benefit in
4  paragraph 5 (c) of these employment agreements the type
5  of deferred compensation benefit that you were testifying
6  about earlier when we talked about what a retiring or
7  exiting doctor may get in the event of retirement, death
8  or disability as compensation for his value of the
9  practice that he's leaving behind?
10           MR. SUDELL:  You mean is this a deferred
11 compensation provision?
12           MR. PENZA:  Yes.
13 BY MR. PENZA:
14      Q.  Is this a deferred compensation provision and
15 specifically the type of deferred compensation provision
16 that you were talking about in your earlier testimony
17 when we said there may be two forms of compensating an
18 exiting doctor -- one with a deferred compensation
19 payment and the second with a payment for stock
20 repurchase?
21      A.  Yeah.  This would be an example of a payment
22 being made by a corporation of either a severance or
23 deferred compensation and would not be a payment made for
24 stock.

William Martin, Esq.

Page 62

1    Q.  If you look back at Tilton 7, on the last page
2    there is a document headed Valuation Addendum, and it
3    says the value of outstanding shares is a dollar per
4    share.  Is that amount -- a dollar per share -- and I
5    know each of the doctors has 60 shares.  So I can
6    actually do that math.  That would be $60.  Is that
7    number a calculation -- $60 -- the amount that was set
8    before the compensation be paid to repurchase stock as
9    that term was used in your earlier testimony today?
10       A.  Is that an example of a nominal payment?  Not
11   necessarily compensation but payment for stock?  Yes.
12       Q.  Okay.  We had talked earlier about
13   repayment -- repurchase of stock, and that can be some
14   number.  It can be a nominal number.  It can be a large
15   number.  And we talked about deferred compensation.  So I
16   want to see:  Are these the two components, meaning in
17   Tilton 7 where these documents define a fixed number of
18   $60 to be paid for the stock and the three employment
19   agreements from 2000 that have a severance or deferred
20   comp benefit -- are those the two mechanisms that are put
21   in place with this company for the compensation to be
22   paid for the exiting doctor as we talked about generally
23   earlier?
24       A.  At the time these documents were signed?

Page 63

1    Q.  Yes.
2    A.  In other words, that was in effect as of
3    January 1, 2000.
4    Q.  Yes.
5    A.  These would be the relevant documents for
6    determining what obligations the company had to the
7    departing physicians who were shareholders.
8    Q.  In these 2000 employment agreements,
9    paragraph 5 (c) talks about the payment being paid out
10   over three calendar years, and paragraph 5 (d)(ii) on
11   page 4 of the three employment agreements talk about the
12   total of any such deferred compensation payable to the
13   employee shall not in any fiscal year exceed 30 percent
14   of the employer's gross receipts.
15       Is the first thing I referred to -- the
16   three years being the payment term that you were talking
17   about which may typically be three to five years -- and
18   the second thing that I mentioned -- paragraph (d)(ii) --
19   the 30 percent gross receipts -- would that be a specific
20   example of the cap that you were talking about earlier
21   that you may talk to a client about?
22       A.  Those are examples of deferred payout over
23   time and a cap, yes.
24       Q.  In this specific case, with ROPA and these

Page 64

1    three doctors at the time -- Drs. Tilton, Donavanik and
2    Hulick -- I'm not asking you what you said to them or
3    what they said to you.  But do you recall having any
4    discussions with them?  Or if you don't recall, do you
5    believe you may have documents that would reflect any
6    discussions that you had with them or they had with
7    you that led to the creation of the deferred comp
8    provisions that are in these employment agreements at
9    paragraph 5 (c) and the cap that's in (d)(2)?
10       A.  I think I would have knowledge, and it would
11   certainly be supplemented if I was able to look at my
12   file at the same time I was testifying.  But the
13   knowledge that I have would involve discussions that I
14   had with the three owners of the company.
15       Q.  I'm going to show you another document
16   previously marked as Tilton E.  This looks like a letter
17   from you dated February 7, 2001 to the same three
18   doctors, enclosing separate amendments to each of their
19   employment agreements.
20          Now I'll show you three more documents.
21          MR. PENZA:  I'm going to need this
22   marked Martin 1.
23          (Martin Deposition Exhibit No. 1 was
24   marked for identification.)

Page 65

1    BY MR. PENZA:
2    Q.  The first one has been marked Martin 1 --
3    Amendment to Dr. Tilton's Employment Agreement -- and
4    Hulick 2, which was previously marked, and Donavanik 10,
5    which was previously marked.  Do these three amendments
6    to the employment agreements appear to be the amendments
7    that you were referring to in your February 7, 2001
8    letter?
9    A.  Yes.
10       Q.  What is the purpose of the amendment?
11          MR. SUDELL:  Well, I think that the
12   document speaks for itself.  If you're going beyond that,
13   I think --
14   BY MR. PENZA:
15       Q.  Generally, what would you say is the primary
16   purpose or one or more of the purposes of the amendment?
17       A.  Well, I think it is fair to say it speaks for
18   itself.  It is an amendment to the employment -- to each
19   of their employment agreements.
20       Q.  Okay.
21       A.  And specifically, I'm amending a section
22   dealing with the amount of deferred compensation that
23   would be paid if the individual retires as of a certain
24   date.

William Martin, Esq.

18 (Pages 66 to 69)

Page 66

1    Q.  Okay.  Now, again, I'm not asking you what you
2  said to any of these three doctors or what they may have
3  said to you.  But do you have a recollection of any
4  discussions that you had with the three doctors or they
5  had with you that led to the terms that are in these
6  amendments to the employment agreements marked as
7  Donavanik 10, Hulick 2 and Martin 1?
8    A.  Yes.  I have that recollection, but that would
9  involve an explanation of discussions and meetings that I
10  had with the three officers of the corporation.
11  Therefore, I think that I would assert the
12  attorney-client privilege.
13    Q.  Well, I didn't ask you what you said to them
14  or they said to you yet.
15    A.  Right.  But that's a good example of -- yes, I
16  recollect a background of what transpired when these
17  documents were prepared as the attorney involved in that
18  case.
19    Q.  Do you recall how many meetings you may have
20  had with one or more of the doctors prior to the drafting
21  of these amendments?
22        MR. SUDELL:  You can answer that
23  portion.
24    A.  I recall having one meeting.

Page 67

1    Q.  Do you recall where the meeting was?
2    A.  Yes.  It was at my office.
3    Q.  Who was present at the meeting?
4    A.  The three doctors.
5    Q.  Was anyone else present?
6    A.  Not to my knowledge.
7    Q.  How long did the meeting last?
8    A.  It was a -- it was one of those quarterly
9  board meetings, and it probably lasted an hour and a
10  half.  And the amendment to the employment agreements of
11  the senior radiologist was one of the number of items on
12  the agenda.
13    Q.  Approximately how many numbers were on the
14  agenda?
15    A.  I can't recall.
16    Q.  Was that agenda one of these agendas that was
17  prepared by one of the doctors circulated to you in
18  advance or was it an agenda that you prepared?
19    A.  I believe it was an agenda prepared by the
20  doctors.
21    Q.  Do you know which one of the three doctors
22  would be preparing the agenda?
23    A.  I believe Dr. Hulick prepared the agenda.
24    Q.  Approximately when was this meeting at your

Page 68

1  office that we're talking about?
2    A.  It would have been in October of 2000.
3    Q.  Okay.
4    A.  Let me correct that.  It may have been
5  November.  It may have been November 15th of 2000.
6    Q.  Why would you believe --
7    A.  If you would allow me to look at my file, I
8  could tell you exactly, if it makes a difference.
9    Q.  I think it would help if we knew the date of
10  the meeting.
11        MR. SUDELL:  All right.  That's fine.
12    A.  All right.  I just want to refresh my memory.
13        Having refreshed my memory, the meeting
14  occurred on November the 15th of 2000.
15    Q.  During the meeting of November 15th of 2000,
16  that's when a change in the deferred compensation formula
17  was discussed, along with other agenda items.  Is that
18  correct?
19    A.  That the -- the matter was on the agenda, yes.
20    Q.  Okay.  Did you take notes at the time of that
21  meeting?
22    A.  To the best of my knowledge, I may have
23  scribbled some notes upon the agenda that I was given.
24    Q.  Do you have a copy of the agenda that you used

Page 69

1  on that November 15, 2000 meeting with any of your notes
2  contained on it?
3    A.  I believe in my file -- the agenda is in my
4  file, yes.
5    Q.  Approximately how many pages is the agenda?
6    A.  It was about one and a half pages.
7    Q.  Do you recall whether you had any subsequent
8  communications -- and, again, I'm not asking what you
9  said to anyone or what they said to you.  But do you
10  recall having any subsequent conversations after the
11  November 15, 2000 meeting prior to your drafting of the
12  amendment to the employment agreements with any of the
13  three doctors concerning a change to the deferred
14  compensation formula?
15        MR. SUDELL:  Could you read back that
16  question?  I'm sorry.
17        (The reporter read the requested
18  portion.)
19    A.  I don't recall.
20        MR. PENZA:  Let's mark this as Martin 2,
21  please.
22        (Martin Deposition Exhibit No. 2 was
23  marked for identification.)
24

William Martin, Esq.

19 (Pages 70 to 73)

Page 70

1  BY MR. PENZA:
2      Q.  I'm going to show you a deferred compensation
3  agreement that I have marked as Martin 2 dated
4  December 27, 2002.  Were you involved with the drafting
5  of this document?
6      A.  Yes.
7      Q.  Is it your understanding that this document,
8  Martin 2, would be consistent with the deferred
9  compensation benefit provided to Dr. Tilton in Martin 1,
10  the amendment dated February 8th, 2001?
11      A.  Yes.
12      Q.  Let me give you the next document.
13          I'm going to show you a document marked
14  as Hulick 3.  This is a shareholder agreement with an
15  effective date of January 1, 2003.  It shows the owners
16  still being Dr. Hulick and Dr. Donavanik owning 60
17  shares, but now it shows Dr. Dzeda owning 60 shares.
18          Is it your understanding that this is
19  the only amendment that occurred after the earlier
20  stockholder agreement which is marked as Tilton 7?
21      A.  The only?  No.  As other shareholders were
22  added, they would have entered into stockholders'
23  agreements.  This would have been the amendment that was
24  done when Dr. Dzeda joined the practice as an owner.  But

Page 71

1  I think there are certainly other amended and restated
2  stockholders' agreements that were done when -- I think
3  at the time I stopped working for the corporation there
4  were five shareholders, I believe.  So my guess is that
5  there are at least two other versions of amended or
6  restated stockholders' agreements that have been signed
7  by Dr. Shah and Dr. Sorensen.
8      Q.  Okay.  I guess what I'm getting at is:  Do you
9  know if they would have occurred before this one?
10      A.  It would have occurred after this.
11      Q.  After this one.
12          So, chronologically, we have a
13  shareholder agreement effective January 1, 2000 that had
14  Dr. Tilton, Dr. Hulick and Dr. Donavanik each owning 60
15  shares or an equal amount.
16          Is this Hulick 3 the next amended and
17  restated stockholders' agreement that occurred after the
18  January 1, 2000?
19      A.  I believe that's the case, yes.
20      Q.  Do you have knowledge -- and I'm not asking
21  what that knowledge is.  But I'm just asking:  Do you
22  have knowledge as to what compensation, if any, Dr. Dzeda
23  paid to acquire the 60 shares that's listed on this
24  January 1, 2003 stockholders' agreement?

Page 72

1      A.  Yes, I have knowledge.
2          MR. PENZA:  I'm going to mark this
3  document as Martin 3.
4          (Martin Deposition Exhibit No. 3 was
5  marked for identification.)
6  BY MR. PENZA:
7      Q.  Sir, I'll represent to you that is a ROPA
8  Quarterly Business Meeting agenda dated May 18th, 2004.
9  Is Martin 3 the type of agenda document that we're
10  talking about earlier that the client may provide to you
11  in advance of a quarterly business meeting?
12      A.  I guess, again, it speaks for itself.  It is
13  an agenda that ROPA used for its quarterly business
14  meeting in May of 2004.  Is it an example of the ones
15  that I was involved in?  The ones that I can recall were
16  done differently.  It might have just been a typed-up
17  list of five, ten, fifteen things that had to be
18  discussed at the business meeting.  The format is
19  different than I recall.  They may have had business
20  meetings on their -- at their hospital location that did
21  not involve me.  And this appears to be an example of
22  something that did not involve me.  So this does look
23  different than what I would have expected.  It seems to
24  cover the same types of issues, I guess we would say.

Page 73

1      Q.  Well, were you involved with a quarterly
2  business meeting in 2004 with ROPA?  I guess that would
3  be sometime toward either the end of May or end of June.
4      A.  I don't know.  I don't recall the date that I
5  was involved.  I may have been, but I don't have any
6  recollection.
7      Q.  If you had a business meeting with ROPA, would
8  you have notes of any meeting that you would have
9  participated in?
10      A.  My recollection is the other doctors would
11  have kept the minutes, the internal minutes.  So not
12  necessarily that I would have -- I wouldn't have kept
13  minutes.  And my notes would be primarily items that
14  required me to take some action.  That would be the type
15  of note that I might take.
16      Q.  In looking at this agenda, on the 4th page
17  there is a topic labeled 14.2:  Formula for Deferred
18  Compensation.  And the Findings, Conclusions and
19  Recommendations states:  "It was noted that there was a
20  cost of living escalation to the contact relative to
21  living in Philadelphia."  Do you know what they may be
22  referring to?
23      A.  No.  I've never -- to the best of my
24  knowledge, I have never seen this before.  So I'm not

William Martin, Esq.

20 (Pages 74 to 77)

Page 74

1  sure what "contact" is intended to mean.  Contract?  But
2  I don't know.
3      Q.   Well, I'll show you Dr. Dzeda's employment
4  agreement dated June 13th, 2003, which was previously
5  marked Donavanik 13.  Is there something in Dr. Dzeda's
6  June 18, 2003 employment contract in the deferred
7  compensation part of it that has a cost of living
8  component to it?
9      A.   If you go to page 6, subsection (i)(i) refers
10 to a -- subsection (E)(i) refers to a limit on deferred
11 compensation, I believe, for any one senior radiologist
12 oncologist at $1.2 million.  And the contract says:  On
13 or after January 1, 2004, such limitation shall be
14 increased with changes in the cost of living for the --
15 as published by the U.S. Department of Labor for the
16 Philadelphia region.  So, yes, there is something in that
17 contract to the cost of living increases.
18     Q.   So what do you understand all that to mean?
19     A.   I believe what subsection E (i)(i)
20 accomplishes is to limit any payout for any one senior
21 radiation oncologist to $1.2 million.  However, after
22 2004 -- after January 1st of 2004, that $1.2 million
23 limit is to be increased per cost of living.  And that's
24 all -- I mean, that's what I read that agreement to say.

Page 75

1  And it does refer to a cost of living increase in the
2  $1.2 million limitation.
3      Q.   So after January 1, 2004, if an exiting
4  physician is entitled to a deferred compensation benefit
5  which reaches a cap, the cap could be a number higher
6  than 1.2 million if there is a CPI increase.  Is that --
7      A.   That's correct.
8      Q.   So looking back at Martin 3 where the doctors
9  refer on their agenda to a formula for deferred
10 compensation and they indicate it's noted that there's a
11 cost of living escalation, do you have any knowledge as
12 to what they actually discussed or agreed upon?
13     A.   I don't have any knowledge.  I mean, I -- you
14 can draw your own, you know, conclusions.  But, no, I
15 don't have any firsthand knowledge about the question
16 that you've asked me.
17     Q.   All right.  Mr. Martin, I told you I would
18 recognize some of your time constraints today and stop at
19 four o'clock.  It sounds like there are a number of
20 things that you have some knowledge of.  But, again,
21 because of the timing of where we are procedurally in
22 this case, we're going to need the Court's assistance to
23 resolve our dispute as to whether you can reveal any
24 discovery to me.  In some of these things, the privilege

Page 76

1  has been asserted that I would like disclosed.  So we'll
2  deal with that on a different date.
3          MR. PENZA:  We'll end the deposition
4  now, if that's acceptable with you Mr. Sudell.
5          MR. SUDELL:  That's fine.
6          (The deposition adjourned at 4:05 p.m.
7  this same day.)
8
9          - - - - -
10
11         (I HAVE READ THE FOREGOING DEPOSITION,
12 AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)
13
14
15
16 _____
17   WITNESS NAME
18
19         - - - - -
20
21
22
23
24

Page 77

1          INDEX TO TESTIMONY
2
WILLIAM J. MARTIN, ESQ.                    PAGE
3
   Examination by Mr. Penza          2
4
5
          - - - - -
6
7
          INDEX TO EXHIBITS
8
9  MARTIN DEPOSITION EXHIBIT NO.          PAGE
10 1   Document Bates stamped DCT 000180   64
       through DCT 000183
11
   2   Document Bates stamped WM 000002   69
12     through WM 000005
13 3   Document Bates stamped WM 000006   72
       through WM 000010
14
15
          - - - - -
16
17
18
19
20
21
22
23
24

William Martin, Esq.

21 (Page 78)

Page 78

```
1              C E R T I F I C A T E
2    STATE OF DELAWARE:
                      :
3    NEW CASTLE COUNTY:
4         I, Robert Wayne Wilcox, Jr., a Registered
5    Professional Reporter and Notary Public, within and for
6    the County and State aforesaid, do hereby certify that
7    the foregoing deposition of WILLIAM J. MARTIN, ESQ., was
8    taken before me, pursuant to notice, at the time and
9    place indicated; that said deponent was by me duly sworn
10   to tell the truth, the whole truth, and nothing but the
11   truth; that the testimony of said deponent was correctly
12   recorded in machine shorthand by me and thereafter
13   transcribed under my supervision with computer-aided
14   transcription; that the deposition is a true record of
15   the testimony given by the witness; and that I am neither
16   of counsel nor kin to any party in said action, nor
17   interested in the outcome thereof.
18        WITNESS my hand and official seal this 1st day
19   of August A.D. 2006.
20
21        _____
          ROBERT WAYNE WILCOX, JR.
22        REGISTERED PROFESSIONAL REPORTER
          CERTIFICATION NO. 101-RPR
23        (Expires January 31, 2008)
24
```

Corbett & Wilcox

DEPOSITION
EXHIBIT

Martin-1
Examiner 7·20·06

PENGAD 800-631-6989

AMENDMENT TO
RADIATION ONCOLOGISTS, P.A.
SENIOR RADIOLOGIST'S EMPLOYMENT AGREEMENT

THIS AMENDMENT to the Senior Radiologist's Employment Agreement entered into by and between DONALD C. TILTON, D.O. (hereinafter referred to as "Employee") and RADIATION ONCOLOGISTS, P.A., a Delaware professional corporation (hereinafter referred to as "Employer") is made this 8th day of February. 2001.

WITNESSETH:

WHEREAS, Employer and Employee desire to amend in certain respects the Senior Radiologist's Employment Agreement ("Agreement") entered into by the parties hereto.

NOW, THEREFORE, in consideration of the mutual exchange of promises contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. Paragraphs 5(c) and (d) of the Agreement shall be deleted in their entirety and replaced with the following new Paragraphs 5(c), (d), and (e):

"(c)  provided, however, that in the event the Employee's employment shall terminate due to (i) death, (ii) total and permanent disability, or (iii) complete retirement from the practice of medicine after attaining age fifty-five (55) and completion of at least ten (10) years of service with the Employer, he shall be entitled to "Deferred Compensation" calculated as follows:

(i)  In the event Employee dies, is totally and permanently disabled, and/or delivers written notice of his complete retirement from medicine on or before December 31, 2002, he shall be entitled to Deferred Compensation in the amount of $1,200,000, payable as provided in Subparagraphs (d) and (e) below.

(ii)  In the event Employee dies, is totally and permanently disabled, and/or delivers written notice of his complete retirement from medicine after December 31, 2002, his Deferred Compensation shall be calculated as follows:



EXHIBIT

"B"

DCT        000180

(A) <u>Age 55 to 65</u>. If Employee's age as of the date of death, disability or giving written notice of his complete retirement from the practice of medicine shall be between fifty-five (55) to sixty-five (65), then his Deferred Compensation shall be equal to the annual average of the three (3) previous years' "Total Compensation Package" for Senior Radiologists multiplied by two (2).

(B) <u>Age 66</u>. If Employee's age as of the date of death, disability or giving written notice of his complete retirement from the practice of medicine shall be sixty-six (66), then his Deferred Compensation shall be equal to the annual average of the three (3) previous years' "Total Compensation Package" for Senior Radiologists multiplied by one and one-half (1 ½).

(C) <u>Age 67</u>. If Employee's age as of the date of death, disability or giving written notice of his complete retirement from the practice of medicine shall be sixty-seven (67), then his Deferred Compensation shall be equal to the annual average of the three (3) previous years' "Total Compensation Package" for Senior Radiologists multiplied by one and one-quarter (1 ¼).

(D) <u>Age 68</u>. If Employee's age as of the date of death, disability or giving written notice of his complete retirement from the practice of medicine shall be sixty-eight (68), then his Deferred Compensation shall be equal to the annual average of the three (3) previous years' "Total Compensation Package" for Senior Radiologists multiplied by one (1).

(E) <u>Age 69</u>. If Employee's age as of the date of death, disability or giving written notice of his complete retirement from the practice of medicine shall be sixty-nine (69), then his Deferred Compensation shall be equal to the annual average of the three (3) previous years' "Total Compensation Package" for Senior Radiologists multiplied by one-half (1/2).

(F) <u>Age 70</u>. If Employee's age as of the date of death, disability or giving written notice of his complete retirement from the practice of medicine shall be seventy (70), then his Deferred Compensation shall be equal to the annual average of the three (3) previous years' "Total Compensation Package" for Senior Radiologists multiplied by one-quarter (1/4).

(G) <u>Age 71 or Older</u>. If Employee's age as of the date of death, disability or giving written notice of his complete

DCT          000181

retirement from the practice of medicine shall be seventy-one (71) or older, then no Deferred Compensation shall payable.

(d)  Deferred Compensation hereunder shall be payable in equal monthly installments, without interest, for forty-eight (48) months following the Employee's death, disability or permanent retirement from the practice of medicine.  Such monthly installments shall commence not later than the first day of the first calendar month following the calendar month in which the Employee's employment so terminates.

(e)  Any payments of Deferred Compensation determined under Subparagraph (c) above shall be limited in the following respects:

(i)  If the Employee should engage in the practice of radiation oncology (including any related disciplines thereof) within New Castle County, Delaware and/or Cecil County, Maryland, his right to any further payments of Deferred Compensation shall cease upon the date such competitive practice begins and shall not thereafter be due and payable in any event.

(ii)  Notwithstanding anything in this Agreement to the contrary, the amount of Deferred Compensation payable pursuant to Subparagraph (c) above shall not, for any one Senior Radiologist, exceed $1,200,000.  On or after January 1, 2004, such $1,200,000 limitation shall be increased for changes in the cost of living (CPI-U as published by the U.S. Department of Labor for the Philadelphia region), calculated on a "base year" ending December 31, 2003.

(iii)  The total of such Deferred Compensation payable, in the aggregate, to or on behalf of Senior Radiologists shall not in any fiscal year exceed twenty-five percent (25%) of the Employer's gross receipts for such fiscal year.  Any amounts paid or payable in excess of such limitation shall be deferred (on a pro-rata basis) until the following fiscal year (or years), but shall also accrue interest at the prime interest rate until the eventual payment of such amounts.

(iv)  If the Employee had received salary continuation due to illness or injury as set forth in the Agreement within twelve (12) months of his death, total disability, or other termination of his employment, the total amount of his Deferred Compensation shall be reduced by the total of any such salary continuation pay he had received.

(v) Any Employee desiring to permanently retire under these provisions shall give the Employer at least twelve (12) months' advance written notice of his intention to so retire. If the Employee should voluntarily terminate (except in the event of death or total disability) his employment hereunder without giving at least twelve (12) months' advance written notice of his intention to do so, he shall not be entitled to any Deferred Compensation.

(vi) The Employee's Deferred Compensation shall be reduced by the amount, if any, of expenses and benefits paid by the Employer for the benefit of the Employee which relate to a period after the date of the termination of Employee's employment. Such expenses and benefits may include, but not be limited to, dues, subscriptions, and health insurance premiums, if applicable."

2. All other terms and conditions of the aforementioned Agreement, together with any amendments thereto, shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the day and year first above written.

EMPLOYEE:

_____         _____ (SEAL)
Witness                                              DONALD C. TILTON, D.O.

EMPLOYER:
RADIATION ONCOLOIGSTS, P.A.,
a Delaware professional association


By: _____
                    President

Attest: _____
                         Secretary

[Corporate Seal]

DEPOSITION
EXHIBIT
Marton-2
Pennan 7.20.06
PENGAD 800-631-6989

# DEFERRED COMPENSATION AGREEMENT

This Agreement is made this 27th day of December, 2002, to be effective as of December 31, 2002, by and between RADIATION ONCOLOGISTS, P.A., a Delaware professional corporation (hereinafter referred to as the "Corporation") and DONALD C. TILTON, D.O., of New Castle County, Delaware (hereinafter referred to as "Employee").

WHEREAS, the Corporation has employed the Employee and the Employee has served the Corporation as a physician, an officer and director of the Corporation, and in such other capacities as the Board of Directors of the Corporation has from time to time designated; and

WHEREAS, in consideration of and to reward the Employee's past clinical, executive and administrative services rendered on behalf of the Corporation, the Corporation has agreed (under the terms of Employee's Employment Agreement dated July 7, 2000, as amended on February 8, 2001) to provide a deferred compensation benefit to the Employee upon his retirement;

NOW, THEREFORE, in consideration of the mutual promises, covenants, conditions and agreements, the parties hereto, intending to be legally bound hereby, agree as follows:

1. **DEFERRED COMPENSATION OBLIGATION:**  The Corporation agrees to pay Employee, as deferred compensation, the sum of ONE MILLION TWO HUNDRED THOUSAND DOLLARS ($1,200,000), payable without interest in ninety-six (96) bi-monthly installments of TWELVE THOUSAND FIVE HUNDRED DOLLARS ($12,500), with the first payment due as of January 15, 2003 and continuing on the last day and the 15th day of each month thereafter for four (4) years until December 31, 2006.  This obligation to pay deferred compensation shall continue in the event of Employee's death, and in such case the payments shall be made to the beneficiary designated by Employee in a writing filed by the Employee with the Corporation.

2. **LIMITATIONS ON CORPORATION'S OBLIGATIONS:**   The Corporation's obligations to pay Deferred Compensation (and the Employee's entitlement to receive Deferred Compensation) shall be limited and subject to adjustments provided in Employee's agreements as contained in his Employment Agreement dated July 7, 2000 as amended on February 8, 2001 (copies of which are attached hereto as Exhibits "A" and "B," respectively).  In particular, (a) pursuant to Paragraph 5(e)(i) of his Employment Agreement, as amended, if the Employee should engage in the practice of radiation oncology (including any related disciplines thereof) within New Castle County, Delaware and/or Cecil County, Maryland, his right to any further

WM 000002

1

payments of Deferred Compensation shall cease upon the date such competitive practice begins and shall not thereafter be due and payable in any event, and (b) pursuant to Paragraph 21 of Employee's Employment Agreement, he is subject to certain "financial damages provisions" in the event he engages in certain activities within a twenty-five (25) mile radius of any of Employer's office locations at any time within twelve (12) months following his termination of employment with Employer. All restrictions, forfeiture provisions, and financial damages provisions contained in Employee's Employment Agreement, as amended, shall continue in full force and effect. Notwithstanding these provisions, Employee shall be permitted to work on a part-time basis for Corporation after January 1, 2003, upon such terms as the parties may agree in writing, and shall be permitted to work anywhere in Sussex County, Delaware, and in such events Employee shall not be deemed to be engaging in any competitive practices. Prior to termination of deferred compensation payments by Employer to Employee and prior to invocation of the financial damages provision by Employer against Employee, Employer shall give Employee fifteen (15) days prior written notice of the prohibited conduct. In the event Employee does not permanently cease such prohibited conduct within fifteen (15) days of receiving such notice, Employer may exercise any and all of its rights under this Agreement.

3. <u>GENERAL CREDITOR</u>: The Employee shall be regarded as a general creditor of the Corporation with respect to any rights derived by the Employee from the existence of this Agreement.

4. <u>ASSETS</u>: Title to and beneficial ownership of any assets, whether cash, investments, or other assets which the Corporation may earmark to pay the contingent deferred compensation hereunder, shall at all times remain in the Corporation. The Employee and any beneficiary of the Employee shall not have any property interest whatsoever in any specific assets of the Corporation, except as stated herein.

5. <u>DEATH</u>: In the event the Employee should die before all of his deferred compensation benefits are paid to the Employee, the Corporation shall pay the unpaid balance to the Employee's designated beneficiary or beneficiaries as provided in Paragraph 1 above. The Employee shall designate his beneficiary or beneficiaries on the Beneficiary Designation Form attached to this Agreement as Exhibit "C."

6. <u>BINDING EFFECT</u>: This Agreement shall be binding upon the parties hereto and their respective heirs, personal representatives, executors, administrators, successors and assigns. Notwithstanding the foregoing sentence, the right to receive deferred compensation benefits hereunder is expressly declared

WM 000003

2

to be personal, non-assignable and non-transferable, except by a properly executed beneficiary designation accepted by the Corporation, will or intestacy, with preference given to the foregoing order.

7. <u>ENTIRE WRITING</u>: This writing contains the entire agreement of the parties with respect to the subject herein discussed and no covenant, promise, undertaking or representation concerning or relating to such subject not contained herein shall bind any party hereto unless it is in writing and executed with the same formality as this Agreement.

8. <u>WAIVER</u>: Failure to insist upon strict compliance with respect to any of the terms, covenants, or conditions hereof shall not be deemed a waiver of such term, covenant or conditions nor shall any waiver or relinquishment of such right or power hereunder at any time or times be deemed a waiver or relinquishment of such right or power at any other time or times.

9. <u>INVALIDITY</u>: The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

10. <u>APPLICABLE LAW</u>: This Agreement is a Delaware contract and shall be interpreted under the laws of the State of Delaware.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.


_____                    _____(SEAL)
Witness                                                             Donald C. Tilton, D.O.


                                                                    RADIATION ONCOLOGISTS, P.A.,
                                                                    a Delaware professional corporation


                                                                    By: _____
                                                                                          President

                                                                    Attest: _____
                                                                                          Secretary


                                                                    [corporate seal]


                                                                    WM 000004

3

## BENEFICIARY DESIGNATION FORM
## RADIATION ONCOLOGISTS, P.A.
## NONQUALIFIED DEFERRED COMPENSATION AGREEMENT

I hereby designate as Primary Beneficiary and Contingent Beneficiary under the Agreement the following:

Primary Beneficiary: _Anada Steele-Tilton_

Contingent Beneficiary: _Donald C. Tilton Trust_

Any and all previous Beneficiary Designations made by me are revoked and in the event of my death, any benefits due to be paid to me by the Employer shall be paid to the above-designated Beneficiary(ies) in accordance with the terms of the Nonqualified Deferred Compensation Agreement.

I acknowledge that this Beneficiary Designation Form will not be effective until acknowledged in writing by the Employer in the space provided below.

PARTICIPANT:

_Denise Mahoney_
Witness

_[signature]_ (SEAL)
Donald C. Tilton, D.O.

Beneficiary Designation Form herein acknowledged and approved this _31st_ day of December, 2002.

EMPLOYER:
RADIATION ONCOLOGISTS, P.A

By: _[signature]_
President

WM 000005



DEPOSITION
EXHIBIT

Martin - 3
PENGAD 800-631-6989
Plouis 7-20-06

**CHRISTIANA CARE**

RADIATION ONCOLOGISTS, PA

'JUN 1 5 2004

May 18, 2004

**ROPA Quarterly Business Meeting**

**Present:**  Viroon Donavanik MD, Michael Dzeda, MD, Peter Hulick, MD, Sunjay Shah, MD

| TOPIC | FINDINGS, CONCLUSIONS AND RECOMMENDATIONS | ACTIONS and FOLLOW-UP | PENDING/ RESOLVED |
|---|---|---|---|
| 1.  Call to Order | Peter R. Hulick, MD called the Medical Staff meeting to order on Monday, May 18, 2004 at 5:00 PM at the Helen F. Graham Cancer Center. | No action required | Resolved |
| 2.  Review of Agenda and   Approval of Minutes | The ROPA Quarterly Business Meeting minutes of April 26, 2004 were previously approved and filed.  Current agenda was reviewed. | No action required | Resolved |
| 3.  Accounting Services | Discussion was held on whether to enlist the services of Tabeling & Company, LLC for the distribution of paychecks, rather than the Paychecks system.  It was noted that the current Paychecks has made errors, and has not been providing quality service on a consistent basis.  It was decided that further investigation is required to decide which accounting service will provide this function. | Topic to be added to next agenda, pending further investigation. | Pending |
| 4.  ROPA Business Manager | The need for a business manager for the practice of ROPA was discussed.  It was the consensus opinion that there was not a great enough need for a business manager since there are only seven (7) physicians and no additional employees.  The amount of work generated by the seven physicians does not necessitate the services of a business manager. | The position of business manager has been eliminated. | Resolved |
| 5.1  Contract Update | The contract term for Lawrence Berk, MD was updated to fifteen (15) months in order to provide a better window for ROPA to hire a replacement, should this so occur.  It was determined that the actual length of the contract should be sixteen (16) months rather than fifteen (15) months since Dr. Berk will be starting September 1st, and a | No action necessary | Resolved |

WM 000006

*Radiation Oncologists, P.A.*
*ROPA Quarterly Business Meeting*
*May 18, 2004*

| TOPIC | FINDINGS, CONCLUSIONS AND RECOMMENDATIONS | ACTIONS and FOLLOW-UP | PENDING/ RESOLVED |
|---|---|---|---|
| 5.2 **Dr. Lawrence Berk's Licensure and Credentialing Update** | sixteen-month contract would terminate on December 31st.  It was noted that the length of contract was primarily for notification of ROPA to allow for employment of another physician, and actual terms as far as salary increases and other advancements were based on a twelve (12) month period.<br><br>Dr. Berk was sent a good deal of information from Perioperative Services.  This information was given to Dr. Koprowski, and was forwarded to Dr. Berk's residence.  The status of his medical licenses for Maryland and Delaware as well as hospital privileges will be confirmed with Jeri Glynn.  She will also assist in the completion of the participating insurance contract applications and will monitor their status. | Jeri Glynn will assist Dr. Lawrence Berk with the documentation required for licensure and credentialing. | Pending |
| 6. **Malpractice Insurance Update** | Neither Dr. Hulick nor Dr. Shah has received any updates for the malpractice applications, which have been sent.  An insurance agent will be contacting them.  Dr. Hulick learned that Dr. Tilton had applied to MedPro and had received a quote for part-time work of $21,000 for a yearly period.  This would translate to an approximate cost of $30,000 per year per employee for full-time employment. | Work in progress | Pending |
| 7. **Current Status of Contract with A.I.duPont Hospital for Children** | We are currently waiting for the fee schedule from A.I. duPont for the amount of time that Dr. Sunjay Shah is spending to support their cancer program.  Dr. Shah has recently sent an E-mail detailing his duties and time. | Work in progress | Pending |
| 8. **Electronic Billing** | Apparently, the Weekly Management Code # 77327 was not being sent and will be coordinated with the hospital. | Informational Only | Resolved |
| 9. **ROPA Partnership Issue** | Dr. Michael Sorensen will be eligible for partnership on July 1, 2004. Documentation by his peers and Chairman is required.  There have been ongoing discussions, primarily related to interactions with and impressions of | Consideration of this topic is ongoing<br><br>WM 000007 | Pending |

| TOPIC | FINDINGS, CONCLUSIONS AND RECOMMENDATIONS | ACTIONS and FOLLOW-UP | PENDING/ RESOLVED |
|---|---|---|---|
| | referring physicians. There was consideration for a probation period after July 1st, but it was felt that this would be hard to justify and difficult to document. This is a standing item for discussion and will be resolved within the next several weeks. | | |
| **10. Performance Evaluation** | Dr. Christopher Koprowski and Dr. Adam Raben will need performance evaluations by the remaining members of ROPA, Drs. Shah, Donavanik, and Dzeda. Dr. Koprowski's two-year evaluation was due February 2004. Dr. Raben's will be due June 2004. | Informational | Pending |
| **11. ROPA 2004 Financial Outlook** | Dr. Peter Hulick gave a brief forecast for the financial outlook of ROPA for 2004. There have been changes to the Periop billing process. The back dated claims should be filed within the next several months, and with the change to weekly billing, expectations are for said increase in revenues for 2004. It is felt that the claims should be up-to-date by August 2004. Any bonus available in ROPA accounts will need to be redistributed among current partners (i.e., Drs. Hulick, Donavanik, Dzeda, and Shah) prior to Dr. Sorensen's anticipated entrance into partnership in July, 2004. We are still awaiting malpractice insurance quotes for rates for July 2004. | Informational only | Resolved |
| **12. ROPA Presidential Election** | Dr. Peter Hulick's approximate retirement date is December 15, 2004. There will need to be a transition of duties and responsibilities from current President, Dr. Hulick, to the President Elect. A vote was taken, and Dr. Michael Dzeda was nominated and elected to succeed Dr. Hulick. Transition responsibilities will begin almost immediately. One of the President Elect's upcoming responsibilities will be to meet with Dr. Harold Rosen, Christiana Hospital. Currently, ROPA is in year two of a three-year contract with the Christiana Hospital. Typically, contract | Motion made, duly seconded, and voted to elect Dr. Michael Dzeda as incoming President of Radiation Oncology, PA. | Resolved |

WM 000008

| TOPIC | FINDINGS, CONCLUSIONS AND RECOMMENDATIONS | ACTIONS and FOLLOW-UP | PENDING/ RESOLVED |
|---|---|---|---|
| | negotiations are performed one year prior to end of term. | | |
| **13. Revenue Cycle Audit Results** | The majority of the audit focused on the processes at Christiana Hospital. Revenue Cycle did not specifically spend time at Perioperative offices for auditing purposes. Dr. Hulick was to have further discussion with Ron from Revenue Cycle to determine the efficiency of Perioperative Services as well as any criticisms or suggestions for improvement. The evaluation has been distributed to the current ROPA partners. The report has not been distributed to the non-partners since there were several pages of financial projections. These pages will be removed prior to distribution to the non-partners. | Informational only | Resolved |
| **14.1 Formula for Partner Salary Calculation** | The formula for calculating partner salary was discussed. There are several factors that were discussed individually. Under the current format, there is a 1% increase in base salary for each year of employment beyond ten years. For example: if a physician has worked 22 years with ROPA, he would have a 12% increase in base salary. He would have a 13% increase in base salary in year 23. | There were no immediate changes to this portion of the contract. | Pending |
| **14.2 Formula for Deferred Compensation** | It was noted that there was a cost of living escalation to the contact relative to living in Philadelphia. | Informational only | Resolved |
| **14.3 Formula for Officers** | It was affirmed that there was a 10% increase in base salary for serving as President of ROPA or Chairman of the Department. | There was no change in this policy. | Resolved |
| **14.4 Formula for "On Call" Service** | One adjustment to the salary is the ability of the partners with greater than 10 years of service and over the age of 55 to not take their turn in "on call" coverage by forfeiting 10% of their base salary. Dr. Hulick did voice his recommendation that he did not feel that all of the "on call" physicians were diligently performing their duties, including seeing consultations, and in | 10% "on call" forfeiture of base salary for 10 years of service/+55 | Resolved |

WM 000009

| TOPIC | FINDINGS, CONCLUSIONS AND RECOMMENDATIONS | ACTIONS and FOLLOW-UP | PENDING/ RESOLVED |
|---|---|---|---|
| **14.5  Disability** | fact, many of these responsibilities were being deferred to the workweek.  If the "on call" coverage was not being adequately covered, he felt that a 10% premium from base salary was higher than its real value.<br><br>Dr. Sunjay Shah introduced the topic of disability, and how the current contract calls for doubling of the disability benefit when partners delivered greater than 10 years of service and were greater than age 55.  He felt that this was an unfair advantage to the older partners, and in fact, the need of disability was probably greater for a younger employee | This topic will be further discussed for final resolution. | Resolved |
| **15.  ADJOURNMENT** | There being no further business, the meeting was adjourned. | Next Meeting:  TBD | Resolved |

Respectfully submitted,

proval of Minutes          _Michael Dzeda (signature)_          Date:  6/11/v4

Michael F. Dzeda, President Elect and Secretary
Radiation Oncologists, PA

WM 000010